IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-714

Filed: 4 February 2020

Davidson County, Nos. 16 CRS 21–24

STATE OF NORTH CAROLINA

v.

MOLLY MARTENS CORBETT and THOMAS MICHAEL MARTENS

Appeal by defendants from judgments entered 9 August 2017 and order entered 4 December 2017 by Judge W. David Lee in Davidson County Superior Court. Heard in the Court of Appeals 31 January 2019.

*Attorney General Joshua H. Stein, by Special Deputy Attorneys General Jonathan P. Babb and L. Michael Dodd, for the State.*

*Tharrington Smith, LLP, by Douglas E. Kingsbery and Melissa H. Hill, for defendant-appellant Molly Martens Corbett.*

*Crumpler Freedman Parker & Witt, by David B. Freedman, Jones P. Byrd, Jr., and Dudley A. Witt, for defendant-appellant Thomas Michael Martens.*

ZACHARY, Judge.

Defendants Molly Martens Corbett ("Molly") and Thomas Michael Martens ("Tom"), daughter and father, appeal from judgments entered upon a jury's verdicts finding them guilty of second-degree murder in the death of Jason Corbett ("Jason"), Molly's husband. Defendants also appeal the trial court's order denying their Motion for Appropriate Relief alleging juror misconduct. After careful review, we affirm the order denying Defendants' Motion for Appropriate Relief. However, due to a number

of prejudicial errors apparent within the record, we reverse the judgments entered upon Defendants' convictions for second-degree murder and remand for a new trial.

Although Defendants raise 13 issues on appeal—many of which are interconnected and complex—this case is deceptively simple, boiling down to whether Defendants lawfully used deadly force to defend themselves and each other during the tragic altercation with Jason. Having thoroughly reviewed the record and transcript, it is evident that this is the rare case in which certain evidentiary errors, alone and in the aggregate, were so prejudicial as to inhibit Defendants' ability to present a full and meaningful defense. Moreover, the trial court erred in instructing the jury on the aggressor doctrine as to Tom, given the absence of evidence to support such an instruction.

Because these errors are dispositive and warrant a new trial, we need not address the additional issues raised by Defendants.

## I.    Background

Jason originally lived in Ireland with his first wife, Margaret, and their two children, Jack and Sarah. After Margaret died unexpectedly in 2004, Jason hired Molly to work as an *au pair*. Jason and Molly later began a romantic relationship, and in 2011, they moved with the children to Davidson County, North Carolina. Jason and Molly married later that year.

A.    The Altercation

On 1 August 2015, Molly's parents, Tom and Sharon Martens, traveled from their home in Knoxville, Tennessee, to visit the Corbetts in Davidson County. Tom, an attorney and retired FBI agent, packed an aluminum Little League baseball bat and a tennis racket as gifts for Jack. When Tom and Sharon arrived at the Corbetts' home at around 8:30 p.m., Jason was in the driveway, drinking a beer with a neighbor, and he walked over to greet Tom and Sharon. That evening, Tom, Sharon, Jason, Molly, and Sarah had dinner together while Jack attended a party. Jack came home at around 11:00 p.m. Because of the late hour, Tom decided not to give Jack the bat and tennis racket that night.

Tom and Sharon slept in the guest room, which was located just below the bathroom that adjoined Jason and Molly's bedroom. Late in the night, Tom was awakened by noises, including "a scream and loud voices," above their bedroom. Wearing only a golf shirt and boxer shorts, Tom jumped out of bed, grabbed the Little League bat that remained with his luggage by the bed, and rushed upstairs.

Once he arrived upstairs, Tom determined that the noises were coming from Jason and Molly's bedroom. When Tom opened the bedroom door, Molly and Jason were facing each other, and Jason had his hands around Molly's neck. As Tom entered and closed the door behind him, Jason quickly removed his hands from Molly's neck, and shifted her into a tight chokehold with her neck in the crook of his right arm, and her body positioned between himself and Tom.

Tom repeatedly told Jason, "Let her go"; Jason repeatedly responded, "I'm going to kill her." Jason began to move down the hall toward the bathroom, dragging Molly with him. Tom feared that if Jason took Molly into the bathroom and closed the door, Tom would be unable save her, and "that would be the end of that." To impede Jason's progress down the hall, Tom swung the baseball bat at "the back of the two of them glued together"—hitting Jason in the back of the head, while carefully avoiding Molly. Jason did not "go down" or even waver, and it seemed to Tom that the blow only "further enraged" Jason. Nevertheless, Tom continued to hit Jason "as many times as [he] could to distract him because he now had Molly in a very tight chokehold," and "she was no longer wiggling."

Despite Tom's efforts, Jason successfully pulled Molly into the bathroom. Tom was close behind them, however, and Jason was unable to close the door. Tom had more room to maneuver inside of the bathroom than in the hallway, and he was able to hit Jason in the head with the bat again. Yet these efforts "didn't seem to have any effect."

Jason forced his way out of the bathroom, into the hallway, and back into the bedroom, pushing Molly and Tom along as he went. The affray resumed in the bedroom. Tom swung the bat at Jason, who caught the bat in his left hand, enabling Molly to break free from Jason's chokehold. While Tom and Jason were struggling for possession of the bat, Jason "punche[d]" his hand out and shoved Tom across the

4

width of the bed, and Tom fell face first onto the floor. As he lay facedown on the floor, Tom heard Molly scream, "Don't hurt my dad."

When Tom got up, he saw Jason holding the bat, standing in "a good athletic position . . . looking between [Tom] and Molly." Seeing that Molly was "trapped" between the wall and the bed, Tom "rush[ed]" Jason to "try to get ahold of the bat." Tom and Jason renewed their struggle for control of the bat, and at some point, Molly picked up a brick paver that was sitting on her nightstand and used it to strike Jason.

Tom managed to regain control of the bat. By this point, he was "shaking" and physically weak from the altercation. However, because Tom remained afraid that Jason might regain control of the bat and again attempt to kill him or Molly, Tom continued hitting Jason until he was down, and Tom felt certain that Jason "could not kill" them.

Shortly thereafter, Tom called 911 and told the operator, "My, my, uh, daughter's husband, uh, my son-in-law, uh, got in a fight with my daughter, I intervened, and I, I think, um, and, he's in bad shape. We need help. . . . He, he's bleeding all over, and I, I may have killed him." With the 911 operator's guidance, Molly and Tom took turns administering CPR to Jason until the emergency medical crew arrived.

B.    The Investigation

Davidson County EMS paramedics arrived at the scene within ten minutes of receiving the 911 call. One paramedic quickly determined that Jason had suffered "severe heavy trauma to the back of the head." While attempting to lift Jason's chin in order to prepare him for intubation, all of the paramedic's left "fingers went inside the skull."

Inside of the house, first responders observed a significant amount of blood on the floor and walls of the bedroom, dry blood on portions of Jason's body, and a brick paver on the bedroom floor. Deputies from the Davidson County Sheriff's Office retrieved the children from their bedrooms, where they found Sarah and Jack asleep and undisturbed.

Meanwhile, Deputy David Dillard escorted Molly to his patrol car, where she remained for approximately one hour. In his written report of the incident, Deputy Dillard noted that Molly was "very obviously in shock." He recalled that Molly "was making crying noises but [he] didn't see any visible tears. She was also rubbing her neck. . . . It wasn't a constant. She would do it and stop and do it and then stop while continuing to make the crying noises."

Molly was "in the fetal position" on the ground beside Deputy Dillard's car when two paramedics approached to examine her. Both paramedics observed redness on Molly's throat, and when one of them asked Molly whether her neck hurt, she said yes, and stated that she had been choked. Aside from Molly's symptoms of shock and

the redness and soreness to her throat, none of the first responders observed any apparent injuries to either Molly or Tom.

Lieutenant Frank Young, III, arrived on the scene later, and took photographs of Jason's body. One of the photographs depicted Jason's right hand with a long blonde hair in his palm.

Later that day, Molly submitted the following written statement to the Davidson County Sheriff's Office:

> My husband, Jason Corbett, was upset that he awoke and an argument ensued with him telling me to "shut up," (etc.) and he applied pressure to my throat/neck and started choking me. At some point, I screamed as loud as possible. He covered my mouth and then started choking me again with his arm. My father, Tom Martens, came in the room and I cannot remember if he said something or just hit Jason to get him off me. Jason grabbed the bat from him and I tried to hit him with a brick (garden decor) I had on my nightstand. I do not remember clearly after that.

On 3 August 2015, a medical examiner at the North Carolina Office of the Chief Medical Examiner performed an autopsy and determined Jason's cause of death to be blunt force head trauma, including "extensive skull fractures" and "two large, branched, full-thickness lacerations of bilateral parietal scalp," arising from multiple blows to the head. The medical examiner found that one laceration on Jason's head "ha[d] an appearance of a postmortem injury." He also noted that Jason had a blood alcohol level of 0.02% and tested positive for low levels of an antidepressant medication known to have sedative effects.

7

That day, Sarah and Jack were staying with Molly's brother in Union County when they were visited by a social worker from the Union County Department of Social Services ("DSS"). Pursuant to a request from the Davidson County Sheriff's Office, the social worker conducted separate interviews of the children, inquiring about issues including domestic violence and familial relationships. During his interview, Jack reported that "his dad gets mad at his mom [Molly] for no good reason." He also shared that once, he was accidentally pushed down the stairs while attempting to intervene in a fight between Jason and Molly. Sarah similarly stated during her interview that "her dad is angry on a regular basis," and she described an incident when Jason pulled Molly's hair and "smacked her in the face."

Upon the referral of Davidson County DSS, on 6 August 2015, four days after Jason's death, Jack and Sarah received child medical evaluations at the Dragonfly House Children's Advocacy Center in Mocksville, North Carolina. Davidson County Sheriff's Detectives Mark Hanna and Nathan Riggs observed the forensic medical interview portions of the children's separate, two-part child medical evaluations. Prior to the interviews, Detectives Hanna and Riggs met with the other members of the children's multi-disciplinary team and submitted the following list of questions related to the investigation of Jason's death, which they wanted the interviewer to ask the children:

QUESTIONS FOR KIDS –

1. FIND OUT ABOUT DV IN HOME.
   IS JACK AFRAID OF DAD.  DO KIDS LIKE/HATE MOLLY.
2. FIND OUT ABOUT PAVER IN BEDROOM
3. ASK ABOUT NIGHTMARE THAT WOKE HER UP.
4. ASK ABOUT HOW THE "EMERGENCY #"
   – WHY WAS IS [sic] SETUP – WHO SETUP – WHEN – WHO WROTE#.
5. ASK WHERE G-MOM + G-DAD USUALLY SLEEP WHEN THEY STAY
6. ASK IF DAD EVER MENTIONED A TRIP TO IRELAND THIS MONTH
7. ASK ABOUT RELATIONSHIP W/ MOLLY
8. ASK ABOUT SARAH'S SLEEPING IN BED W/MOLLY [illegible] DAD.

During his interview, Jack described how Jason often got angry with Molly over "simple things" such as "bills" and "leaving lights on."  Jack stated that Jason "physically and verbally hurt" Molly, and that he had personally witnessed occasions when Jason punched, hit, and pushed her.  According to Jack, Jason's anger problems had "gotten worse over the past few months."

In addition, Jack explained that the brick paver was present in the master bedroom because Molly and the children "were going to paint it, because [they] just . . . got flowers that [they] were going to plant in [their] front yard or back yard[.]"  Jack further explained, however, that it had been raining, and they did not want the brick paver "getting all wet.  So [they] brought it inside, and [Molly] put it at her desk."

Like Jack, Sarah similarly stated during her interview that Jason would get angry for "ridiculous reasons," such as when he was inadvertently awakened from

sleep at night. Sarah explained that she sometimes had nightmares and would come to Molly for comfort, but that Jason would get "very angry" if she accidentally woke him up. Sarah described one such incident that occurred in the middle of the night that Jason died. That night, Sarah had a nightmare involving the fairies on her bedsheets, and she went to Jason and Molly's bedroom and asked Molly to change her sheets. When Molly got out of bed to go to Sarah's bedroom, Jason became angry, and the ensuing argument between Molly and Jason eventually led to the deadly affray in this matter.

## C. Defendants' Trial

On 18 December 2015, a grand jury indicted Molly and Tom for second-degree murder and voluntary manslaughter. Defendants pleaded not guilty, and a joint trial was set for 17 July 2017 in Davidson County Superior Court, the Honorable W. David Lee, judge presiding.

By the time of trial, Jack and Sarah were in the custody of Jason's family in Ireland, and thus, beyond the subpoena power of the trial court. Accordingly, prior to trial, Defendants moved to admit the children's hearsay statements from their interviews conducted (1) by the Union County DSS social worker on 3 August 2015, and (2) at the Dragonfly House on 6 August 2015, pursuant to N.C. Gen. Stat. § 8C-1, Rule 803(4), the medical diagnosis or treatment exception, or in the alternative, Rules 803(24) and 804(b)(5), the residual exceptions. Following a hearing on 8 and 9

June 2017, the trial court decided to defer its ruling on Defendants' motion until trial. Ultimately, although the trial court found that both children were unavailable to testify, it nonetheless denied Defendants' motion to admit the children's hearsay statements following Tom's testimony during Defendants' case-in-chief.

At trial, the State relied heavily upon forensic evidence, including photographs of Jason's body and the undeniably violent fight scene, as well as the testimony of first responders and law enforcement officers who were present that night. The State also presented significant medical evidence, including testimony from the medical examiner and Jason's medical records from Kernersville Primary Care, which established that two weeks before his death, during a 16 July 2015 appointment, Jason reported that he had been feeling dizzy and "more stressed and angry lately for no reason."

When the State proffered an expert witness in bloodstain pattern analysis, Defendants requested voir dire, challenging the reliability of the witness's conclusions regarding certain evidence that the State had not submitted to the North Carolina State Crime Laboratory for blood or DNA testing. Following voir dire, the trial court ruled that the testimony was sufficiently reliable under N.C. Gen. Stat. § 8C-1, Rule 702(a), and admitted the witness's testimony over Defendants' objections at trial.

At the charge conference, Defendants requested that the trial court remove all aggressor language from the proposed pattern jury instructions, arguing that there was no evidence "that anyone was the aggressor but Jason." The State had "no objection" to the trial court's "declining to instruct on the aggressor issue as to" Molly, but argued that there was "conflicting evidence" in Tom's case, which could reasonably be interpreted to support that he was the aggressor. Following detailed arguments from the parties, the trial court ruled, as a matter of law, that Molly was not an aggressor, and properly omitted all aggressor language from the proposed pattern instructions in her case. As to Tom, however, the trial court ruled in the State's favor, and accordingly, instructed the jury on the aggressor doctrine in his case.

The State also requested that the trial court instruct the jury that it could find Molly guilty under an acting-in-concert theory, if it found that she was present during the incident and acted with Tom in pursuit of a common plan or purpose. The trial court delivered the State's requested instruction, over Defendants' objections.

On 9 August 2017, the jury returned verdicts finding Defendants guilty of second-degree murder. That day, the trial court entered separate judgments sentencing Defendants to 240-300 months each in the custody of the North Carolina Division of Adult Correction. Defendants gave oral notice of appeal in open court.

On 16 August 2017, Defendants filed a joint Motion for Appropriate Relief asserting that they were entitled to an evidentiary hearing and ultimately, a new trial, due to alleged juror misconduct. On 4 December 2017, the trial court entered an order denying Defendants' Motion for Appropriate Relief, which Defendants timely appealed to this Court.

## II.    Motion for Appropriate Relief

We first address Defendants' challenge to the trial court's order denying their Motion for Appropriate Relief. Defendants contend that the trial court erred by failing to grant, or conduct an evidentiary hearing on, Defendants' requests to set aside the jury verdicts and judgments and grant them a new trial, "because competent evidence demonstrates frequent juror misconduct prejudicial to the defense and harmful to the judicial system." We disagree.

A.    Standard of Review

On appeal, we review a trial court's order denying a motion for appropriate relief "to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *State v. Frogge*, 359 N.C. 228, 240, 607 S.E.2d 627, 634 (2005) (quotation marks and citation omitted). "When a trial court's findings on a motion for appropriate relief are reviewed, these findings are binding if they are supported by competent evidence and may be disturbed only upon a showing

of manifest abuse of discretion." *State v. Wilkins*, 131 N.C. App. 220, 223, 506 S.E.2d 274, 276 (1998) (citation omitted). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Elliott*, 360 N.C. 400, 419, 628 S.E.2d 735, 748, *cert. denied*, 549 U.S. 1000, 166 L. Ed. 2d 378 (2006). "However, the trial court's conclusions are fully reviewable on appeal." *Wilkins*, 131 N.C. App. at 223, 506 S.E.2d at 276.

B.     N.C. Gen. Stat. § 15A-1414

"After the verdict but not more than 10 days after entry of judgment," a criminal defendant may "by motion . . . seek appropriate relief for any error committed during or prior to the trial." N.C. Gen. Stat. § 15A-1414(a) (2019). *See generally id.* §§ 15A-1414, -1415 (setting forth the errors that may be asserted, as well as the time limitations upon, a criminal defendant's motion for appropriate relief made in the trial division). However, once the 10-day, post-judgment period expires, the only errors from which a defendant may seek appropriate relief in the trial court are those specifically enumerated in N.C. Gen. Stat. § 15A-1415. *Id.* § 15A-1414(b); *see also id.* § 15A-1415.

Whether the trial court must conduct an evidentiary hearing before ruling on a motion for appropriate relief depends upon a number of factors, including when the motion was filed; the complexity of the issues presented, as well as the trial court's

familiarity with the underlying record; and whether the allegations involve questions of law or fact. *See id.* § 15A-1420(c)(1)-(4). No evidentiary hearing is required "when the motion is made in the trial court pursuant to [N.C. Gen. Stat. §] 15A-1414, but the court may hold an evidentiary hearing if it is appropriate to resolve questions of fact." *Id.* § 15A-1420(c)(2).

Accordingly, where the defendant moves the trial court for appropriate relief within 10 days following entry of judgment, the decision of whether to hold "an evidentiary hearing is . . . within the sound discretion of the trial court." *Elliott*, 360 N.C. at 419, 628 S.E.2d at 748. "[I]f the trial court can determine from the motion and any supporting or opposing information presented that the motion is without merit, it may deny the motion without any hearing either on questions of fact or questions of law, including constitutional questions." *Id.* (original emphasis and citations omitted). We review the trial court's decision to deny "an evidentiary hearing for abuse of discretion." *Id.* (citation omitted).

C.    Defendants' Motion for Appropriate Relief

In the instant case, after the jury returned verdicts on 9 August 2017 finding Defendants guilty of second-degree murder, the trial court proceeded to enter separate judgments and sentences upon Defendants' convictions. Defendants entered oral notice of appeal in open court.

Seven days later, on 16 August 2017, Defendants filed a Motion for Appropriate Relief alleging juror misconduct and violations of their constitutional rights, and requesting that the trial court "set an evidentiary hearing, set aside the jury's verdict[s] and grant [Defendants] a new trial." In support of their motion, Defendants submitted affidavits and exhibits, including (1) printouts from Facebook on 10 August 2017 showing various individuals discussing the details of Defendants' trial, and a few former jurors sharing their personal experiences and opinions about the case; and (2) an 11 August 2017 report featuring coverage of Defendants' case and trial in that evening's upcoming episode of ABC News "20/20."

In the State's Response to Defendants' Motion for Appropriate Relief, filed 21 August 2017, the State asserted that Defendants' allegations of juror misconduct were "speculative" and could not be proved by admissible evidence; accordingly, the State requested that the trial court deny Defendants' motion without conducting an evidentiary hearing. On 25 August 2017, Defendants filed a Supplemental Motion for Appropriate Relief and Reply to State's Response, and submitted additional supporting affidavits and exhibits including, *inter alia*, affidavits from two individuals who attested to having witnessed pre-deliberation conversations between jurors. The State filed a response to Defendants' Supplemental Motion for Appropriate Relief on 8 September 2017.

Without conducting an evidentiary hearing, on 4 December 2017, the trial court entered an order denying Defendants' Motion for Appropriate Relief, determining that

> there is neither evidence nor forecast with reasonable certainty of evidence that rises above the level of mere speculation or conjecture of either (1) any extraneous prejudicial information brought to a juror's attention or (2) any outside influence that has violated either defendants' [sic] constitutional right of confrontation brought to bear on any juror.

In their filings before the trial court, Defendants advanced numerous arguments in support of their contention that "frequent juror misconduct prejudicial to the defense and harmful to the judicial system" occurred in this case. However, we need only address the three arguments raised in Defendants' briefs with respect to this issue.

On appeal, Defendants contend that the trial court abused its discretion by denying their Motion for Appropriate Relief, as well as their request for an evidentiary hearing, because (1) competent evidence demonstrated that certain jurors "committed gross and pervasive misconduct in their private discussions of the case"; (2) jurors engaged in "private discussions" amongst themselves prior to deliberations, thereby violating Defendants' constitutional right to trial by a jury of twelve qualified jurors; and (3) several jurors' statements during post-trial media interviews evinced

that they improperly considered and formed opinions about Molly's mental health, although that issue was not in evidence.

After careful review, we agree with the State that the trial court did not abuse its discretion by denying Defendants' Motion for Appropriate Relief without conducting an evidentiary hearing. Defendants' allegations of juror misconduct are, at best, general, speculative, and conclusory. Furthermore, we conclude that even if the trial court were to hold an evidentiary hearing on Defendants' § 15A-1414 motion—which it is not required to do, *see* N.C. Gen. Stat. § 15A-1420(c)(2)—precedent prohibiting verdict impeachment would bar Defendants from presenting any admissible evidence to prove the truth of their allegations.

The proscription against impeachment of a jury verdict "is well settled in North Carolina." *State v. Cherry*, 298 N.C. 86, 100, 257 S.E.2d 551, 560 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980). "[A]fter a verdict has been rendered and received by the court, and jurors have been discharged, jurors will not be allowed to attack or overthrow their verdict, nor will evidence from them be received for such purpose." *Id.*

The purpose of the "no-impeachment rule" is "to promote freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment." *Cummings v. Ortega*, 365 N.C. 262, 267, 716 S.E.2d 235, 239 (2011), *cert. denied*, 566 U.S. 993, 182 L. Ed. 2d 1029 (2012). This rule has

18

been codified under N.C. Gen. Stat. § 8C-1, Rule 606(b), and N.C. Gen. Stat. § 15A-1240(a). As our Supreme Court has observed, "Rule 606(b) reflects the common law rule that affidavits of jurors are inadmissible for the purposes of impeaching the verdict except as they pertain to *extraneous influences* that may have affected the jury's decision." *Cummings*, 365 N.C. at 267, 716 S.E.2d at 239 (internal quotation marks omitted). *See also State v. Lyles*, 94 N.C. App. 240, 246, 380 S.E.2d 390, 394 (1989) ("[T]he exceptions to the anti-impeachment rule listed in Section 15A-1240 are designed to protect the same interests as, and are entirely consistent with, the exceptions in Rule 606(b).").

Whether evidence may be utilized to impeach a verdict depends upon whether jurors were subjected to "external" or "internal" influences. External influences, "which generally are admissible to prove the invalidity of a verdict," may "include information dealing with the defendant or the case which is being tried, which reaches a juror without being introduced in evidence." *Cummings*, 365 N.C. at 269, 716 S.E.2d at 240 (internal quotation marks, ellipsis, and citation omitted). By contrast, "internal influences" include "information coming from the jurors themselves—the effect of anything upon a juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith." *Id.* "Internal influences may include: a juror not assenting to the verdict, a juror misunderstanding the instructions of the court, a

juror being unduly influenced by the statements of his fellow-jurors, or a juror being mistaken in his calculations or judgments." *Id.* (internal quotation marks and citations omitted).

In the case at bar, it is evident that any notions developed by the jurors regarding Molly's mental health relate to "internal influences" of the jury. Therefore, Rule 606(b) precludes Defendants from presenting juror testimony—or affidavits regarding the internal influences of the jury—as a means to impeach the verdicts. *See Elliott*, 360 N.C. at 420, 628 S.E.2d at 748 (concluding that the trial court did not abuse its discretion in denying a hearing where the "defendant would have been unable to present any evidence which would have strengthened the claims made in the motion for appropriate relief").

Nor do Defendants offer any facts to support that their allegations regarding the jurors' statements concerning Molly's mental health are based upon anything beyond mere speculation or opinion. The interviews appearing on ABC News "20/20," in which three jurors made statements that Defendants allege pertained to Molly's mental health, were conducted after the verdicts had been rendered. Notably, Defendants fail to identify, or even suggest, any source from which the jurors might have improperly gleaned this information prior to rendering a decision at trial. *Cf. State v. Rollins*, 224 N.C. App. 194, 201-02, 734 S.E.2d 634, 636-37 (2012) (holding that the trial court did not abuse its discretion by failing to hold an evidentiary

hearing on the defendant's motion that "failed to specify: which news broadcast the juror in question had seen besides a possible broadcast summary from the News 14 Carolina website; the degree of attention the juror . . . had paid to the broadcast; the extent to which the juror . . . received or remembered the broadcast; whether the juror . . . had shared the contents of the news broadcast with other jurors; and the prejudicial effect, if any, of the alleged juror misconduct" (footnote omitted)), *aff'd per curiam*, 367 N.C. 114, 748 S.E.2d 146 (2013).

The no-impeachment rule similarly defeats Defendants' arguments regarding any "private discussions" that allegedly took place between jurors. Again, "Rule 606(b) of the North Carolina Rules of Evidence bars jurors from testifying during consideration of post-verdict motions seeking relief from an order or judgment about alleged predeliberation misconduct by their colleagues." *Cummings*, 365 N.C. at 270, 716 S.E.2d at 240-41. The *Cummings* Court concluded that affidavits tending to show that a juror made statements regarding his opinion about the case were inadmissible under Rule 606(b) because such statements were internal influences: "Even if [a juror] had made up his mind before [the] plaintiff introduced any evidence, this state of mind is precisely the type of information that Rule 606(b) excludes. Consequently, the affidavits of [two of the jurors] were inadmissible pursuant to Rule 606(b)." *Id.* at 271, 716 S.E.2d at 241.

Here, the no-impeachment rule bars the admission of Defendants' proffered affidavits. Moreover, any evidence regarding pre-deliberation conversations would also be inadmissible under Rule 606(b). *See* N.C. Gen. Stat. § 8C-1, Rule 606(b) ("Nor may [a juror's] affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.").

Moreover, the affidavit from the non-juror who attested to having witnessed two jurors conversing in a car prior to the jury's deliberations contains nothing more than speculative allegations. *See Elliott*, 360 N.C. at 420, 628 S.E.2d at 748 (holding that the trial court did not abuse its discretion in denying a request for an evidentiary hearing where the "defendant failed to make an adequate threshold showing of juror misconduct"). Indeed, as Defendants acknowledge in their brief, "the content of this conversation is unknown." By Defendants' own admission, the only parties who could offer evidence regarding the subject and scope of this conversation are the two jurors who took part. But as previously explained, their statements would not be admissible for that purpose. *See* N.C. Gen. Stat. § 8C-1, Rule 606(b); N.C. Gen. Stat. § 15A-1240(a); *cf. Rollins*, 224 N.C. App. at 201, 734 S.E.2d at 636 ("Based on the record, [the] defendant's evidence was insufficient to show the existence of the asserted ground for relief. There is insufficient evidence to determine whether juror misconduct occurred as [the] defendant's motion and [a fellow juror's] affidavit merely

contained general allegations and speculation." (citations and internal quotation marks omitted)).

For the same reasons, Defendants' argument that the alleged private discussion between jurors violated their constitutional right to trial by 12 qualified jurors must also fail. *See Elliott*, 360 N.C. at 418, 628 S.E.2d at 747 ("[T]he documentary evidence [the] defendant submitted to support his motion for appropriate relief was insufficient to show, by any standard, that juror misconduct occurred in the form of private deliberations outside the presence of the other jurors. While [the] defendant's brief characterizes the prayer between the two jurors as 'deliberations' and 'discussions about the case outside the presence of their ten fellow jurors,' there is nothing in the record that indicates a discussion or deliberation of any kind occurred.").

Even assuming, *arguendo*, that the affidavits were admissible to prove misconduct, Defendants nevertheless fail to indicate the effect—prejudicial or otherwise—of the alleged misconduct upon the jury's verdicts. *See* N.C. Gen. Stat. § 15A-1420(c)(6) ("Relief must be denied unless prejudice appears, in accordance with [N.C. Gen. Stat. §] 15A-1443."); *see also Cummings*, 365 N.C. at 271-73, 716 S.E.2d at 241-42 (reversing this Court's decision upholding the trial court's grant of a new trial due to jury misconduct, despite allegations from multiple jurors that pre-deliberation statements by one juror "inhibited jurors from engaging in full

deliberations" and "interfered with [another juror's] thought process"); *Elliott*, 360 N.C. at 419, 628 S.E.2d at 748 (affirming the trial court's denial of the defendant's "inadequately supported motion for appropriate relief" because the defendant "failed to shed light on any prejudice to [the] defendant which arose from [the alleged juror] discussions").

Absent the required showing of prejudice, we conclude that the trial court did not err in denying Defendants' Motion for Appropriate Relief without conducting an evidentiary hearing.

### III. Motion to Dismiss

Defendants next argue that the trial court erred by denying their motions to dismiss for insufficient evidence the charges of second-degree murder and voluntary manslaughter. Defendants contend that this case is analogous to *State v. Carter*, 254 N.C. 475, 119 S.E.2d 461 (1961), in which our Supreme Court held, *inter alia*, that "[w]hen the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements." 254 N.C. at 479, 119 S.E.2d at 464. Accordingly, Defendants assert that the State failed to present substantial evidence to rebut or contradict Molly's exculpatory handwritten statement establishing that Molly and Tom acted in lawful self-defense and defense of others, which was introduced by the State and by which the State was bound. We disagree.

"In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Chekanow*, 370 N.C. 488, 492, 809 S.E.2d 546, 549 (2018) (citation omitted). "Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *Id.* The trial court "must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *Id.* at 492, 809 S.E.2d at 549-50 (citation omitted). "Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *State v. Crockett*, 368 N.C. 717, 720, 782 S.E.2d 878, 881 (2016).

"Second-degree murder is defined as (1) the unlawful killing, (2) of another human being, (3) with malice, but (4) without premeditation and deliberation." *State v. Arrington*, 371 N.C. 518, 523, 819 S.E.2d 329, 332 (2018) (quotation marks and citation omitted). By contrast, voluntary manslaughter is defined as "the unlawful killing of a human being without malice, express or implied, and without premeditation and deliberation." *State v. Rinck*, 303 N.C. 551, 565, 280 S.E.2d 912, 923 (1981). Malice sufficient to support a conviction of second-degree murder is either actual, express malice, or acting in a manner "which is inherently dangerous to

human life . . . [in that it is] so reckless[ ] and wanton[ ] as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief." *State v. Reynolds*, 307 N.C. 184, 191, 297 S.E.2d 532, 536 (1982). "[T]he burden of showing an unlawful killing . . . rest[s] with the State." *Carter*, 254 N.C. at 479, 119 S.E.2d at 464 (citation omitted).

When a defendant raises a self-defense claim on a motion to dismiss, the State must "present sufficient substantial evidence which, when taken in the light most favorable to the State, is sufficient to convince a rational trier of fact that [the] defendant did not act in self-defense." *State v. Kirby*, 206 N.C. App. 446, 453, 697 S.E.2d 496, 501 (2010) (citation and quotation marks omitted). The four elements of self-defense are:

> (1) it appeared to [the] defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
>
> (2) [the] defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
>
> (3) [the] defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and
>
> (4) [the] defendant did not use excessive force, i.e.[,] did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Presson*, 229 N.C. App. 325, 328, 747 S.E.2d 651, 654-55 (citations omitted), *disc. review denied*, 367 N.C. 274, 752 S.E.2d 150 (2013).

Defendants rely heavily on *State v. Carter* to support their contention that the trial court erred by denying their motion to dismiss the second-degree murder charges. The salient facts in *Carter* came entirely from a county sheriff's testimony. At 9:00 p.m. on 7 July 1960, the defendant came to the home of the sheriff and said, "I think I have killed my daddy." *Carter*, 254 N.C. at 476, 119 S.E.2d at 462. Earlier that night, when the defendant's father came home from work, he noticed that a screen door was damaged. He became angry and "jumped on [the defendant's] 9 and 1/2-year-old brother . . . about it." *Id.* The defendant's mother and father began to argue, which led to the defendant's father beating her mother with a wine bottle. *Id.* at 477, 119 S.E.2d at 462. When the defendant tried to intervene, the defendant's father "grabbed [the defendant's] arm and started twisting it." *Id.* After the defendant's father released her, he began beating her mother again. *Id.* at 477, 119 S.E.2d at 463. The defendant retrieved a bumper jack and hit her father on the head with it numerous times until he went down, at which time the defendant left her father on the ground and took her mother to the hospital. *Id.* The defendant's father died two days later. *Id.* at 478, 119 S.E.2d at 463.

In *Carter*, "the State introduced statements of the accused to the effect that the defendant was trying to stop the deceased from assaulting her mother with a broken

bottle." *Id.* at 479, 119 S.E.2d at 464. The State limited its evidence in this regard to the accused's statements, and there was "no evidence from which a jury could reasonably find that either the defendant or her mother was at fault in starting the altercation described in the record." *Id.* Our Supreme Court explained that "[w]hile the State by offering this evidence was not precluded from showing that the facts were different, no such evidence was offered, and the State's case was made to rest entirely on the statements of the defendant, which the State presented as worthy of belief." *Id.* Thus, the Court concluded that "[t]his evidence plainly negatives the existence of an unlawful killing," and reversed the trial court's denial of the defendant's motion for judgment of nonsuit. *Id.* at 479-80, 119 S.E.2d at 464.

We conclude that *Carter* is not analogous to the case before us. This Court has repeatedly distinguished self-defense cases from *Carter* where there is circumstantial or physical evidence contradicting exculpatory evidence. *See, e.g.*, *State v. Stafford*, 66 N.C. App. 440, 443, 311 S.E.2d 64, 66 ("While there was evidence tending to show that [the] defendant acted in self-defense, there was also substantial circumstantial evidence tending to show an intentional shooting done without legal excuse. The credibility and sufficiency of [the] defendant's evidence to establish his plea of self-defense were for the jury to evaluate in the light of the court's instructions." (citation and internal quotation marks omitted)), *disc. review denied*, 311 N.C. 406, 319 S.E.2d 279 (1984); *State v. Lane*, 3 N.C. App. 353, 355, 164 S.E.2d 618, 619 (1968) ("The

evidence did not completely exculpate the defendant because accidental death was not conclusively shown. There was some intimation of ill will or a quarrel between the defendant and the deceased, and the defendant was holding the knife in such a manner as to indicate an intentional use thereof.").

Likewise, the instant case was not entirely predicated on Molly's statement that she and Tom acted in self-defense and defense of each other. Here, the State presented substantial circumstantial evidence from which a rational juror could reach a contrary conclusion, including that: (1) Jason suffered at least twelve blows to the head; (2) Tom had no visible injuries and Molly had only a "light redness" on her neck; (3) Jason was unarmed when the altercation occurred; (4) the children remained asleep throughout the entire altercation; (5) EMS, paramedics, and law enforcement responders observed that some of the blood on Jason's body had dried, and that Jason's body felt cool; (6) Tom told a coworker that he hated Jason; and (7) Jason had a life insurance policy, of which Molly was the named beneficiary.

Viewed in the light most favorable to the State, there was sufficient evidence from which a rational juror could conclude that Defendants did not act in self-defense, or defense of each other. Accordingly, the trial court did not err by denying Defendants' motions to dismiss the charges of second-degree murder and voluntary manslaughter.

## IV. Evidentiary Errors

A.     Sarah and Jack's Interview Statements

We next consider Defendants' arguments that the trial court erred by excluding hearsay statements made by Sarah and Jack (1) during their child medical evaluations at the Dragonfly House on 6 August 2015, and (2) during their 3 August 2015 interviews with a social worker employed by the Union County DSS.

On 3 August 2015, the day after Jason's death, both children were interviewed by a Union County DSS social worker, after an urgent request from the Davidson County Sheriff's Office.  Later that week, on 6 August 2015, Jack and Sarah visited the Dragonfly House, a nationally accredited children's advocacy center in Mocksville, North Carolina.  The children were referred to the Dragonfly House by the Davidson County Sheriff's Office, due to concerns of abuse in the home.

Prior to trial, Defendants moved to admit hearsay statements made by the children during their interviews (1) by Union County DSS on 3 August 2015; and (2) at the Dragonfly House on 6 August 2015, pursuant to N.C. Gen. Stat. § 8C-1, Rule 803(4), or in the alternative, Rules 803(24) and 804(b)(5).[1]  Defendants further moved the trial court "to declare the minor witnesses, Jack Corbett and Sarah Corbett, unavailable for purposes of testifying at" trial, noting the defense's inability "to

---

[1] Defendants also moved to admit statements made by the children on 13 August 2015 during interviews conducted by Union County DSS personnel, at the request of Davidson County DSS. However, on appeal, Defendants do not argue that the exclusion of these statements was erroneous. Accordingly, we do not consider the 13 August 2015 statements in our analysis. *See* N.C.R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").

procure the presence of" Jack and Sarah, who "are citizens and residents of the country of Ireland which is outside the jurisdiction of the subpoena power of the state of North Carolina." The State sought to exclude all of the proffered statements. Following an extensive hearing with numerous witnesses on 8 and 9 June 2017, the trial court decided to "defer an absolute ruling" on Defendants' hearsay motion until trial.

The trial court delivered its ruling on Friday, 4 August 2017, shortly after Tom testified during Defendants' case-in-chief. The court properly found "that both Jack Corbett and Sarah Corbett are unavailable for purposes of this proffer of evidence. . . . [T]hey are beyond the jurisdiction and process of th[e] Court[,]" in that they "have been and remain in Ireland." The trial court concluded, however, that none of the proffered statements were admissible under either (1) the medical diagnosis or treatment exception, Rule 803(4), or (2) the residual exception, pursuant to Rule 803(24). The trial court subsequently entered a written order memorializing its ruling.

1. Medical Diagnosis or Treatment Exception

Defendants first contend that the trial court erroneously concluded that the children's statements were not admissible under Rule 803(4). We agree.

Rule 803 provides, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

> (4) Statements for Purposes of Medical Diagnosis or Treatment. – Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

N.C. Gen. Stat. § 8C-1, Rule 803(4).

The medical diagnosis or treatment exception to the hearsay rule is based upon the common-law rationale "that a patient has a strong motivation to be truthful in order to obtain appropriate medical treatment." *State v. Hinnant*, 351 N.C. 277, 287, 523 S.E.2d 663, 669 (2000). For this reason, statements admitted under Rule 803(4) are considered "inherently trustworthy and reliable[.]" *Id.* at 284, 523 S.E.2d at 668.

In *Hinnant*, our Supreme Court established a two-part test for admissibility under Rule 803(4):

> First, the trial court must determine that the declarant intended to make the statements at issue in order to obtain medical diagnosis or treatment. The trial court may consider all objective circumstances of record in determining whether the declarant possessed the requisite intent. Second, the trial court must determine that the declarant's statements were reasonably pertinent to medical diagnosis or treatment.

*Id.* at 289, 523 S.E.2d at 670-71. A trial court's determination of the admissibility of hearsay statements pursuant to Rule 803(4) is reviewed de novo on appeal. *State v.*

*Norman*, 196 N.C. App. 779, 783, 675 S.E.2d 395, 399, *disc. review denied*, 363 N.C. 587, 683 S.E.2d 382 (2009).

In order to satisfy the first prong of the *Hinnant* test—the intent inquiry—the proponent of Rule 803(4) evidence must "demonstrat[e] that the declarant made the statements understanding that they would lead to medical diagnosis or treatment." *Hinnant*, 351 N.C. at 287, 523 S.E.2d at 669. As our courts have repeatedly recognized, however, it is not always easy to ascertain "whether a declarant understood the purpose of his or her statements[,]" *id.*, particularly in cases involving child-declarants. *See, e.g., id.; State v. Blankenship*, __ N.C. App. __, __, 814 S.E.2d 901, 915-16 (2018), *disc. review denied*, 372 N.C. 295, 827 S.E.2d 98 (2019); *State v. Isenberg*, 148 N.C. App. 29, 36-37, 557 S.E.2d 568, 573 (2001), *appeal dismissed and disc. review denied*, 355 N.C. 288, 561 S.E.2d 268 (2002).

The trial court may consider a number of factors in determining whether a child's statements were motivated by the necessary intent, including "whether an adult explained to the child the need for treatment and the importan[ce] of truthfulness; with whom and under what circumstances the declarant was speaking; the setting of the interview; and the nature of the questions." *Blankenship*, __ N.C. App. at __, 814 S.E.2d at 916 (citation omitted). But again, "the trial court should consider *all* objective circumstances of record surrounding [the] declarant's

statements in determining whether he or she possessed the requisite intent under Rule 803(4)." *Hinnant*, 351 N.C. at 288, 523 S.E.2d at 670 (emphasis added).

"The second inquiry under Rule 803(4) is whether the statements of the declarant are reasonably pertinent to diagnosis or treatment." *Id.* (citations omitted). Here, it is important to note that a "statement need not have been made to a physician" in order to satisfy Rule 803(4)'s requirements for admission. N.C. Gen. Stat. § 8C-1, Rule 803(4) cmt. Indeed, our Supreme Court has recognized that the exception could "include 'statements to hospital attendants, ambulance drivers, or even members of the family.'" *Hinnant*, 351 N.C. at 288, 523 S.E.2d at 670 (quoting *State v. Smith*, 315 N.C. 76, 84, 337 S.E.2d 833, 839 (1985) (quoting N.C. Gen. Stat. § 8C-1, Rule 803(4) cmt.)).

The common-law rationale underlying the medical diagnosis or treatment exception is "equally relevant during the second inquiry under Rule 803(4). If the declarant's statements are not pertinent to medical diagnosis, the declarant has no treatment-based motivation to be truthful." *Id.* at 289, 523 S.E.2d at 670. The Court in *Hinnant* thus determined that although statements to nonphysicians made *before* the declarant obtains treatment might be covered by the exception, "Rule 803(4) does not include statements to nonphysicians made after the declarant has already received initial medical treatment and diagnosis." *Id.* Nor does the Rule apply where the declarant "was interviewed *solely* for purposes of trial preparation." *Id.* (emphasis

added) (citations omitted). *But cf. Isenberg*, 148 N.C. App. at 38-39, 557 S.E.2d at 574 (concluding that statements were properly admitted under Rule 803(4) where the trial court found from the evidence that "the purpose of the examination was 'dual, in that it was both for the purpose of medical intervention and for the purpose of future prosecution,' which meets the first prong of the [*Hinnant*] test").

In the instant case, the trial court concluded that the children's interview statements were inadmissible under Rule 803(4) because:

> 3. None of the proffered statements of Jack Corbett and Sarah Corbett satisfy the first prong of the <u>Hinnant</u> analysis as they were not intended to obtain a medical diagnosis or treatment.
>
> 4. Likewise, none of the proffered statements of Jack Corbett and Sarah Corbett satisfy the second prong of the <u>Hinnant</u> analysis as they were not pertinent to any medical diagnosis or treatment.

Following similar reasoning, our dissenting colleague concludes that the children's statements fail the first prong of the *Hinnant* test because (1) the forensic medical interviews were conducted in a child-friendly environment, separate and distinct from the physical examinations that the children received at the Dragonfly House; and (2) the objective circumstances of record do not indicate that the children understood that the purpose of the interviews was to obtain medical diagnosis or treatment. We disagree.

Here, the child-friendly setting in which the interviews were conducted favors admission, rather than exclusion, of Jack's and Sarah's statements. Brandi Reagan, Executive Director of the Dragonfly House, testified at the pretrial hearing on Defendants' motion to admit the children's statements. Reagan explained that the Dragonfly House is an independent, nationally accredited, non-profit children's advocacy center "that provides all-inclusive services to children who have either disclosed abuse or are suspected of experiencing abuse, which is physical abuse, sexual abuse, neglect or witnessed violence." The Dragonfly House provides myriad services, including a "child medical evaluation," which Reagan explained is "a type of exam that is very detailed and thorough that is set forth from the [State] Department of Social Services . . . us[ing] a program . . . that was established by UNC Chapel Hill." The purpose of a child medical evaluation is to determine the child's needs, and to diagnose and treat the child accordingly.

A child medical evaluation at the Dragonfly House begins with a meeting of the child, his or her caregivers, and Heydy Day, child advocate for the Dragonfly House. Day conducts intake paperwork, answers questions, and informs the parties what to expect during all stages of the appointment. Reagan testified that "[a]fter [Day] explains that to the caregiver, she does explain that to the child at their level so if it's a younger child, she will explain it in a different way than she would a teenager. She makes sure that they understand and they know what to expect."

Day described how she typically explains the child medical evaluation process

to the parties during intake:

> I start off talking to the child and the caregiver saying, "you will be talking with one of my friends today," whether that's our interviewer Kim or interviewer Brandi, you will be talking to that lady.
>
> Her job is just to talk with you. That's all she will do. But while she is talking with you there are cameras set up in the room. I typically point out the camera to them in the lobby. We have security cameras just for security purposes in the lobby. Outside I will say, "Can you find the camera in this room?" They will point to it. I say, "Miss Kim and Miss Brandi have cameras just like that in that room. The cameras in that room are to record what you and her talk about because this is really important. This way I don't have to talk to all of these different people that you don't know." I usually ask them, "Do you have any questions? Are you okay with that?" And I will answer their questions. After that I say, "While you are talking with Miss Brandi or Miss Kim your caregiver will be talking with our doctor. Our doctor will be asking questions about your health throughout your whole life."
>
> I typically give kids examples of those questions such as, have you ever been in the hospital, have you ever had surgeries, broken bones, allergies, take medicine regularly, just to give the child an idea what the doctor is going to be talking to their caregiver about. I say, "Once you finish talking with Miss Kim or Miss Brandi and the doctor finishes talking with the caregiver, then the doctor will call you back to do a head to toe check-up of you." I say, "there is a nurse, . . . she's going to help you pick out a T-shirt and a blanket for the medical exam."
>
> . . . .
>
> "Once you come out of the bathroom, the nurse and

37

doctor will ask you how much you weigh, how tall you are."
I usually say, "The thing that gives you a hug for your blood
pressure, your vision, your hearing, your height, your head
check, back, bottom, private area, legs and feet." I do a
head to toe of myself to give them an overview of what is to
be expecting [sic]. I say, "Is that okay with you?" I get a
variety of responses on that from different children. I say,
"Do you have any questions for me about that?" I answer
the questions if they have any. Then I say, "Okay I will go
ahead and let everybody know I have spoken with you and
then Miss Kim or Miss Brandi will come and get you."
Then I will defer them.

The Dragonfly House is "set into an old home." Forensic medical interviews[2]

and physical examinations are conducted in separate bedrooms across the hall from

one another. The interview room is "intentionally designed and laid out to be . . .

'child friendly' ": there is an easel "in case the child needs to draw," along with

anatomically correct dolls, Play-Doh, and tissues, among other items.

Nonetheless, the room's child-friendly design does not negate its clinical

purpose. Reagan testified that the room's two "chairs are positioned so that they can

be seen from two cameras on the wall; one is – you can see everything in the room

from both cameras; one is primarily focused on one chair. The other is focused on the

other chair." Members of the child's "multi-disciplinary team"[3] may view the forensic

---

[2] According to Reagan, a "forensic interview" is "an interview done by someone who is trained to talk to children in a non-leading manner in a format that is approved on a national level while being recorded."

[3] Davidson County Sheriff's Detective Mark Hanna explained, "We have what's called an MDT, multi-disciplinary team, which involves law enforcement, DSS and the Dragonfly House. Each of those entities work together to figure out what's going on in the child's life, how to properly treat the child, and get services for the child."

medical interview in an adjacent "observation room," via a one-way, live audio-visual feed.

In the instant case, the child-friendly atmosphere and the separation of the examination rooms do not indicate that the children's statements during the interviews were not intended for medical purposes. The children were informed *before* their interviews that they would be receiving medical interviews together with physical examinations as part of their full evaluations at the Dragonfly House. *See Hinnant*, 351 N.C. at 289, 523 S.E.2d at 670 ("Rule 803(4) does not include statements to nonphysicians made after the declarant has already received initial medical treatment and diagnosis.").

Day testified that during intake, she informed Jack and Sarah that they "[we]re going to be interviewed and . . . have a medical exam." Day did not recall either child asking any questions during intake; in her view, the children "seem[ed] to understand" both components of the child medical evaluation. *Contra State v. Bates*, 140 N.C. App. 743, 746-47, 538 S.E.2d 597, 600 (2000) (concluding that the record failed to demonstrate that the child possessed the requisite intent under Rule 803(4) where the child "did not know why she was there" and the psychologist "never made it clear that the child needed treatment"; neither the psychologist nor the " 'child-friendly' room" in which the interview was conducted "emphasize[d] the need for honesty"; and "the child's statements lack[ed] inherent reliability because of the

39

nature of [the psychologist's] leading questions"), *disc. review denied*, 353 N.C. 383, 547 S.E.2d 20 (2001).

Moreover, Reagan testified that the Dragonfly House is child-friendly *by design*: the intention is to ease any anxiety that the child may be experiencing upon arrival, and to encourage open and frank discussions. Day testified that in her experience, "the lobby is the most comfortable place" for families to conduct intake procedures, likely due to the child-friendly décor and the presence of many toys, children's books, and puzzles. Children come to the Dragonfly House because they are either confirmed or suspected victims of some type of abuse or other trauma; they are more likely to be truthful with an unknown interviewer if they are at ease and feel safe and comfortable with their surroundings. *Cf. State v. McLaughlin*, 246 N.C. App. 306, 321, 786 S.E.2d 269, 281 (rejecting the defendant's contention that some of the nurse's interview questions, "such as the importance of telling the truth, were not pertinent to medical diagnosis or treatment[,]" because "these questions were crucial to establishing a rapport with the victim and impressing upon him the need to be open and honest about very personal and likely embarrassing details pertinent to his well-being"), *appeal dismissed and disc. review denied*, 368 N.C. 919, 787 S.E.2d 29 (2016).

Both the dissent and the trial court focus heavily on the children's responses to one of Reagan's initial inquiries: "Tell me why you're here." Sarah replied,

"Because my dad died." Jack responded, "[M]y dad died, and people are trying—my aunt and uncle from my dad's side are trying to take away—take me away from my mom." The trial court gleaned from these responses that "[t]he children understood the impetus of these interviews was to affect future legal custody determinations and not to obtain medical evaluation or treatment." The dissent concludes that Defendants fail "to affirmatively establish that Sarah or Jack had the requisite intent to make statements" for medical diagnosis or treatment purposes during their forensic interviews. *Dissent* at 21. Both analyses under Rule 803(4) miss the point.

Under the first prong of the *Hinnant* test, the focus is not whether the children independently sought out medical treatment, nor even whether their statements evince that they might do so if they were able. Instead, the focus must be on whether all of the objective circumstances of record demonstrate that the children understood the overall medical purpose and significance of their interviews at the Dragonfly House, and were accordingly motivated to be truthful. *See State v. Lewis*, 172 N.C. App. 97, 104, 616 S.E.2d 1, 5 (2005) (concluding that the first part of the *Hinnant* inquiry was satisfied where "the children were old enough to understand the interviews had a medical purpose, and they indicated as such[,]" and "the circumstances surrounding the interviews created an atmosphere of medical significance"—even though "the interviews took place in a 'child-friendly' room, not a

medical examination room"—because they were conducted "at a medical center, with a registered nurse, immediately prior to a physical examination").

Here, the objective circumstances of record support the conclusion that the children had the requisite intent under Rule 803(4). Reagan asked non-leading, open-ended questions, and she instructed the children that they should not "guess at anything." Both Day and Reagan emphasized the overall significance of the child medical evaluations that Jack and Sarah would be receiving at the Dragonfly House. Day testified that during intake, she points to the security cameras in the lobby and tells children that there will be similar cameras in the interview room "to record what you and [Miss Kim or Miss Brandi] talk about because *this is really important*." (Emphasis added).

Reagan testified that before she begins interviewing a child, she explains her "rules" for the interview. Reagan first establishes that the child knows the difference between the truth and a lie. Reagan also instructs the child to correct her if she makes a mistake, and explains that if she asks a question that the child cannot answer, "it's okay to say you don't know."

Jack and Sarah were of sufficient age and maturity to understand the medical significance of the overall evaluations. *See id.* ("[T]he children were old enough to understand the interviews had a medical purpose, and they indicated as such."). Furthermore, it is evident from the children's conduct and responses—both during

Reagan's statement of the "rules" and throughout their interviews—that they understood the importance of honesty. Sarah self-corrected when she misspoke; when her answer was unclear, Reagan gently redirected Sarah to the previous topic until she provided a clear answer. Moreover, not only did Reagan convey the importance of honesty, when asked whether anyone had told them what to say during their interviews prior to their arrival at the Dragonfly House, both children affirmatively stated that they had only been instructed to "tell the truth."

Jack was initially reluctant to speak about his father's death during his interview with Reagan. Who could blame him? It would be a rare ten-year-old boy indeed who relished the opportunity to speak openly with a complete stranger about what must be deeply painful, complicated feelings regarding the violent, tragic death of his father—and in Jack's case, his last remaining biological parent—mere hours after attending his funeral. But this is precisely why Jack required the Dragonfly House's services, and why he and Sarah were referred for examinations: they were present during an extremely traumatic event involving the death of their father, and they may have been witnesses to, or victims of, domestic abuse. *See McLaughlin*, 246 N.C. App. at 321, 786 S.E.2d at 281 ("[H]aving the victim relate the details from beginning to end helped the medical practitioners to evaluate the extent of the mental and physical trauma to which the victim was exposed, inquire as to whether the

43

victim was out of danger, and discover whether other abusers or victims may have been involved.").

There is no requirement under the Rule or the *Hinnant* test that children independently seek medical treatment, nor even request it. Children do not have the ability to seek medical assistance without the resources, financial or otherwise, of their parents or caregivers. *See Smith*, 315 N.C. at 84, 337 S.E.2d at 840 ("[Y]oung children cannot independently seek out medical attention, but must rely on their caretakers to do so."). Nor do they have the emotional acumen or the language necessary to effectively seek help when the medical need involves mental health. Indeed, this is an area with which many *adults* struggle. In asking children who lack sufficient knowledge even to verbalize the trauma that they have experienced to independently seek medical assistance, the trial court demands too much.

Our courts have a strong precedent of allowing this type of evidence in cases involving children. Most often it is the State seeking its admission. *See, e.g.*, *McLaughlin*, 246 N.C. App. at 321, 786 S.E.2d at 281; *State v. Burgess*, 181 N.C. App. 27, 34-35, 639 S.E.2d 68, 74 (2007), *cert. denied*, 365 N.C. 337, 717 S.E.2d 384 (2011); *Lewis*, 172 N.C. App. at 105, 616 S.E.2d at 6; *State v. Thornton*, 158 N.C. App. 645, 649-51, 582 S.E.2d 308, 310 (2003); *Isenberg*, 148 N.C. App. at 36, 557 S.E.2d at 573.

The Dragonfly House is just one of many similar team-oriented children's advocacy centers statewide. Excluding the evidence in this case runs counter to

44

existing precedent and muddies the law moving forward. *Cf. McLaughlin*, 246 N.C. App. at 322 n.5, 786 S.E.2d at 282 n.5 ("We do not posit that the [children's advocacy center] interview is a substitute for in-court testimony, but, where, as here, the declarant is unavailable, his video recorded medical interview is sufficiently reliable to be admissible. Therefore, the jury is able to assess the testimony, to observe the demeanor of the declarant, to determine the credibility and trustworthiness of his statements, and thereby perform their function as a jury.").

Having determined that the children possessed the requisite intent under Rule 803(4), we proceed to the second inquiry of the *Hinnant* test. We conclude that the children's statements were reasonably pertinent to medical treatment or diagnosis, and therefore, should have been admitted pursuant to Rule 803(4).

Following their forensic medical interviews, Sarah and Jack received physical examinations by Dr. Amy Suttle, the pediatrician for the Dragonfly House. Based upon the results of the examinations, Dr. Suttle diagnosed both children as "victim[s] of child abuse based on exposure to domestic violence" and recommended that they "receive mental health services" as treatment. The children attended one therapy session in North Carolina on 10 August 2015, following a referral by the Dragonfly House personnel, and they began attending counseling for grief and trauma in early September 2015, after they were taken to Ireland.

As Defendants argued at the pretrial hearing on the admissibility of these statements, Jack and Sarah were referred to the professionals at Dragonfly House in order to obtain examinations "primarily for their health, safety, and welfare." The medical interviews and the physical examinations were conducted for the same purpose and as part of the same overall child medical evaluation. Both parts were used to inform the ultimate conclusion in each child's medical evaluation, and conducting one part without the other would render the evaluation incomplete.

The children's statements evince the requisite intent under Rule 803(4), and the statements clearly pertain to medical treatment or diagnosis. Thus, the trial court erred in excluding these statements.

2. Residual Exception

Even if the children's Dragonfly House forensic medical interview statements were inadmissible under the medical diagnosis or treatment exception to the rule against hearsay, these statements are admissible under the residual exception.

The residual exception to the rule against the admission of hearsay is codified by N.C. Gen. Stat. § 8C-1, Rules 803(24) and 804(b)(5). Rules 803(24) and 804(b)(5) are "substantively nearly identical": "Rule 804(b)(5) is a verbatim copy of Rule 803(24), except that Rule 804(b)(5) also requires that the declarant be unavailable before the hearsay may be admitted and Rule 803(24) does not." *State v. Triplett*, 316 N.C. 1, 7, 340 S.E.2d 736, 740 (1986). For purposes of Rule 804, a declarant is

"unavailab[le] as a witness" if, *inter alia*, he "[i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . by process or other reasonable means." N.C. Gen. Stat. § 8C-1, Rule 804(a)(5).

As set forth under either Rule, the residual exception permits admission of

> [a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

N.C. Gen. Stat. § 8C-1, Rules 803(24), 804(b)(5).

In order for hearsay statements to be admissible under Rule 803(24) or Rule 804(b)(5), the trial court must determine:

> (1) whether proper notice has been given, (2) whether the hearsay is not specifically covered elsewhere, (3) whether the statement is trustworthy, (4) whether the statement is material, (5) whether the statement is more probative on the issue than any other evidence which the proponent can procure through reasonable efforts, and (6) whether the interests of justice will be best served by admission.

*State v. Valentine*, 357 N.C. 512, 518, 591 S.E.2d 846, 852 (2003).

We review a trial court's ruling on the admissibility of hearsay statements under the residual exception for abuse of discretion. *State v. Sargeant*, 365 N.C. 58, 62-63, 707 S.E.2d 192, 195 (2011); *Smith*, 315 N.C. at 97, 337 S.E.2d at 847. The trial court must "make adequate findings of fact and conclusions of law sufficient to allow a reviewing court to determine whether the trial court abused its discretion in making its ruling." *Sargeant*, 365 N.C. at 65, 707 S.E.2d at 196 (citing *Smith*, 315 N.C. at 97, 337 S.E.2d at 847). "If the trial court either fails to make findings or makes erroneous findings, we review the record in its entirety to determine whether th[e] record supports the trial court's conclusion concerning the admissibility of a statement under a residual hearsay exception." *Id.* "If we conclude that the trial court erred in excluding [Jack's and Sarah's] hearsay statement[s], we consider whether [D]efendant[s] w[ere] prejudiced." *Id.* at 65, 707 S.E.2d at 197.

Defendants contend that the trial court committed prejudicial error by concluding that the following evidence was inadmissible under the residual exception: (1) the children's statements during their interviews with the Union County DSS social worker on 3 August 2015; and (2) Jack's and Sarah's statements during their child medical evaluations at the Dragonfly House on 6 August 2015.[4] We agree.

---

[4] Contrary to their arguments at trial, Defendants do not contend on appeal that the 3 August 2015 Union County DSS interview statements were admissible under the medical diagnosis or treatment exception; consequently, we limit our consideration of the admissibility of those statements

In its written order, the trial court determined, in relevant part:

> 1. The declarant minor children, Jack Corbett and Sarah Corbett, are unavailable for purposes of N.C.G.S. 8C-1, Rule 803.
>
>     . . . .
>
> 6. Admissibility of hearsay statements offered pursuant to the residual exception, N.C.G.S. 8C-1, Rule 803(24) is governed by the six-prong test set out by our Supreme Court in <u>State v. Smith</u>, 315 N.C. 76 (1990).
>
> 7. This court must first consider whether proper notice has been given. The defendant provided written notice to the State more than 60 days in advance of trial. This notice was proper and timely.
>
> 8. This court next considers whether each proffered statement is specifically covered under one of the other hearsay exceptions. The defendants' only contention of another applicable exception is the medical treatment or diagnosis exception, Rule 803(4). The court has determined the statements are not admissible pursuant to that exception. The court has reviewed all other exceptions set out in the Rule and finds that none are applicable.
>
> 9. This court must next consider whether the proffered statements are trustworthy. "[A] hearsay statement . . . may be admissible under the residual exception if it possesses 'circumstantial guarantees of trustworthiness' equivalent to those required for admission under the enumerated exceptions." <u>Smith</u>, at 93.

---

to the residual exception, in accordance with N.C.R. App. P. 28(b)(6). Furthermore, as explained in Section IV(A)(1) above, the children's Dragonfly House statements should have been admitted under the medical diagnosis or treatment exception. But even assuming, *arguendo*, that Sarah's and Jack's statements from the child medical evaluations conducted at the Dragonfly House on 6 August 2015 were inadmissible under Rule 803(4), for the reasons set forth herein, the trial court nevertheless erred by excluding the statements under the residual exception.

. . . .

> 14. The proffered statements do not have circumstantial guarantees of trustworthiness. Further, this court having concluded the statements are not trustworthy, the court need not continue to the additional prongs of the Smith analysis.

(Alteration in original).

The third inquiry of the trial court's analysis, which asks whether the proffered statement possesses "circumstantial guarantees of trustworthiness" akin to those required for admission under other exceptions, "has been called 'the most significant requirement' of admissibility" under the residual exception to the rule against the admission of hearsay. *Smith*, 315 N.C. at 93, 337 S.E.2d at 844-45. In evaluating the "circumstantial guarantees of trustworthiness" of a statement pursuant to Rules 803(24) and 804(b)(5), the trial court must consider "(1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination." *Triplett*, 316 N.C. at 10-11, 340 S.E.2d at 742. "Also pertinent to this inquiry are factors such as the nature and character of the statement and the relationship of the parties." *Id.* at 11, 340 S.E.2d at 742.

Here, the trial court concluded that the proffered statements lack circumstantial guarantees of trustworthiness because:

11. The court is not assured of the personal knowledge of the declarants as to the underlying events described in that both children identified the source of their knowledge being nothing more than statements of a defendant and that defendant's mother. The declarations contain no reference to seeing, hearing or perceiving anything about the events described except these statements of others.

12. The court is not assured of the children's motivation to speak the truth, but instead finds the children were motivated, in the near immediate aftermath of the death of their father, to preserve a custody environment with the only mother-figure they could remember having known during their lives. The children appear to have known that if they were not in the custody of defendant Molly Corbett they would be taken to live in the Republic of Ireland with relatives of their father.

13. The proffered statements were specifically recanted and disavowed.

Defendants challenge the following findings of fact underlying the above conclusions: (1) findings #15 and #20, which pertain to the children's personal knowledge; (2) finding #21, that the statements "were not made at a time when the children were motivated to speak the truth but were rather motivated to affect future custody arrangements"; and (3) finding #22, that the statements regarding Molly and Jason's relationship "have been specifically recanted" by the children in diary entries and a Skype interview between Jack and a member of the district attorney's office. We consider each of Defendants' arguments in turn.

Findings of fact #15 and #20 provide:

15. The children's statements did not describe actual

knowledge of the events surrounding the homicide of Jason Corbett. Jack identified the source of the information in his statements by saying "my mom told me" and "she (defendant Molly Corbett) told us." Sarah similarly described the source of her knowledge, saying the [sic] her grandmother "told [me] first and then her mother [told me]." When speaking of her "grandmother," Sarah was referring to the mother of defendant Molly Corbett and the wife of defendant Thomas Martens.

. . . .

20. The statements of the children which the defense proffers were not made out of the personal knowledge of the declarant children but are instead double hearsay declarations of the defendant Molly Corbett and her mother.

(Alterations in original).

Insofar as the trial court limited its consideration of the children's statements during their interviews with Union County DSS and Dragonfly House personnel on 3 and 6 August 2015, respectively, to "the events surrounding the homicide of Jason Corbett" alone, findings of fact #15 and #20 are erroneous. *See Sargeant*, 365 N.C. at 65, 707 S.E.2d at 196 ("If the trial court either fails to make findings *or makes erroneous findings*, we review the record in its entirety to determine whether th[e] record supports the trial court's conclusion concerning the admissibility of a statement under a residual hearsay exception." (emphasis added)).

As explained in Section IV(A)(1) above, the Davidson County Sheriff's Office referred the children to the Dragonfly House, due to concerns that they may have

witnessed or experienced domestic abuse. Similarly, Union County DSS personnel interviewed the children at the request of Davidson County DSS, to which this matter had been referred by the Davidson County Sheriff's Office, following allegations of domestic violence and substance abuse in the home. On 3 August 2015, Davidson County DSS faxed a letter to Union County DSS, stating, *inter alia*:

> To Whom This May Concern:
>
> Our agency received and accepted a [Child Protective Services] referral in reference to [Jack and Sarah Corbett] on 08/02/2015 with a 72 hours [sic] response time, however due to the nature of this report and the concerns that Molly Corbett, step-mother, may leave to Tennessee with the children we asked that you assist us in initiating this case TODAY (08/03/2015). *Please interview each children* [sic] *privately* to address the [Child Protective Services] concerns as well as questions surround [sic] SEEMAPS. *Please interview the mother and her parents, Mr. and Mrs. Martens, regarding the incident that was alleged in the* [*Child Protective Services*] *referral.*
>
> Due to the death of the children's father, our Sheriff's Office has scheduled a [child medical evaluation] for both children. This [child medical evaluation] have [sic] been schedule [sic] for Thursday (08/06/2015) at 1:00 pm. Please provide the family with the attached brochure regarding our [child advocacy center]. *I've informed Mrs. Corbett that she cannot be present during the children's* [*child medical evaluation*] *due to the nature of the allegations.* Mrs. Corbett reported that her mother can transport the children to and from their appointment. Please address this in the safety plan with Mrs. Corbett and her mother.

(Emphases added).

53

This letter plainly states that the primary purpose of the Union County DSS interviews—like the Dragonfly House interviews—was to ensure the immediate safety and well-being of the children. Indeed, as the trial court observed in finding of fact #16, the Union County DSS interviews were conducted "in regard to alleged alcohol and/or substance abuse by the defendant Molly Corbett and concern about physical abuse of Jack Corbett." Moreover, it is also clear from this letter that the utmost care was taken to protect the objectivity, integrity, and confidentiality of the children's interviews, both those conducted by DSS personnel as well as those conducted at the Dragonfly House. Davidson County DSS requested that Union County DSS interview each child privately, and specifically noted that Molly had already been instructed that her presence was not permitted during the children's Dragonfly House interviews.

The trial court's findings of fact #21 and #22 are similarly flawed in their reasoning:

> 21. These same statements were not made at a time when the children were motivated to speak the truth but were rather motivated to affect future custody arrangements – specifically the children feared that they were going to be "taken away from their mother" and removed to another country by their father's relatives.

> 22. The statements of the children that are offered by the defense as pertinent to the relationship between Molly Corbett and Jason Corbett have been specifically recanted. Sarah Corbett, the younger of the two children, recanted her statements in diary entries made after her return to

Ireland.  Jack Corbett recanted his statements in diary
entries and during a recorded interview with members of
the District Attorney's Office.

Finding of fact #21 is erroneous in that it overlooks the overwhelming evidence that both children understood the seriousness of the proceedings and the importance of truthfulness, as well as the temporal proximity of the children's statements to Jason's death.  Although both children indicated that they loved Molly and desired to remain in her custody, this, alone, is not indicative of a dishonest motive, particularly where there is substantial evidence to the contrary.

Moreover, this finding discounts statements by Jack and Sarah that tend to *refute* that "the children feared that they were going to be 'taken away from their mother' and removed to another country by their father's relatives."  Jack told Reagan that he was "[a]ngry and upset" about what had happened, and he wondered, "How can people be so mean?"  When Reagan asked him what he meant, Jack clarified, "How my dad could get so angry.  How my grandpa could hit him with a bat and my mom hit him with a brick."  Sarah explained to Reagan that she held Molly's hand at Jason's funeral earlier that day on 6 August 2015, "[b]ecause my aunt, she's – she's real nice, but she gets emotional, and she doesn't want me and Jack to have a bad life.  She wants us to have the best life that she can make for us.  But my mom wants the same."

As for the children's alleged recantations, it is unclear from finding of fact #22 why the trial court deemed the "diary entries" or the circumstances of Jack's Skype interview with a member of the district attorney's office to be more trustworthy than either of the objective and impartial interviews at issue here. The diary entries were never authenticated before the trial court. Moreover, while Molly was explicitly prohibited from attending the children's interviews with Union County DSS and Dragonfly House personnel, Jack's Skype interview with the district attorney's office was conducted from his home in Ireland, with his aunt—Jason's sister—and uncle upstairs and within earshot. *Cf. Sargeant*, 365 N.C. at 66, 707 S.E.2d at 197 ("We emphasize again that the issue is not whether [the declarant's] statement is objectively accurate; the determinative question is whether [the declarant] was motivated to speak truthfully when he made it. The agreement between [the defendant's co-conspirator] and the State, reached when [the co-conspirator] provided his statement, appears designed to ensure his truthfulness.").

Both the Union County DSS and the Dragonfly House interviews covered much more information than just the specific "events surrounding the homicide of Jason Corbett," to wit: Jason's worsening anger management issues; Molly and Jason's ongoing relationship troubles, including alleged verbal, emotional, and physical abuse; and, perhaps most importantly, the children's awareness and perception of these issues. Furthermore, the most probative of the children's statements are all

clearly based upon their own personal knowledge.  For example, during her 3 August 2015 Union County DSS interview, Sarah told the social worker that "what she likes most about home" is "being with her mom when her dad is not there . . . because her dad fights her mom and sometimes he brings it out on her.  She stated sometimes she will get in trouble for saying stop."  Sarah told the social worker that "her father screams and yells" and "is angry on a regular basis"; when her parents' fighting "is really bad, . . . she has to stay in her room for a long time."  Sarah "has seen her dad hit her mom and pull her hair."  Sarah shared that, on one occasion, she "saw her dad smack her mom.  [Sarah] stated that her mom fell, got up and then went to the car."

Similarly, Jack told the social worker "that what he does not like [about] being at home is his parents fighting.  Jack stated physically and verbally."  Jack said "that his dad gets mad at his mom for no good reason; . . . she can do nothing right."  According to Jack, Jason "curses his mom; [Jack] stated that he has seen his dad a few times hit his mom with his fist anywhere on her body that he can."

The children's Dragonfly House interviews are lengthy and broadly substantive.  But perhaps the most material of evidence that may be gleaned from the Dragonfly House interviews are statements that the children made based upon their personal knowledge and never recanted, and which unquestionably pertained to "the events surrounding the homicide of Jason Corbett."

Sarah told Reagan that she often experienced difficulty sleeping through the night, and in such instances, she would approach Molly for comfort. Jason, however, disliked it when Sarah got out of bed and Molly attended to her in the middle of the night, and he would get angry with them both. The evidence shows that Sarah's nightmare and her consequent appearance in Jason and Molly's bedroom on 2 August 2015 was the precipitating event that caused Jason to grow angry with Molly, thereby starting the fight that led to the fatal altercation:

> Ms. Reagan: Okay. And had there ever been any times that you did wake up during the night in the past?
>
> Sarah Corbett: Yeah.
>
> Ms. Reagan: Okay. What would happen when you do wake up during the night?
>
> Sarah Corbett: I would go downstairs because I usually had a nightmare. But I think what caused my dad being really mad that night was because, um, my mom kept on coming upstairs because I – like I have fairies on my bed, and I really get scared of those things, because they like look like there are spiders and lizards on my bed. So that's why my mom had to keep on coming up. I couldn't fall asleep until my mom put another sheet on my bed, and then my dad got mad.
>
> Ms. Reagan: Okay. So you told me that you had fallen asleep downstairs and someone carried you upstairs. Did you wake up at any point after that?
>
> Sarah Corbett: Nope.
>
> Ms. Reagan: Okay. So you said your mom had to put another sheet on. How did you know that?

Sarah Corbett: Because before I went to sleep, she – because I woke up, like, in the middle – like not in the middle, but like – I'm sorry I said that I didn't wake up.

Ms. Reagan: It's okay.

Sarah Corbett: I woke up just a little bit. Um, because it's like I just woke up before my mom put me in my bed, and I put – and I put the – I put the covers on me, and I tried to go to bed, but I couldn't.

Ms. Reagan: Okay.

Sarah Corbett: And at first I thought I had a big lizard in my room. And it freaked me out.

Ms. Reagan: And you said she kept coming and checking on you?

Sarah Corbett: Uh-huh.

Ms. Reagan: And why do you think that's what they were arguing about?

Sarah Corbett: Because my dad, like, doesn't like my mom sleeping, like, with me. He wants her to be upstairs with him.

Ms. Reagan: Have you ever heard them argue about that before?

Sarah Corbett: Yes.

Bedsheets matching those described by Sarah are visible on the floor in State's Ex. 62, a photograph of Sarah's bedroom.

59

Jack's Dragonfly House interview also contains statements, based upon his personal knowledge, that are both material and highly probative to Defendants' claims of self-defense and defense of a family member. The State established that there were two possible murder weapons: the baseball bat, which Tom brought with him from the basement upon hearing the commotion upstairs, and the brick paver, which was already sitting on Molly's dresser in the bedroom when the affray began. The brick paver's presence in the master bedroom was never explained to the jury. The admission of Jack's Dragonfly House statements would therefore have provided a reasonable answer to a significant and unanswered question:

> Ms. Reagan: Okay. And then tell me about this cinder block that you were talking about. Like a brick that your mom used?
>
> Jack Corbett: Um, we were going to paint it, because we just – we just got flowers that we were going to plant in our front yard or back yard, and we were going to paint it so it would look pretty, and that – *it was in my mom's room, because it was raining earlier, and we already – we were going to paint it. We didn't want it getting all wet.* So we brought it inside, and my mom put it at her desk. And then that's where it was.

(Emphasis added).

Like Sarah's statements about Jason's anger following her nightmare and appearance in Jason and Molly's bedroom, Jack's statement about the brick paver tends to corroborate Molly's written statement from 2 August 2015. Moreover, no

other evidence admitted at trial is as material or as probative of Defendants' version of events, and thus their defense, as either of these statements.

After finding that the children were unavailable to testify for purposes of N.C. Gen. Stat. § 8C-1, Rule 803, the trial court failed to consider the practical effect of that finding in conducting the rest of its analysis under the residual exception. *See Triplett*, 316 N.C. at 9, 340 S.E.2d at 741 (observing that "the necessity for use of the hearsay testimony often will be greater" and "the inquiry . . . may be less strenuous" under Rule 804(b)(5) than Rule 803(24), "since the declarant will be unavailable"). The trial court's determination that there were insufficient "circumstantial guarantees of trustworthiness" to support admission of the children's statements was "made on the basis of inaccurate and incomplete findings of fact used to reach unsupported conclusions of law." *Sargeant*, 365 N.C. at 67, 707 S.E.2d at 198.

Accordingly, the trial court erred by excluding the children's statements during their interviews by Union County DSS personnel on 3 August 2015, and at the Dragonfly House on 6 August 2015. Moreover, for the reasons more fully explained in Section VI below, the trial court's exclusion of this evidence prejudiced Defendants' ability to present a complete and meaningful defense. *See id.* at 68, 707 S.E.2d at 198 ("As a matter of fundamental fairness, the exclusion of [the co-conspirator's] statement deprived the jury of evidence that was relevant and material to its role as finder of fact.").

B.      Bloodstain Pattern Analysis

We next address Defendants' challenge to the testimony of Stuart James, the State's expert witness in bloodstain pattern analysis. Defendants contend that James's testimony regarding the untested blood spatter on the underside hem of Tom's boxer shorts and the bottom of Molly's pajama pants was not sufficiently reliable for admission under N.C. Gen. Stat. § 8C-1, Rule 702(a). We agree.

1. Issue Preservation

During voir dire, Defendants raised a targeted challenge to the reliability of James's proposed testimony concerning his analysis of certain bloodstains on the underside of Tom's boxer shorts and the bottom of Molly's pajama pants. Wendell Ivory, a forensic scientist with the North Carolina State Crime Laboratory, had testified the previous day that, unlike stains appearing elsewhere on these and other articles of clothing worn by Defendants during the altercation with Jason, the stains at issue never received even basic, or "presumptive," testing to confirm the presence of blood.

Defendants questioned James about several of the conclusions in his "Supplementary Report of Bloodstain Pattern Analysis," which James drafted on 16 February 2016 after traveling to North Carolina to examine certain bloodstained evidence, including Tom's boxer shorts and Molly's pajamas. Defendants challenged the following conclusions from James's three-page Supplementary Report:

- The impact spatters on the front underside hem of the left leg of the shorts are consistent with the wearer of the shorts close to and above the source of spattered blood. The source of the impact spatters is most likely the head of Jason Corbett while it was close to the floor in the bedroom.

    . . . .

- The impact spatters on the front lower legs and cuff of . . . the pajama bottoms are consistent with the wearer in proximity to Jason Corbett when he was close to the floor when blows were struck to his head.

James acknowledged that because none of the stains underlying these conclusions were ever submitted for testing—a fact that he did not learn until the day before he testified in court—James could not state "with a scientific certainty" that the stains on either garment were, in fact, blood. James also conceded that he had never seen—neither in person nor via photograph—Tom wearing the boxer shorts, and consequently, he did not know how the boxer shorts "laid on [Tom's] body" or whether "the cuff was flipped up or down or anything along those lines[.]" Nevertheless, James was permitted to testify that the State's failure to test the evidence in question did not "really . . . change much of [his] opinion. It is still impact spatter with the wearer of the shorts in proximity with the source of the blood." When the trial court asked whether James "consider[ed] the opinions that [he's] offered and as outlined in both of these reports to be the product of reliable principles and methods in bloodstain pattern analysis[,]" James responded, "Yes, I do."

Noting that James's own peer-reviewed treatise, *The Analysis of Blood and Forensic Serology*, mandates that "an identification of blood be established to a scientific certainty before it can be presented in court[,]" Defendants asserted that the proposed expert testimony was not "properly before this Court, pursuant to 702-(a)." More specifically, Defendants contended that (1) the challenged testimony was not "based on sufficient facts or data," in that James had not been provided with the necessary information "to render that particular opinion within the broader scope of his other opinions"; and (2) as a result, James was not provided "the opportunity to apply the principles and methods reliabl[y] to the facts in this case."

At the conclusion of voir dire, the trial court ruled that, notwithstanding the failure to identify the stains as blood to "a scientific certainty," James would be permitted to testify to his expert opinion before the jury.

Our dissenting colleague concludes that Defendants waived appellate review of this issue because, despite their careful and extensive objections during voir dire, Defendants failed to object in the presence of the jury when the evidence was actually introduced at trial. *Dissent* at 43. However, the transcript reveals that Defendants did, in fact, timely object, and did so on multiple occasions before the jury throughout James's testimony. This issue was properly preserved for appellate review.

Tom's counsel first objected when the State tendered James as an expert in the field of bloodstain pattern analysis. Defendants did not object throughout James's

64

testimony providing a general overview of the field of bloodstain pattern analysis, nor did they raise any substantive objections while James began to testify to his conclusions regarding the blood spatter at the scene in the instant case.

However, Defendants immediately objected when the State proffered James's "Supplementary Report of Bloodstain Pattern Analysis" containing his comments and conclusions concerning, *inter alia*, Tom's boxer shorts and Molly's pajamas, which were the subject of Defendants' objections during voir dire. The trial court admitted James's Supplementary Report as State's Ex. 200 over Defendants' explicit objections to James's conclusions and supporting testimony. Additionally, Defendants later objected when the State submitted photographs of Tom's boxer shorts and Molly's pajamas, which James enhanced under his digital microscope; the trial court overruled Defendants' objections and admitted the photos as State's Ex. 201-215 and 216-237, respectively. Moreover, when the State's direct examination of James continued to a second day, Defendants renewed their previous objections for the record in the presence of the jury before his testimony resumed.

It is, therefore, clear that Defendants properly objected and preserved this issue for appeal, and we proceed to the merits of their argument.

2. Rule 702(a)

Defendants contend that the trial court erred by admitting James's expert testimony regarding the untested stains on the underside of Tom's boxer shorts and

the bottom of Molly's pajama pants, because the testimony did not satisfy Rule 702(a)'s reliability test or the expert's own admitted standards for reliability. We agree.

"Whether expert witness testimony is admissible under Rule 702(a) is a preliminary question that a trial judge decides pursuant to" N.C. Gen. Stat. § 8C-1, Rule 104(a). *State v. McGrady*, 368 N.C. 880, 892, 787 S.E.2d 1, 10 (2016) (citations omitted).

> In answering this preliminary question, the trial judge is not bound by the rules of evidence except those with respect to privileges. To the extent that factual findings are necessary to answer this question, the trial judge acts as the trier of fact. The court must find these facts by the greater weight of the evidence. As with other findings of fact, these findings will be binding on appeal unless there is no evidence to support them.

*Id.* at 892-93, 787 S.E.2d at 10-11 (internal quotation marks and citations omitted).

The trial court must then determine, from its findings of fact, "whether the proffered expert testimony meets Rule 702(a)'s requirements of qualification, relevance, and reliability." *Id.* at 893, 787 S.E.2d at 11. On appeal, we review the trial court's ruling for abuse of discretion. *Id.* "[A] trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *Id.* (citation omitted).

Rule 702(a) provides:

> (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
> > (1) The testimony is based upon sufficient facts or data.
> > (2) The testimony is the product of reliable principles and methods.
> > (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702(a).

As noted above, "Rule 702(a) has three main parts, and expert testimony must satisfy each to be admissible." *McGrady*, 368 N.C. at 889, 787 S.E.2d at 8. First, the witness must be "qualified as an expert," such that the witness is "in a better position than the trier of fact to have an opinion on the subject[.]" *Id.* at 889, 787 S.E.2d at 9.

Second, the expert testimony must be relevant, and must "assist the trier of fact to understand the evidence[.]" *Id.* at 889, 787 S.E.2d at 8. "But relevance means something more for expert testimony. In order to 'assist the trier of fact,' expert testimony must provide insight beyond the conclusions that jurors can readily draw from their ordinary experience." *Id.* (internal citation omitted).

Third, and most pertinent to our analysis here, the expert testimony must be reliable. When evaluating the reliability of expert testimony, "[t]he primary focus of the inquiry is on the reliability of the witness's principles and methodology, not on the conclusions that they generate[.]" *Id.* at 890, 787 S.E.2d at 9 (internal quotation

67

marks and citations omitted). "However, conclusions and methodology are not entirely distinct from one another, and . . . the court is not required to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* (internal quotation marks and citations omitted).

"The precise nature of the reliability inquiry will vary from case to case[,]" and "determining how to address the three prongs of the reliability test" is within the trial court's discretion. *Id.* In the context of scientific testimony, *McGrady* delineates the following additional factors "from a nonexhaustive list" that may bear upon reliability:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the theory or technique's known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory or technique has achieved general acceptance in its field.

*Id.* at 890-91, 787 S.E.2d at 9 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94, 125 L. Ed. 2d 469, 482-83 (1993)) (internal quotation marks omitted).

Again, these "factors are part of a flexible inquiry, so they do not form a definitive checklist or test[.]" *Id.* at 891, 787 S.E.2d at 9-10 (citations and internal quotation marks omitted). "Whatever the type of expert testimony, the trial court must assess the reliability of the testimony to ensure that it complies with the three-pronged test in Rule 702(a)(1) to (a)(3)." *Id.* at 892, 787 S.E.2d at 10.

3. <u>Analysis</u>

Defendants do not challenge James's qualifications to testify as an expert in the field of bloodstain pattern analysis. Indeed, the record shows that James is unquestionably qualified to provide expert testimony on the subject. Rather, Defendants contend that James's conclusions regarding the untested stains on the underside of Tom's boxer shorts and the bottom of Molly's pajama pants are not the product of reliable principles and methods applied reliably to the facts of this case. We agree.

James coauthored a peer-reviewed treatise on the subject of bloodstain pattern analysis, which sets forth the methodology and standards governing the field. As established at trial, James's treatise provides, *inter alia*: "Although it might seem that visual identification of a stain is blood, it would be sufficient to warrant further analysis of the material, proper scientific approach and legal requirements dictate that such an identification be established to a scientific certainty before it can be presented in court[.]" And when asked about the routine protocol and procedures used in conducting bloodstain pattern analysis, James testified, consistent with his treatise, that the stains should be subject to presumptive, confirmatory, and DNA testing—in that order—*before* an analysis of the spatter is conducted.

Yet, James's analysis of the challenged evidence clearly contravened the reliability protocol established in his own treatise. James testified that he was able

to reach his ultimate conclusions concerning the stains on the underside of Tom's boxer shorts and the bottom of Molly's pajama pants, despite the State's failure to submit those stains for even the most basic testing for the presence of blood (presumptive testing). James testified that he reached his conclusions based on the "physical characteristics" of the stains; he determined that their "location, size, shape, and distribution" were "very characteristic of blood spatter[.]" But again, James acknowledged that he could not testify to a scientific certainty that these stains were, indeed, blood.

James also testified that in conducting an analysis of bloodstained clothing, it is the "best practice" for an analyst to view a photograph of the person wearing the blood-spattered clothes. However, during cross-examination, James conceded that contrary to the best practice set forth in his treatise, he never viewed a photograph of Tom "wearing just the boxer shorts." In fact, "the only photographs that [he] received of [Tom] with his clothing was a different pair of shorts that he was wearing. Apparently the boxer shorts were beneath that. These shorts were given to him to wear." As for Molly, James testified that the State provided him with just one photograph of her wearing the pajama pants. James agreed, however, that it was not readily apparent from that photograph how the pants actually fit Molly on the night of the incident. In the photograph, the pajama pants seem "longer than how pants

would typically fit a person[,]" and "[t]he rear portion . . . appears to be dragging on the ground or between her leg and flip flop[.]"

Notwithstanding James's expertise in bloodstain pattern analysis, noncompliance with the reliability standards and protocol prescribed in one's own treatise is inherently suspect, particularly when the treatise propounds that "proper scientific approach and legal requirements dictate that such an identification be established to a scientific certainty before it can be presented in court." *Cf. McGrady*, 368 N.C. at 891, 787 S.E.2d at 10 (noting that "[t]he federal courts have articulated additional reliability factors that may be helpful in certain cases, including . . . [w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion").

The State argues, and James similarly testified during voir dire, that testing the stains on the underside of Tom's boxer shorts was unnecessary to James's conclusions because the appropriate testing was performed on certain *other stains* appearing on the front side of the boxer shorts. However, these assertions are inconsistent with James's other testimony during voir dire that the spatters on the underside of Tom's boxer shorts "have to be" the result of a separate blow "because on the inside of the hem – it's not a soak-through from the outside so they would have to be coming up from down below."

71

Moreover, Defendants have never challenged the trial court's admission of James's testimony regarding those stains that received full presumptive, confirmatory, and DNA testing before James rendered his analysis. Without such testing, it seems nearly impossible to escape questions of how the testimony could be "based upon sufficient facts or data," N.C. Gen. Stat. § 8C-1, Rule 702(a)(1), and whether "[t]he witness has applied the principles and methods reliably to the facts of the case," *id.* § 8C-1, Rule 702(a)(3). *See State v. Babich*, 252 N.C. App. 165, 168, 797 S.E.2d 359, 362 (2017) ("[E]ven if expert scientific testimony might be reliable in the abstract . . . the trial court must assess whether that reasoning or methodology properly can be applied to the facts in issue." (citation and internal quotation marks omitted)).

In the present case, the State failed to enable James to testify in any reliable manner concerning his analysis of the blood spatter. James readily admitted that the underside of Tom's boxer shorts had not received presumptive testing for the presence of blood, proper protocol per James's treatise. He also conceded that the State never informed him that these stains had not been tested; indeed, he did not learn this information until the day before he testified.

Nevertheless, James testified that he concluded:

> With respect to the small spatters on the front underside of the left leg of the shorts, *these were consistent with the wearer of the shorts close to and above the source of the spattered blood.* To what extent, I can't really say. In order

72

> for the stains to get to that location on the inside of the leg, they would have to be traveling, you know, at least somewhat upward in order to do that. *My conclusion there was the source of the impact spatters is most likely the head of Jason Corbett while it was close to the floor in the bedroom.*

(Emphases added).

This unsupported conclusion is more emphatic than even that which James provided regarding the *tested bloodstains* on the front of Tom's boxer shorts:

> [M]y conclusions are that the spatters on the front of these boxer shorts were confirmed as impact spatters. . . . [T]he stains were embedded within the weave of the fabric, which is pretty much the definition of impact spatter on clothing. And this had me – my conclusions then are these impact spatters are consistent with the wearer of these boxer shorts in proximity to the victim Jason Corbett when blows were struck to his head. The head being the source of the blood in this particular case.

Although James referenced other stains on Defendants' clothing and concluded that they were consistent with the wearer being in Jason's general proximity at the time of impact, the untested stains on the underside of Tom's boxer shorts and Molly's pajama pants were the *only stains* that allowed James to specifically conclude that Jason's head was near or on the floor at the time of impact. Given how critical these particular stains were to supporting James's ultimate conclusions, it is reasonable to expect the State to ensure that this evidence received all of the necessary and recommended testing before expert testimony regarding the source and content of the stains could be admitted at trial.

To be sure, it would certainly be excessive and unreasonable to require that the State test every trace of forensic evidence discovered at a crime scene in order for expert testimony to pass muster under Rule 702. As James explained during voir dire, "DNA laboratories often . . . only allow maybe five or six samples to be submitted" because of the burden that testing additional samples would have on laboratories. In this case, however, the central value of James's testimony—that which is most probative of the State's theory of the case, and consequently, the most prejudicial to Defendants' cases—specifically relates to the untested stains on the underside of Tom's boxer shorts and the bottom of Molly's pajama pants, which James opined tend to show impacts to Jason's head while it was near the floor. Moreover, the State had ample opportunity to ensure that these stains were among those submitted for testing for the presence and source of the purported blood, but failed to do so.

At trial, Ivory testified that he was responsible for testing certain evidence at the request of the Davidson County Sheriff's Office. Ivory explained that he routinely tests materials in accordance with a "submission form," in which the submitting agency "detail[s] specifics of the case as well as any items to be submitted for testing and the type of testing that is requested[.]" According to Ivory, "In this particular case certain areas were asked to be tested." When asked whether anyone requested that he test the stains underneath the hem of Tom's boxer shorts or the bottom of

Molly's pajama pants, Ivory responded that no one requested that those areas be tested. James, however, testified that he had previously suggested that the State test "at least some of the stains that [he] had marked. . . . They did some but not all."

By failing to ensure that suspected blood stains are appropriately tested for the presence of human blood, the State knowingly risked depriving its expert witness of the ability to conduct a blood spatter analysis in accordance with established and reliable principles and methods. This risk is exacerbated in cases where, as here, the expert testimony regarding those specific stains is both a crucial element of the State's case, and highly prejudicial to Defendants.

Here, James simply was not provided with all the necessary information to provide reliable expert testimony that satisfied the requirements of Rule 702(a). As Defendants asserted during voir dire, James's inability to "state to a scientific certainty that [it] is blood" was "not his fault[,]" but the State's:

> [I]f we don't even have presumptive testing on a different set of stains, on a completely different side of this pair of underwear that's coming from a different event, that reaches a different conclusion, then if we don't even have presumptive testing on that, let alone confirmatory. I think, according to [James's] book, that's not something that's properly before this Court, pursuant to 702-(a). I just don't think that it is. Again, that's not Mr. James'[s] fault. He was not provided that piece of information. I'm assuming that could have been tested at some point over the last couple of years. Again, it wasn't – that's not his fault. His own words, he cannot state to a scientific certainty that is blood. If you can't, that's not proper evidence before this Court and before this jury.

For the foregoing reasons, James's testimony regarding the untested stains on Tom's boxer shorts and Molly's pajama pants was based upon insufficient facts and data, and accordingly, could not have been the product of reliable principles and methods applied reliably to the facts of this case. *Id.* § 8C-1, Rule 702(a)(3). Therefore, the trial court abused its discretion by admitting this testimony.

4. Prejudice

"An error is not prejudicial unless there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." *State v. Mason*, 144 N.C. App. 20, 27, 550 S.E.2d 10, 16 (2001) (citation and internal quotation marks omitted). "[T]he erroneous admission of evidence is reversible if it appears reasonably possible that the jury would have reached a different verdict without the challenged evidence." *Id.* at 28, 550 S.E.2d at 16.

Ultimately, the only part of James's testimony that could have possibly assisted the jury in reaching its verdict is James's erroneously admitted conclusion that the untested stains on Tom's boxer shorts and Molly's pajama pants were consistent with a strike to Jason's head "while it was close to the floor in the bedroom." However, it is difficult to view this testimony as anything "more than mere conjecture[,]" given that James's analysis was grounded neither in actual data nor the principles and methods outlined in his treatise and testimony to establish reliability. *See Babich*, 252 N.C. App. at 172, 797 S.E.2d at 364 ("[W]here, as here,

76

the expert concedes that her opinion is based entirely on a speculative assumption about the defendant—one not based on any actual facts—that testimony does not satisfy the *Daubert* 'fit' test because the expert's otherwise reliable analysis is not properly tied to the facts of the case.").

If this is the bedrock of James's scientific inquiry concerning the challenged evidence, then it is unclear why he was in a better position to make this ultimate determination than the lay members of the jury. Without viewing a photograph of Tom wearing the boxer shorts, as James testified was the appropriate practice in his field, James was unable to discern the position of Tom's body relative to Jason at the time of impact. And given the State's failure to ensure that the stains were appropriately tested and verified as Jason's blood, James was no better positioned than the jury to decide with any scientific certainty whether the relevant stains were, in fact, blood—or its source. Mere observations of the "physical characteristics" of the stains and their locations are not determinations that the jury is incapable of making on its own. *Cf. McGrady*, 368 N.C. at 895, 787 S.E.2d at 12 ("Though [the] defendant served in the military, he did not testify that he relied on any specialized training in threat assessment when he evaluated the threat that [the victim] posed to his life and the life of his son. Nor was there any evidence that he relied on anything other than common experience and instinct when he did so. *Jurors possess this experience*

77

*and instinct as well, which is exactly why they are tasked with deciding whether a defendant has acted in self-defense.*" (emphasis added)).

Lastly, it is important to note that North Carolina's 2011 amendment to Rule 702 substantially "chang[ed] the level of rigor that our courts must use to scrutinize expert testimony before admitting it." *Id.* at 892, 787 S.E.2d at 10; *see also id.* (observing that our previous *Howerton* standard "was decidedly less rigorous than the *Daubert* approach" incorporated with the 2011 adoption of the language from the federal rule (internal quotation marks and citation omitted)). Rule 702 as amended "necessarily strikes a balance between competing concerns since the testimony can be both powerful and quite misleading to a jury because of the difficulty in evaluating it." *Id.* (citation and internal quotation marks omitted).

In this case, James's testimony had the powerful effect of bolstering the State's claim that Jason was struck after and while he was down and defenseless. However, given that James's testimony failed to assist the jury in determining whether this was, in fact, the case, the testimony could only serve to unduly influence the jury to reach a conclusion that it was fully capable of reaching on its own. Given this undue influence, as explained in Section VI below, "it appears reasonably possible that the jury would have reached a different verdict without the challenged evidence." *Mason*, 144 N.C. App. at 28, 550 S.E.2d at 16.

C. Tom's Stricken Testimony

Defendants next argue that the trial court erred in striking Tom's testimony that he "hear[d] Molly scream[,] 'Don't hurt my dad.' "  The challenged exchange occurred on direct examination, during Tom's account of the fatal altercation with Jason:

> [DEFENSE COUNSEL:] And what happened after that?
>
> [TOM:] And that's – you know, if I can get any more afraid, that was it.  I can't see him.  It's dark in the bedroom. I'm thinking the next thing is going to be a bat in the back of the head.  I'm on the ground.  I hear Molly scream "Don't hurt my dad."
>
> > [THE STATE:] Objection, move to strike.
> >
> > THE COURT: That's sustained.  Don't consider that, ladies and gentlemen.

As an initial matter, we note that although the State did not "stat[e] the specific grounds" for its objection to Tom's testimony, the parties nevertheless seem to agree that the basis for the State's objection—hearsay—was "apparent from the context." N.C.R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context.").

The trial court erroneously sustained the State's objection to Tom's testimony because Molly's out-of-court statement was either non-hearsay, or alternatively, admissible hearsay.  The prohibition against the admission of hearsay "does not

preclude a witness from testifying as to a statement made by another person when the purpose of the evidence is not to show the truth of such statement but merely to show that the statement was, in fact, made." *State v. Holder*, 331 N.C. 462, 484, 418 S.E.2d 197, 209 (1992) (citation omitted). Thus, when an out-of-court "statement is offered for a purpose other than proving the truth of the matter asserted, it is not hearsay" at all. *Id.*

"The probative value of a nonhearsay statement does not depend, in whole or in part, upon the competency and credibility of any person other than the witness." *Valentine*, 357 N.C. at 524, 591 S.E.2d at 856 (citations and internal quotation marks omitted). "Further, a nonhearsay statement does not put the truth or falsity of the statement at issue." *Id.*; *see also id.* at 521, 524, 591 S.E.2d at 854, 856 (explaining that the statement "You know where we are from and if somebody pulls a knife or a gun out on you, you are supposed to get smoked" was offered not for its truth—"that this was in fact the custom in the area where [the] defendant and [his brother] were raised"—but instead "to show that [the] defendant intended to shoot the victim").

Here, Tom's testimony was not offered to prove the truth of Molly's statement—i.e., that Jason was, in fact, attempting to "hurt [her] dad." Nor did the relevance of this statement depend upon its truth. *See State v. Alston*, 131 N.C. App. 514, 517, 508 S.E.2d 315, 317 (1998) (rejecting the defendant's hearsay challenge to the admission of his child's statement "Daddy's got a gun," where the evidence was

admitted solely for its effect on the officer's state of mind and to "explain his subsequent conduct"), *superseded by statute in part on other grounds, as stated in State v. Gaither*, 161 N.C. App. 96, 103, 587 S.E.2d 505, 510 (2003), *disc. review denied*, 358 N.C. 157, 593 S.E.2d 83 (2004).

Molly's statement was offered and admissible for the non-hearsay purpose of illustrating Tom's then-existing state of mind—a particularly relevant issue, given Defendants' claims of self-defense and defense of another. *See State v. Faucette*, 326 N.C. 676, 683, 392 S.E.2d 71, 74 (1990) (concluding that the victim's statements regarding the defendant's threats were admissible under Rule 803(3) because they revealed the victim's "then-existing fear of [the] defendant" and explained "why she did not want [him] visiting her home," which was relevant to show that the defendant "knew he was entering the . . . home without consent," and "to rebut [the] defendant's self-defense inferences that he did not start shooting until he saw her reach for her gun" (quotation marks omitted)); *see also* N.C. Gen. Stat. § 8C-1, Rule 803(3) (excepting from the rule against hearsay a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition").

The State, however, contends that "[t]he alleged statement, while self-serving, was not relevant. . . . Immediately prior to his stricken testimony of what [Molly] allegedly said, [Tom] testified that Jason had just shoved him across the bed. The alleged statement of [Molly] added nothing to [Tom]'s state of mind." Our dissenting

colleague echoes this sentiment, concluding that "[e]ven assuming, *arguendo*, that the trial court erred by sustaining the State's objection," Defendants are unable to show prejudice, because "Tom had already testified about circumstances illustrating the reasonableness of his fear and apprehension, and Molly's statement – made after the altercation had been well underway – was of mild, if any, additional value." *Dissent* at 49. These assertions miss the point.

Despite the number and complexity of the issues presented, the outcome of this case ultimately turns on whether Defendants' use of deadly force was lawful under the circumstances. Pursuant to N.C. Gen. Stat. § 14-51.3, our statute governing self-defense and defense of others:

> (a) A person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that the conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force. However, *a person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be if . . .* the following applies:
>
> > (1) *He or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another.*
> >
> > . . . .
>
> (b) *A person who uses force as permitted by this section is justified in using such force and is immune from civil or criminal liability for the use of such force . . . .*

N.C. Gen. Stat. § 14-51.3 (emphases added).

Each of the central issues of this appeal ultimately concerns whether the trial court properly admitted or "excluded evidence that was relevant to [Defendants'] belief that [their] li[ves] w[ere] threatened in relation to [their] plea[s] of self-defense" and defense of others. *State v. Webster*, 324 N.C. 385, 389, 378 S.E.2d 748, 751 (1989). "In determining whether there was any evidence of self-defense presented, the evidence must be interpreted in the light most favorable to [the] defendant." *Id.* at 391, 378 S.E.2d at 752.

It is the jury, not the trial court, which must determine the reasonableness of the defendant's belief under the circumstances, "unless there is no evidence from which a jury could conclude [the] defendant's belief is reasonable." *Id.* at 393, 378 S.E.2d at 753; *cf. State v. Harvey*, 372 N.C. 304, 309, 828 S.E.2d 481, 484 (2019) ("Despite his extensive testimony recounting the entire transaction of events from his own perspective, [the] defendant never represented that [the victim's] actions in the moments preceding the killing had placed [the] defendant in fear of death or great bodily harm such that [the] defendant reasonably believed that it was necessary to fatally stab [the victim] in order to protect himself."). "A jury should, as far as possible, be placed in [the] defendant's situation and possess the same knowledge of danger and the same necessity for action, in order to decide if [the] defendant acted under reasonable apprehension of danger to his person or his life." *Webster*, 324 N.C. at 392, 378 S.E.2d at 753.

Here, when viewed in the light most favorable to Defendants, "[t]he excluded testimony went to the heart of [Tom's] self-defense claim[,]" as well as his claim of defense of Molly. *Id.* at 393, 378 S.E.2d at 753. In order to fully appreciate the extent to which "sustaining the objection . . . prevented [Tom] from completing his side of the story[,]" *id.*, it is necessary to review the challenged testimony in full context:

> [DEFENSE COUNSEL:] What happened after you came down the hallway?
>
> [TOM:] Okay. Then we come back down the hallway and we emerged from the hallway. We are back in the bedroom and so I get what I think is a chance to hit him, as I have before, in the back of the head, only this time he's ready for me. And he puts up his left hand and catches the bat perfectly right in his palm as I swing the bat at the back of his head. But in the process, Molly goes free. She escapes to his right or he let's [sic] her go. Anyway, the two of them separate. But now he's got the bat. And I'm still holding the bat. But he cocks his arm like this (demonstrated). Jason is right-handed, that's my experience. This is with his left hand. He cocks his hand and he punches out (demonstrating) and shoves me across the entire bed, the width of the bed, and I'm on the floor with my back to him and face down on the carpet. And –
>
> Q. And what happened after that?
>
> A. And that's – you know, if I can get any more afraid, that was it. I can't see him. It's dark in the bedroom. I'm thinking the next thing is going to be a bat in the back of the head. I'm on the ground. I hear Molly scream "Don't hurt my dad."
>
> > [THE STATE:] Objection, move to strike.
> >
> > THE COURT: That's sustained. Don't consider that,

ladies and gentlemen.

[DEFENSE COUNSEL:] All right.

[TOM:] And I'm scrambling. I remember thinking irrationally now that I lost my glasses in this exchange and that I need to find my glasses. You know, I'm shook up, and then I realize how stupid that is. I'm better off without my glasses. Because if you are in a fight, you don't want your glasses jammed into your eyes. But I don't know how long it took me. It was a shock to get thrown across the bedroom. But I get up. And I turn over and I get up and now I see Jason essentially where he was, which is essentially where we started, inside the door to the bedroom, just a step or two toward that door from the hallway to the right of the bed as you enter the bedroom, and he's got the bat, and Molly is by the nightstand in the, you know – it's between the wall on that side and the bed, so she's over there. She's trapped. She can't get past him.

> [THE STATE:] Objection to what Molly may or may not be able to do.
>
> [DEFENSE COUNSEL:] His observations.
>
> THE COURT: That's overruled. He may continue.

[TOM:] And I'm on the other side of the room at the end of the bed. And things look pretty bleak. He's got the bat. He's in a good – looks like he's in a good athletic position. He has his weight down on the balls of his feet. He's kind of looking between me and Molly. And so I decided there's – well, I decided to rush him and try to get ahold of the bat.

Viewed in full context, the significance of Tom's testimony regarding Molly's statement "Don't hurt my dad" is manifest. Not only was this statement directly "relevant to [Tom]'s belief that his life was threatened in relation to his plea of self-

defense[,]" *Webster*, 324 N.C. at 389, 378 S.E.2d at 751, but for reasons more fully explained below, the exclusion of this testimony also bore upon the question of Tom's ultimate role in the affray—i.e., whether the evidence supported a jury instruction on the aggressor doctrine, *see State v. Holloman*, 369 N.C. 615, 628, 799 S.E.2d 824, 833 (2017) (holding that the provisions of N.C. Gen. Stat. § 14-51.4(2)(a) "allowing an aggressor to regain the right to use defensive force under certain circumstances do not apply in situations in which the aggressor initially uses deadly force against the person provoked").

"In light of the circumstances of this case and the trial court's instructions on self-defense," *Webster*, 324 N.C. at 393, 378 S.E.2d at 753, as explained in Section VI, we conclude that the trial court committed prejudicial error in striking Tom's testimony that he "hear[d] Molly scream[,] 'Don't hurt my dad.' " *Cf. id.* at 392-94, 378 S.E.2d at 753-54 (awarding the defendant a new trial where the trial court "erroneously sustained the State's objection to the question about whether [the] defendant felt that his life was threatened because that evidence was highly relevant to the crucial question of [the] defendant's statement of mind at the time of the shooting, his knowledge and belief of danger, and his knowledge and belief of the necessity for action in relation to his plea of self-defense").

## V.    Instructional Error

We next address the trial court's decision to instruct the jury on the aggressor doctrine with respect to Tom's claim that he was, at all times, acting in self-defense and in defense of his daughter, Molly. Tom argues that the trial court committed reversible error by instructing the jury that he would not be entitled to the full benefit of self-defense or defense of a family member if the jury found that he were the initial aggressor in the altercation with Jason. We agree.

A.    Standard of Review

"The jury charge is one of the most critical parts of a criminal trial." *State v. Lee*, 370 N.C. 671, 674, 811 S.E.2d 563, 565 (2018) (citation omitted). The trial court's duty is momentous: to deliver a clear instruction on the law arising from all of the evidence presented, and to do so "in such manner as to assist the jury in understanding the case and in reaching a correct verdict." *Holloman*, 369 N.C. at 625, 799 S.E.2d at 831 (citation omitted). We review de novo parties' challenges to the trial court's decisions regarding jury instructions. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009).

"The jury must not only consider the case in accordance with the State's theory but also in accordance with [the] defendant's explanation." *State v. Guss*, 254 N.C. 349, 351, 118 S.E.2d 906, 907 (1961) (per curiam). Consequently, "[w]here there is evidence that [the] defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in

[the] defendant's evidence." *State v. Dooley*, 285 N.C. 158, 163, 203 S.E.2d 815, 818 (1974); *see also Lee*, 370 N.C. at 677, 811 S.E.2d at 568 (Martin, C.J., concurring) (asserting that the principle articulated in *Dooley* "should apply equally to defense of another" where the evidence supports such an instruction).

In considering whether to deliver a jury instruction on self-defense, the trial court generally must view the evidence in the light most favorable to the defendant. *State v. Mumma*, 372 N.C. 226, 239 n.2, 827 S.E.2d 288, 297 n.2 (2019) (citing *Holloman*, 369 N.C. at 625, 799 S.E.2d at 831). However,

> this principle does not apply to the determination of whether the trial court erred by addressing the "aggressor" doctrine in the course of instructing the jury concerning the law of self-defense. In determining whether a self-defense instruction should discuss the "aggressor" doctrine, the relevant issue is simply whether the record contains evidence from which the jury could infer that the defendant was acting as an "aggressor" at the time that he or she allegedly acted in self-defense.

*Id.* (citing *State v. Cannon*, 341 N.C. 79, 82-83, 459 S.E.2d 238, 241 (1995)).

"When there is no evidence that a defendant was the initial aggressor, it is reversible error for the trial court to instruct the jury on the aggressor doctrine of self-defense." *State v. Juarez*, 369 N.C. 351, 358, 794 S.E.2d 293, 300 (2016). Where the trial court delivers an aggressor instruction "without supporting evidence, a new trial is required." *State v. Vaughn*, 227 N.C. App. 198, 202, 742 S.E.2d 276, 278 (citation and quotation marks omitted), *disc. review denied*, 367 N.C. 221, 747 S.E.2d

526 (2013).

B.     Aggressor Doctrine

Simply stated, the aggressor doctrine denies a defendant "the benefit of self-defense if he was the aggressor in the situation." *Juarez*, 369 N.C. at 358, 794 S.E.2d at 300.  An individual who "aggressively and willingly enter[s] into the fight without legal excuse or provocation" is properly deemed "the aggressor in bringing on the difficulty[.]" *State v. Mize*, 316 N.C. 48, 51-52, 340 S.E.2d 439, 441 (1986).

Courts consider a variety of factors in determining which party was the aggressor, including the circumstances that precipitated the altercation; the presence or use of weapons; the degree and proportionality of the parties' use of defensive force; the nature and severity of the parties' injuries; or whether there is evidence that one party attempted to abandon the fight.  *See, e.g.*, *State v. Spaulding*, 298 N.C. 149, 155, 257 S.E.2d 391, 395 (1979) (determining that the victim was the aggressor in a fatal prison-yard knife fight where the victim continued to advance upon the defendant "with his hand jammed into his pocket," while the defendant, who anticipated the attack and "arm[ed] himself as a precaution," used no "language tending to incite an affray" and "made no show of force"); *State v. Washington*, 234 N.C. 531, 534, 67 S.E.2d 498, 500 (1951) ("All the evidence offered at the trial below shows that the deceased, and not the defendant, was the aggressor.  The defendant's evidence indicates that she was entirely free from fault and never fought willingly

and unlawfully. Her evidence further shows that the deceased made a violent attack upon her. . . . She begged the deceased to stop beating her, and it was only after he announced his intention to take her elsewhere and kill her that she stabbed him in a vital spot.").

The State's arguments, and the dissent's conclusion with respect to this issue, heavily rely upon the disparity of injuries suffered by the parties. The State disputes Tom's contention that the State failed to introduce any evidence to contradict Defendants' version of events, and counters that "the lack of any injuries to [Tom], compared with the devastating injuries to Jason, is sufficient evidence to support the aggressor instruction." According to the State, this Court "held exactly that" in *State v. Presson*, 229 N.C. App. 325, 747 S.E.2d 651 (2013). For support, the State cites the following portion of our Court's opinion in *Presson*: "Further, the lack of injuries to [the] defendant, compared to the nature and severity of the wounds on [the victim] at his death, is sufficient evidence from which a jury could find that [the] defendant was the aggressor or that [the] defendant used excessive force." 229 N.C. App. at 330, 747 S.E.2d at 656.

This portion of *Presson*, however, addresses the sufficiency of the State's evidence to withstand the defendant's motion to dismiss the charges, based on his claim of perfect self-defense. *See id.* Although the defendant in *Presson* also contended that the trial court erred by instructing the jury that he "would lose the

right to self-defense if he was the aggressor," *id.*, review of this issue was limited to plain error, due to the defendant's failure to object to the jury instructions at trial, *id.* at 331, 747 S.E.2d at 656. *See id.* ("[The d]efendant bases this claim on similar grounds as those stated in his first argument, arguing that there is insufficient evidence to support the finding that [he] was in any way the aggressor in the fatal confrontation. But, as we have set forth above, the State did put forth sufficient evidence from which a reasonable jury could find that [the] defendant was the aggressor or used excessive force. Accordingly, we find no error with the jury instruction explaining that [the] defendant was not entitled to perfect self-defense if he was found to be the aggressor.").

The distinction between the standard of review of a motion to dismiss and that of plain error is significant. *Compare id.* at 329, 747 S.E.2d at 655 (noting that a motion to dismiss based on perfect self-defense requires the trial court to consider "whether the State has presented substantial evidence which, when taken in the light most favorable to the State, would be sufficient to convince a rational trier of fact that the defendant did not act in [perfect] self-defense"), *and State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."), *with Mumma*, 372 N.C. at 241, 827 S.E.2d at 298 ("As a result of [the] defendant's failure to object to the delivery of an 'aggressor' instruction to the jury before the trial court, [the]

defendant is only entitled to argue that the delivery of the 'aggressor' instruction constituted plain error, under which [the] defendant is not entitled to an award of appellate relief on the basis of the alleged error unless he can demonstrate that a fundamental error occurred at trial that had a probable impact on the jury's finding that the defendant was guilty[.]" (citations, quotation marks, and footnote omitted))*, and Juarez*, 369 N.C. at 358-59, 794 S.E.2d at 300 (concluding that it was "not necessary . . . to decide whether an instruction on the aggressor doctrine was improper," because the defendant failed to meet his burden, under plain error review, of showing that "absent the erroneous instruction, it is probable that the jury would have found that he acted in perfect self-defense" and "would not have rejected his claim of self-defense for other reasons").

The cases that the dissent and the State cite for the proposition that a disparity in injuries is, standing alone, sufficient evidence to support an instruction on the aggressor doctrine were reviewed for plain error. *See Mumma*, 372 N.C. at 241-42, 827 S.E.2d at 298; *Juarez*, 369 N.C. at 357-58, 794 S.E.2d at 299-300; *Presson*, 229 N.C. App. at 330-31, 747 S.E.2d at 656. However, the State cites no case, and we are unaware of any, to so hold upon review for preserved error. Tom's challenge to the inclusion of the aggressor instructions was properly preserved at trial; therefore, *Mumma*, *Juarez*, *Presson*, and other plain error cases with a heightened review for prejudice are inapposite here.

At the charge conference in the instant case, defense counsel requested that the trial court remove all aggressor language from the proposed pattern instructions, asserting that there was no evidence to support "that anyone was the aggressor but Jason." The State conceded that it had "no objection to the Court declining to instruct on the aggressor issue as to Defendant Molly Corbett." As to Tom, however, the State contended that there was "conflicting evidence as to which party was the aggressor," because "there was comment about when the bat entered the equation[.]" The State noted that Tom "brought the one physical deadly weapon" into the fight, in that "the bat entered the equation when [Tom] was standing outside the room, heard an argument, and decided to barge in[.]"

To the extent that the trial court based its ruling on Tom's decision to arm himself with the baseball bat before joining the affray, this ruling was in error. The mere fact that a defendant was armed is not evidence that he was the aggressor if he made no unlawful use of his weapon. *See Spaulding*, 298 N.C. at 155, 257 S.E.2d at 395 ("In going out into the yard, [the] defendant was going to a place where he had a right to be. In arming himself as a precaution, in the context of this case, [the] defendant was not at fault vis-à-vis the law of homicide so long as he did not use the knife or threaten [the] decedent with it until it became necessary or apparently necessary to do so in self-defense." (internal citation omitted)); *State v. Alston*, 228 N.C. 555, 557-58, 46 S.E.2d 567, 568-69 (1948) (awarding a new trial due to the trial

court's erroneous denial of the defendant's request for an instruction "that the fact that the defendant had a pistol in his pocket, but had made no unlawful use of it prior to the attack upon him by the deceased, would not deprive the defendant of his legal right of self-defense"); *Vaughn*, 227 N.C. App. at 203, 742 S.E.2d at 279-80 (concluding that the "[d]efendant's decision to arm herself and leave the vehicle, while perhaps unwise, was not, in and of itself, evidence that she brought on the difficulty, 'aggressively and willingly' entered the fight, or intended to continue the altercation"); *State v. Tann*, 57 N.C. App. 527, 531, 291 S.E.2d 824, 827 (1982) (rejecting the State's argument that the "defendant, who anticipated the confrontation, armed himself with a .38 caliber pistol, and failed to avoid the fight, was somehow responsible for causing the altercation. These observations do not in any way suggest that [the] defendant was the provocator . . . ." (citation omitted)).

The State also argued at the charge conference that Tom "assumed some degree of aggression after there was a pause when he was no longer under a continuous assault," but nonetheless opted to rejoin the affray. In support of this argument, the State cited the portion of Tom's testimony from which the State successfully moved to strike Molly's statement, "Don't hurt my dad":

> [THE STATE:] . . . The testimony from [Tom] from his direct and cross-examination was that after there had been strikes against [Jason] in the bedroom, in the hallway to the bath, in the bathroom, and then back into the bedroom, that [Jason] had caught the bat in his left hand, had then moved [Tom] claims, to have been flung all the

> way across the room even to the ground. He went as far as to say he was expecting to get hit in the head with the bat, which was his perception that [Jason] had time to advance upon him and hit him with the bat. Instead he had enough time to realize he had lost his glasses and finds his glasses, then stands up and turns around and in this confined space sees [Jason]. Yes, holding the bat, but not advanced on him having not attacked him, having not advanced on [Molly], who [Tom] said escaped [Jason's] grasp moments earlier and had moved over to the side away from him.
>
> [Tom] describes very deliberating [sic] everything, evaluated the situation and made the choice, in his words, to rush [Jason]. He then arrested, in his testimony, the bat from [Jason] and proceeded to hit him in the head repeatedly. That would be some indication certainly at least as to [Tom] that at that point in time he assumed some degree of aggression after there was a pause when he was no longer under a continuous assault. Since we believe that's a reasonable interpretation of the evidence, we ask that that instruction be kept.

Insofar as the trial court based its ruling upon the above argument, that decision was erroneous for two reasons. First, as discussed in Section IV(C) above, Tom's testimony that he heard Molly scream, "Don't hurt my dad," was admissible and should not have been excluded. Proper admission of this testimony would have foreclosed the State's argument during the charge conference that "there was a pause when [Tom] was no longer under a continuous assault." Second, Jason was the initial aggressor, and the first person to use deadly force; therefore, Jason could not regain the right to use defensive force unless he first withdrew from the affray.

"Historically, . . . North Carolina law did not allow an aggressor using deadly force to regain the right to exercise the right of self-defense in the event that the person to whom his or her aggression was directed responded by using deadly force to defend himself or herself." *Holloman*, 369 N.C. at 626, 799 S.E.2d at 831; *see also id.* at 626, 799 S.E.2d at 831-32 (explaining the limits of the common-law rule—that "if one takes life, though in defense of his own life, in a quarrel which he himself has commenced with intent to take life or inflict serious bodily harm, the jeopardy into which he has been placed by the act of his adversary constitutes no defense whatever, but he is guilty of murder" (citations and quotation marks omitted)).

In 2011, however, "the General Assembly amended the law of self-defense in North Carolina to clarify that one who is not the initial aggressor may stand his ground, regardless of whether he is in or outside the home." *Lee*, 370 N.C. at 675 n.2, 811 S.E.2d at 566 n.2 (internal citation omitted). Our amended defensive force "statutes provide two circumstances in which individuals are justified in using deadly force, thus excusing them from criminal culpability." *Id.* at 674, 811 S.E.2d at 566. Pursuant to N.C. Gen. Stat. § 14-51.3(a),

> a person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be if either of the following applies:
>
> (1) He or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another.

96

>> (2) Under the circumstances permitted pursuant to [N.C. Gen. Stat. §] 14-51.2.

N.C. Gen. Stat. § 14-51.3(a)(1)-(2).[5]

"Both sections provide that individuals using force as described are immune from civil or criminal liability and that such individuals have no duty to retreat before using defensive force." *State v. Bass*, 371 N.C. 535, 541, 819 S.E.2d 322, 325-26 (2018) (citations and internal footnote omitted). Accordingly, "wherever an individual is lawfully located . . . the individual may stand his ground and defend himself from attack when he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or another." *Id.* at 541, 819 S.E.2d at 326.

As under the common law, the right to use defensive force is not unlimited under N.C. Gen. Stat. §§ 14-51.2 and 14-51.3. Indeed, the statutory justification is not available to an individual who uses defensive force, and:

>> (2) Initially provokes the use of force against himself or herself. However, the person who initially provokes the use of force against himself or herself will be justified in using defensive force if either of the following occur:

>> a. The force used by the person who was provoked is so serious that the person using defensive force reasonably believes that he or she was in imminent danger of death or serious bodily harm, the person using defensive force had no reasonable means to retreat, and the use of force

---

[5] N.C. Gen. Stat. § 14-51.2, "Home, workplace, and motor vehicle protection; presumption of fear of death or serious bodily harm," provides a rebuttable presumption in favor of the "lawful occupant of a home, motor vehicle, or workplace" who uses deadly defensive force under the circumstances set forth by subsection (b). "This presumption does not arise" under N.C. Gen. Stat. § 14-51.3(a)(1). *Lee*, 370 N.C. at 675, 811 S.E.2d at 566.

which is likely to cause death or serious bodily harm to the person who was provoked was the only way to escape the danger.

b. The person who used defensive force withdraws, in good faith, from physical contact with the person who was provoked, and indicates clearly that he or she desires to withdraw and terminate the use of force, but the person who was provoked continues or resumes the use of force.

N.C. Gen. Stat. § 14-51.4(2).

In *Holloman*, our Supreme Court, construing N.C. Gen. Stat. § 14-51.4(2)(a) for the first time, considered "the extent, if any, to which North Carolina law allows an aggressor to regain the right to utilize defensive force based upon the nature and extent of the reaction that he or she provokes in the other party." 369 N.C. at 626, 799 S.E.2d at 831. Our Supreme Court first observed that, unlike the common-law rule, the plain language of subsection (2)(a) "does not, when read literally, appear to distinguish between situations in which the aggressor did or did not utilize deadly force." *Id.* at 627, 799 S.E.2d at 832.

Nevertheless, the Supreme Court declined to adopt the defendant's proposed construction—"which would allow an aggressor to utilize defensive force in the event that his conduct caused the person provoked to lawfully utilize deadly force in his own defense"—concluding that such an interpretation "cannot be squared with the likely legislative intent motivating the enactment of" N.C. Gen. Stat. § 14-51.4(2)(a):

Simply put, the adoption of [the] defendant's construction of [N.C. Gen. Stat.] § 14-51.4(2)(a) would create a situation

in which the aggressor utilized deadly force in attacking the other party, the other party exercised his or her right to utilize deadly force in his or her own defense, and the initial aggressor then utilized deadly force in defense of himself or herself, thereby starting the self-defense merry-go-round all over again. We are unable to believe that the General Assembly intended to foster such a result, under which gun battles would effectively become legal, and hold that the provisions of [N.C. Gen. Stat.] § 14-51.4(2)(a) allowing an aggressor to regain the right to use defensive force under certain circumstances do not apply in situations in which the aggressor initially uses deadly force against the person provoked.

*Id.* at 628, 799 S.E.2d at 833.

In the instant case, the undisputed evidence—viewed in the light most favorable to the State—simply does not support that anyone but Jason was the aggressor in the altercation on 2 August 2015. That night, Tom and Sharon were staying in the guest bedroom in the basement, below the master bedroom occupied by Jason and Molly. Tom "had been asleep for a while" when he "was awakened from a sound sleep" by noises upstairs. Tom testified that he "heard thumping, like loud foot falls on the floor above [him] and . . . a scream and loud voices."

Tom surmised from these noises that "[t]here was an obvious disturbance going on above [him] somewhere in the house." According to Tom, "it sounded bad . . . like a matter of urgency." Tom testified that he instinctively "got out of bed, grabbed that baseball bat" off the floor beside his luggage, where he had left it earlier that evening, and—without getting dressed or putting on shoes—headed upstairs. Tom explained

that although he "did not know at that time what . . . was" causing the commotion upstairs, "[i]t seemed like a good idea" to bring the bat with him, because he "was going up to something that sounded confrontational and [he]'d rather have the baseball bat in [his] hand than not."

Once he arrived upstairs, Tom determined that the noises were coming from inside of Jason and Molly's bedroom. At trial, Tom described the scene he witnessed when he opened the door:

> [TOM:] In front of me, I would say seven or eight feet in front of me, in front of the door as I opened the door, Jason had his hands around Molly's neck. They were facing each other. She was a little to the right. He was a little to the left (indicating).
>
> [DEFENSE COUNSEL:] Where were they in the bedroom?
>
> A. They were, as I'm entering the door, they were to the right of the bed and maybe a step out from the bed closer to the bedroom, the exit from the bedroom.
>
> Q. What happened next?
>
> A. Um – I closed the door.
>
> Q. Why?
>
> A. I don't know. I don't. I did. I know that I did. And I said, "Let her go." And he said, "I'm going to kill her." And I said, "Let her go." And he said, "I'm going to kill her." And I said, "Let her go." (Witness starting to cry.) And he said, "I'm going to kill her." And I don't know how many times that happened. But it happened several times. But I left something out. When I entered, he had his hands up around her neck, and as soon as I entered, he reversed

himself so that he had her neck in the crook of his right arm (demonstrating). And she was in front of him between me and him.

Q. What happened then?

A. And he was really angry.

[THE STATE:] Objection.

THE COURT: Overruled.

[TOM:] And I was really scared. And he took a step back toward the hallway that goes to the bathroom. And I was afraid that he would get to the bathroom and close the door and that would be the end of that. (Witness crying.) Because I would not be able to save her behind the bathroom door. So I took a step to my right and I hit him in the head, the back of the head with the baseball bat. That seemed like the most effective place to hit him. I didn't want to hit Molly. So I tried to hit the back of the two of them glued together. His head was taller than hers and I know that I hit him that time. But it didn't have any effect except seemingly further enraged him. He didn't waiver [sic]. He didn't go down.

[DEFENSE COUNSEL:] How tall are you?

A. About 5,11 [sic].

Q. How much do you weigh?

A. I weigh about 160 pounds.

Q. So after – what happened after you hit him the first time?

A. Then he did, as I feared, he continued to edge down toward into the hallway leading to the bathroom. And I didn't have as much room in that hallway to maneuver as

I did in the bedroom. But I tried. And I tried to hit him as many times as I could to distract him because he now had Molly in a very tight chokehold with his forearm on this side (indicating) and his bicep on this side (demonstrating). She was no longer – she was no longer wiggling. She was just weight, being dragged back into the hallway. So I tried to hit him. I don't know how effective those hits were because I didn't have room to maneuver and to – but I tried. And I was determined that he was not going to close that bedroom door between me and her. And he did get to the bathroom but I was too close for him to close the door.

And we got into the bathroom and now I had room to maneuver again and I did what I did before in the bedroom, I took a step to the right, and was able to get the little angle on him behind him and I hit him. So I know of two times that I hit him in the back of the head and whatever happened in the hallway. (Long pause.) And again, it didn't seem to have any effect. And so he changed tactics at that point. I mean, he had gone into the bathroom. I had followed him into the bathroom and so now he started to push back down the hallway and I was able to get into the hallway before him, but he's pushing me down the hallway – I mean, he's not literally touching me. He's pushing Molly down in front of him and he's getting away. I really don't think I hit him in that trip, in the return trip in the hallway, because he was initiating the action toward me and I was scared and – anyway, that's what I remember.

In this contest, the parties were not equally positioned. Jason was 39 years old, 6'0" tall, and weighed 262 lbs. Tom was 65 years old, 5'11" tall, and weighed 160 lbs. Molly was 31 years old, 5'6" tall, and weighed 110 lbs.

The State offered no evidence to refute Tom and Molly's account of the events, nor does the disparity in the parties' injuries, alone, tend to do so. Furthermore, in

focusing solely on the absence of obvious injuries to Defendants, the dissent and the State fail to acknowledge other evidence that tends to corroborate their version of events, including the long blonde hair that is visible in the palm of Jason's right hand in State's Ex. 172, a photograph taken at the scene of the incident and admitted at trial; and evidence that Molly was suffering from shock when first responders arrived to the scene. Deputy David Dillard testified that Molly was "visibly upset" and "very obviously in shock" when he interviewed her that night. Sergeant Barry Alphin testified that when he left the ambulance to check on Molly, he found her lying on the ground in the fetal position, covered with a blanket. At some point, he noticed that her throat was red.

Moreover, as to the aggressor determination, it is significant that Jason was the first to employ deadly force. Tom testified that from the moment he opened the bedroom door, "Jason had his hands around Molly's neck," and he was stating his intention to kill her. As Tom entered the room, Jason "reversed himself so that he had her neck in the crook of his right arm[,]" and he kept Molly in a "very tight chokehold" in front of him while the fight moved from room to room. At some point, Tom noticed that Molly "was no longer wiggling. She was just weight, being dragged back into the hallway."

As a retired FBI agent, Tom knew the potential dangers of Jason's "very tight chokehold." Tom testified on cross-examination that he was "pretty familiar with this

chokehold[,]" which works to "subdue someone by restricting their blood flow," due to its previous popularity with the Los Angeles Police Department. And Tom testified that Molly was subdued quickly: "Initially she was wiggling. When he put her into the chokehold, but as we got down and into the hallway she was pretty limp."

All of the evidence supports that Jason was the initial aggressor in the affray, and the first person who used deadly force. In that Tom "did not aggressively and willingly enter into the fight without legal excuse or provocation[,]" *Mize*, 316 N.C. at 51, 340 S.E.2d at 441, the trial court erred by instructing the jury on the aggressor doctrine with respect to Tom's claims of self-defense and defense of another.

## VI.    Prejudice

Finally, we consider the extent to which Defendants were prejudiced by the errors analyzed above. Again, "[a]n error is not prejudicial unless there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." *Mason*, 144 N.C. App. at 27, 550 S.E.2d at 16; *see also* N.C. Gen. Stat. § 15A-1443(a). As explained below, we agree with Defendants that "there is a reasonable possibility that, had the error[s] in question not been committed, a different result would have been reached at" trial. N.C. Gen. Stat. § 15A-1443(a).

First, as explained in Section IV(A)(1), the children's interview statements contained significant material evidence that went to the heart of Defendants' claims

of self-defense and defense of another. Sarah was a fact witness, as her nightmare was the event that precipitated Jason and Molly's fight, which led to the fatal altercation. During the multi-disciplinary team meeting preceding the children's medical evaluations at the Dragonfly House, Detectives Hanna and Riggs specifically requested that Reagan inquire about Sarah's nightmare during the children's forensic interviews.

Moreover, Jack's Dragonfly House interview is *the only evidence* that could have explained the presence of the brick paver in the bedroom. This evidence was extremely important to the Defendants' cases as well as the State's case: for Defendants, Jack's statement would have provided a reasonable explanation for the existence of an otherwise out-of-place brick paver in Molly and Jason's bedroom. The State, on the other hand, *benefited* from the unexplained presence of one of two potential murder weapons in the master bedroom, and in fact, raised this very question during its opening statement, noting: "There is a brick paver in the master bedroom and there is nothing else having to do with landscaping or gardening or building walls inside that bedroom."

Defendants requested that the trial court consider the State's reference to the brick paver during its opening argument when the court eventually ruled upon Defendants' motion to admit the children's hearsay statements:

> [DEFENSE COUNSEL:] A brief matter, nothing to rule on
> at this time. During [the State's] opening statement he

made reference to the paving stone and indicated there were no gardening implements in the room. We made a pretrial motion to be able to get in the statements from Jack Corbett he made at the Dragonfly House. One of the things he talked about in that statement is how the paving stone got into the bedroom in the first place. I believe that would be relevant on that issue. And would ask at the time the Court consider that as well not for diagnosis or treatment in terms of the State is raising an issue and their investigation at least, you know, showed that Jack Corbett said how the paving stone got there. They left a question for the jury. I want the Court to take that into consideration when the time comes if we offer evidence and before that to the Court.

Following the trial court's exclusion of the children's hearsay statements, Defendants made a motion in limine to preclude the State from "arguing to the jury how did that paving stone get in there when they have evidence from an individual who is taken to the Dragonfly House and made that statement . . . to ask that evidence be suppressed, then argue to the contrary, I would say would be inappropriate[.]" The State assured the trial court and Defendants that it would avoid the issue during closing arguments. Nevertheless, the damage was already done.

Included in the evidence Defendants submitted in support of their Motion for Appropriate Relief are numerous screenshots of Facebook comments showing individuals—including multiple members of the jury—discussing the case.[6]

---

[6] As discussed in Section II, the no-impeachment rule bars the admission of "evidence of any statement by [a juror] concerning a matter about which he would be precluded from testifying . . . for the[ ] purpose[ ]" of impeaching the jury's verdict. N.C. Gen. Stat. § 8C-1, Rule 606(b); *see also id.* § 15A-1240(a). For this reason, the evidence Defendants submitted in support of their Motion for

According to jury foreman Tom Aamland, the jurors "had many unanswered questions while deliberating[,]" but " 'how and why' the paver made it into the home" was the "*#1 question that was talked about when deliberations started*[.]" (Emphasis added). Jack's statement from his Dragonfly House interview would have answered this question, and its exclusion clearly prejudiced Defendants' ability to present a meaningful defense. *Cf. Lee*, 370 N.C. at 676, 811 S.E.2d at 567 ("[T]he record reflects a reasonable possibility that, had the trial court given the required stand-your-ground instruction, a different result would have been reached at trial. During closing argument the State contended that [the] defendant's failure to retreat was culpable. As such, the omission of the stand-your-ground instruction permitted the jury to consider [the] defendant's failure to retreat as evidence that his use of force was unnecessary, excessive, or unreasonable." (internal citation omitted)).

Similarly, the children's statements regarding Jason's worsening issues with anger management, along with their statements concerning the relationship between Jason and Molly, would have corroborated and provided significant context for the written statement that Molly provided at the Davidson County Sheriff's Office on 2 August 2015. Moreover, the children's statements would also have corroborated

Appropriate Relief is inadmissible to impeach the verdicts rendered by the jury in this matter. However, there is no prohibition on this Court's consideration of this evidence for the purposes of assessing whether Defendants suffered actual prejudice by the errors discussed herein, and determining the likelihood that, absent these errors, "a different result would have been reached at" trial. *Id.* § 15A-1443(a).

testimony from Katie Wingate, nurse practitioner at Kernersville Primary Care, where both Molly and Jason were patients. Wingate testified that when Jason visited Kernersville Primary Care on 16 July 2015, approximately two weeks prior to his death,

> [h]e reported he had been feeling faint and dizzy, this started six months ago, was now occurring more frequently. Now occurring at least once a week and at random times. No relation to exercise or walking. *He said he had been more stressed and angry lately for no reason.* He had also not been taking his thyroid medication for six or seven weeks, had not had follow-up with his cardiologist in at least a year.

(Emphasis added).

The State had just successfully moved to admit into evidence Jason's medical records from his 16 July 2015 visit to Kernersville Primary Care when Wingate provided the testimony above. However, neither the State nor Defendants were aware that these records even existed until the morning before Wingate testified. Where the State opens the door by proffering medical records and a testifying witness to explain their contents, fundamental fairness demands that Defendants be permitted to offer evidence to corroborate that Jason had been "more stressed and angry lately for no reason." The children's interview statements would have served this purpose.

Defendants argue that, in addition to corroborating Jason's medical records, the children's statements also describe specific "instances of [Jason's] irrational anger

toward [Molly] and themselves[,]" which "would have been admissible when offered to demonstrate [Jason's] angry and violent nature," and to establish Jason's "role in the altercation as the aggressor." However, this argument is foreclosed by our Supreme Court's decision in *State v. Bass*, 371 N.C. 535, 819 S.E.2d 322 (2018), which was released during the parties' briefing period to our Court. *See Bass*, 371 N.C. at 544, 819 S.E.2d at 327 ("To say that a person is the aggressor on a specific occasion is not to say that he has a violent character: a generally peaceful person may experience a moment of violence, and a normally aggressive or violent person might refrain from violence on a specific occasion. . . . Accordingly, *with regard to a claim of self-defense, the victim's character may not be proved by evidence of specific acts*." (emphasis added)).

Nonetheless, *Bass* does not foreclose the admission of *all* evidence regarding a victim's character for violence. Even where specific violent acts would be inadmissible, the victim's character for violence may still be proved through evidence of his reputation in the community, or statements offered in the form of an opinion. *See State v. Watson*, 338 N.C. 168, 188, 449 S.E.2d 694, 706 (1994) (holding that, "[b]ecause the jury was instructed on self-defense and was required to determine who was the aggressor in the affray," the trial court erred by excluding a defense witness who would have provided opinion testimony regarding the victim's violent character), *disavowed in part on other grounds by State v. Richardson*, 341 N.C. 585, 461 S.E.2d

109

724, *cert. denied*, 514 U.S. 1071, 131 L. Ed. 2d 569 (1995); *see also Bass*, 371 N.C. at 544, 819 S.E.2d at 328 (distinguishing *Watson* on the basis that "*Watson* dealt only with opinion evidence—not evidence of specific acts" and thus "it sheds little light on the issue presented" in *Bass*).

Assuming, *arguendo*, that the children's statements regarding Molly and Jason's relationship, as well as Jason's "angry and violent nature," might be admissible as *opinion* evidence, and not as evidence of specific violent acts committed by Jason against Molly, the record supports that there is a reasonable possibility that the exclusion of this evidence affected the jury's verdicts. In support of their Motion for Appropriate Relief, Defendants included a news report that was released prior to televised coverage of the case on ABC News "20/20," in which jurors challenged Molly's claim, during her pretrial interview with 20/20, that she was a victim of abuse. As one juror explained, "The defense did not once suggest any of that[.] *So we as jurors, or me as a juror, cannot take that into consideration because it was never presented as a possibility.*" (Emphasis added). Aamland echoed this sentiment: "We had to go by what we heard[.]"

Furthermore, for the reasons explained in Section IV(B), James's expert testimony on bloodstain pattern analysis failed to satisfy the reliability requirements set forth under N.C. Gen. Stat. § 8C-1, Rule 702(a)(1)-(3), as interpreted by our

Supreme Court in the seminal case of *State v. McGrady*, 368 N.C. 880, 787 S.E.2d 1 (2016).

We emphasize that we do not hastily arrive at our conclusion on this issue: that, not only did the trial court err by admitting James's testimony regarding the untested stains on Tom's boxer shorts and Molly's pajama pants, but also, that it "appears reasonably possible that the jury would have reached a different verdict without the challenged evidence." *Mason*, 144 N.C. App. at 28, 550 S.E.2d at 16.

Abuse of discretion is certainly a high bar to overcome, with the burden of demonstrating prejudice even more cumbersome. Here, however, James's testimony and conclusions regarding the untested stains on Tom's boxer shorts and Molly's pajama pants were not based upon sufficient facts and data to reliably pass muster under N.C. Gen. Stat. § 8C-1, Rule 702(a)(1). Moreover, notwithstanding James's unchallenged qualifications in the field of bloodstain pattern analysis, a careful review of his testimony raises serious questions concerning the extent to which he "applied his own methodology reliably in this case." *McGrady*, 368 N.C. at 899, 787 S.E.2d at 14.

Here, the erroneous admission of James's testimony was significantly prejudicial to Defendants. This was the *only* evidence offered as direct proof that Defendants hit Jason in the head from above. James's testimony thus bolstered the State's case to show that Defendants administered blows while Jason was down on

the ground and defenseless. And yet, because James's conclusions about the untested stains were supported by neither sufficient data nor reliable methodology, his testimony about the "physical characteristics" of the stains—including their "location, size, shape, and distribution"—could not have assisted the jury in rendering its verdicts, "because these matters were within the jurors' common knowledge." *Id.* at 895, 787 S.E.2d at 12; *see also id.* ("The factors that [the defendant's proposed expert witness] cited and relied on to conclude that [the] defendant reasonably responded to an imminent, deadly threat are the same kinds of things that lay jurors would be aware of, and would naturally consider, as they drew their own conclusions.").

Additionally, as explained in Section IV(C), Tom's testimony regarding Molly's statement "Don't hurt my dad" was admissible and should not have been excluded. The trial court's error in sustaining the State's objection to this testimony was prejudicial. Tom's testimony was directly relevant to the reasonableness of his belief that the use of deadly force was necessary to prevent imminent death or great bodily harm to himself or Molly—that is, whether his use of deadly force was lawful under the circumstances, the central issue of the case. Moreover, the trial court's erroneous exclusion of this testimony made way for the State's argument for jury instructions on the aggressor doctrine, contending that "at that point in time [Tom] assumed some degree of aggression after there was a pause when he was no longer under a continuous assault."

The trial court committed reversible error in Tom's case by delivering unsupported jury instructions on the aggressor doctrine. *Juarez*, 369 N.C. at 358, 794 S.E.2d at 300. This error alone entitles Tom to a new trial. However, the record evinces that the trial court's error very likely prejudiced Molly, as well.

The trial court ruled, as a matter of law, that Molly was not the aggressor, but instructed the jury that it could find her guilty under an acting-in-concert theory of culpability. "We have long held that a jury is presumed to follow the instructions given to it by the trial court." *State v. Wiley*, 355 N.C. 592, 637, 565 S.E.2d 22, 52 (2002) (citation omitted), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003). Here, however, the record clearly demonstrates that the jury *did not* follow the trial court's instructions. In the Facebook comments proffered by Defendants in support of their Motion for Appropriate Relief, Aamland stated, "[W]e decided on 2nd degree for both, *but feel Molly was the aggressor*, and her dad wanted to take the heat for her actions… he admitted participating, so 'in concert' means equal responsibility to both." (Emphasis added). Accordingly, while the trial court reversibly erred by delivering unsupported jury instructions on the aggressor doctrine in Tom's case, whether due to confusion or some other reason, the record also clearly establishes that the jury did not follow the trial court's instructions with regard to Molly.

For these reasons, we conclude and hold that Defendants satisfied their burden of demonstrating prejudice—that "there is a reasonable possibility that, had the

error[s] in question not been committed, a different result would have been reached at" trial. N.C. Gen. Stat. § 15A-1443(a).

Specifically, Defendants have established a reasonable possibility that the jury might have reached a different result, but for (1) the erroneous exclusion of the children's hearsay statements during their interviews conducted by Union County DSS personnel on 3 August 2015, and at the Dragonfly House Children's Advocacy Center on 6 August 2015; (2) the improper admission of expert testimony regarding the untested stains on Tom's boxer shorts and Molly's pajama pants, which failed to satisfy N.C.R. Evid. 702(a)'s reliability requirements; and (3) the trial court's error in sustaining the State's motion to strike Tom's testimony that he heard Molly scream, "Don't hurt my dad." In addition, the trial court committed reversible error in Tom's case by delivering unsupported jury instructions on the aggressor doctrine. Although Tom, alone, is entitled to a new trial on this basis, for the reasons explained above, the record indicates that this instructional error very likely confused the issues for the jury in Molly's case as well.

Accordingly, we hold that both Defendants are entitled to a new trial in this matter. Moreover, because the issues discussed herein are dispositive of Defendants' appeals, we need not and do not address the additional arguments raised in their briefs.

## VII. Conclusion

114

"The jury is the lie detector in the courtroom and is the only proper entity to perform the ultimate function of every trial—determination of the truth." *State v. Kim*, 318 N.C. 614, 621, 350 S.E.2d 347, 351 (1986). The tragic and unusual circumstances of this case are a humble reminder of the importance of the jury's vital role in our delicate system of justice. Due to the compounding evidentiary and instructional errors that occurred both before and throughout the three-week trial in this matter, Defendants were prevented from presenting a meaningful defense, or from receiving the full benefit of their claims of self-defense and defense of a family member. As a result, the jury was denied critical evidence and rendered incapable of performing its constitutional function. Defendants are therefore entitled to a new trial.

For the reasons stated herein, we affirm the trial court's order denying Defendants' Motion for Appropriate Relief. However, due to the numerous preserved, prejudicial errors apparent within the record, we reverse the judgments entered upon Defendants' convictions for second-degree murder and remand for a new trial.

NEW TRIAL.

Judge TYSON concurs.

Judge COLLINS concurs in part and dissents in part by separate opinion.

COLLINS, Judge, concurring in part and dissenting in part.

I concur in the majority opinion that the trial court did not err by (1) denying Defendants' request for an evidentiary hearing on their Motion for Appropriate Relief ("MAR"), (2) denying Defendants' MAR, or (3) denying Defendants' motions to dismiss for insufficient evidence. I respectfully dissent from the remainder of the majority opinion that leads to its conclusion that Defendants are entitled to a new trial.

## I. Factual Background

Although the majority opinion includes a recitation of the facts, I include a recitation of the facts as well.

Jason was a native of the Republic of Ireland, where he originally lived with his first wife, Margaret, and their children, Sarah and Jack. Margaret died of an asthma attack in 2003. After Margaret's death, Jason employed Molly as an *au pair*. After several weeks, Jason and Molly established a romantic relationship. In 2011, Jason, Molly, Sarah, and Jack (collectively, the "Corbetts") moved to Davidson County, North Carolina. Jason and Molly got married that same year.

*Tom Martens' testimony*

On 1 August 2015, Tom and his wife Sharon, Molly's mother, decided to visit the Corbetts. Tom, an attorney and retired FBI agent, packed a Little League baseball bat and a cut-down tennis racket for Jack. Tom and Sharon left their home in Knoxville, Tennessee and arrived at the Corbetts' home at 8:30 pm. When they

arrived, Jason was sitting in a lawn chair in the driveway having a beer with his neighbor. Jason got up and greeted Tom and Sharon.

Tom unpacked the car while Molly ordered pizza. Tom, Sharon, Jason, Molly, and Sarah had pizza while Jack was at a party. Jack arrived home around 11:00 pm. Tom did not give Jack the bat at that point because it was late and time for everyone to go to bed. Tom and Sharon retreated to the guest room in the basement, which is just below the bathroom that joins Jason and Molly's master bedroom.

Tom testified, "I was awakened from a sound sleep, and I don't know what time it was, but I had been asleep for a while. And I heard thumping, like loud foot falls on the floor above me and I heard a scream and loud voices. There was an obvious disturbance going on above me somewhere in the house." Tom got out of bed, grabbed the baseball bat that was with his luggage on the floor beside his bed, and went upstairs. He opened the door to Jason and Molly's bedroom and saw that "Jason had his hands around Molly's neck." Tom went inside the bedroom and closed the door.

Tom repeatedly told Jason, "Let her go." Jason repeatedly replied, "I'm going to kill her." Tom testified, "I was really scared" and described how Jason, with Molly's neck in the crook of his arm, took a step toward the hall that led to the bathroom. Fearing Jason would get to the bathroom and close the door, Tom testified, "I took a step to my right and I hit him in the head, the back of the head with the baseball bat." But Jason "didn't waiver. He didn't go down." Tom further described the altercation,

admitting, "I tried to hit him as many times as I could to distract him because he now had Molly in a very tight chokehold with his forearm . . . ."

Once they were in the bathroom, Tom angled himself behind Jason and hit Jason two more times in the head. Tom again stated this "didn't seem to have any effect." Jason then began pushing into the hallway while holding Molly in front of him. When they were back in the bedroom, Tom swung the bat again, but Jason caught the bat with his left hand and Molly was able to go free. At this point, both Tom and Jason had the bat. Jason "cock[ed] his hand," "punche[d] out," and shoved Tom across the bed. Tom ended up "on the floor with [his] back to him and face down on the carpet."

When Tom got up, he saw Jason with the bat and Molly by the nightstand. Tom decided to "rush" Jason and "try to get ahold of the bat." When he did so, both he and Jason ended up with both hands on the bat. Tom testified that he tried to hit Jason with the end of the bat. In doing so, Jason "los[t] his grip," and Tom gained control of the bat.

Tom did not know how many times he hit Jason. Tom testified, "I hit him until he goes down. And then I step away. . . . I hit him until I thought that he could not kill me." After he gathered his thoughts, he called 911. Tom told the 911 operator, "My, my, uh, daughter's husband, uh, my son-in-law, uh, got in a fight with my daughter, I intervened, and I, I think, um, and, he's in bad shape. We need help. . . .

He, he's bleeding all over, and I, I may have killed him." While on the 911 call, Molly and Tom both tried to administer CPR, as guided by the operator. When law enforcement arrived, Molly and Tom were told to wait outside on the front porch.

On direct examination, Tom testified, "[Jason] wasn't my favorite person. I didn't like him. I'm sure I said disparaging things about him." On cross-examination, Tom acknowledged that prior to marrying Molly, Jason had transferred a "sizeable amount" of money to America to purchase the Davidson County residence, such that there was no mortgage on the property. Additionally Jason had transferred $49,073.39 to Tom "for the marriage[.]" Tom was aware that Jason had a life insurance policy and that Molly was the beneficiary.

### Barry Alphin's testimony

Sergeant Barry Alphin, a paramedic with Davidson County Emergency Medical Services ("EMS"), received a call at 3:03 am on 2 August 2015 that someone was in cardiac arrest. Ten minutes later he arrived at the scene in an ambulance with his co-worker, David Bent. They had arrived at the scene before they received an update that the call had been changed from cardiac arrest to assault. Alphin went into the room and "saw blood all over the floor and walls." He saw a lamp laying on the floor, and "there was a brick right there in front of it. I noticed there was a small ball bat leaning up against a dresser. . . . As we walked in, I saw [Jason] supine or feet laying out on his back with his head around the corner." Molly and Tom were in

the room, and Molly was doing chest compressions on Jason. Paramedics took over the chest compressions; Molly and Tom stepped outside the door. At some point, Alphin noticed some redness on Molly's throat or neck.

Alphin went to the ambulance and retrieved a back board. With the assistance of other rescue workers, he put Jason on the board and took him to the ambulance. He attempted to intubate Jason. Alphin testified, "I went to lift the chin. As I did, my left hand, all of my fingers went inside the skull. My right hand was just mushy. At that point I realized there was severe heavy trauma to the back of the head." Alphin noted Jason's "eye[] sockets had a lot of gel blood. His ear had a lot of gel." He tried to clean Jason up to find the source of bleeding. He also noted dried blood on Jason's cheek. At 3:24 am, Alphin concluded that life sustaining efforts were futile and stopped advanced life support.

### *David Bent's testimony*

David Bent, also a paramedic with Davidson County EMS, arrived at the scene with Alphin and attempted to get into the master bedroom. They were not able to open the door completely because Jason was lying naked on the floor, partially blocking the door. Bent "observed dry blood on" Jason's body. At some point, he came into contact with Molly and observed a light redness on the left side of her neck. She told him she had been choked. She also told him she felt okay and did not want to go to the hospital.

## Clayton Daggenhart and Rusty Ramsey's testimony

Corporal Clayton Daggenhart with the Davidson County Sheriff's Office received a call from the 911 center a little after 3:00 am on 2 August 2015. The call originally came in as a cardiac incident, but two minutes later was changed to an assault call. He arrived at the scene at 3:16 am; an ambulance was in the driveway. Daggenhart went directly inside the house and into the master bedroom. As he closed the door, he noted blood on the backside of it. A naked white male, who he later determined was Jason, was lying on his back next to what appeared to be puddles of congealing blood. Jason appeared to have a pool of blood around his left eye socket as well as blood on his chest. Daggenhart took some photographs of the scene, and then EMS personnel loaded Jason onto a portable back board and placed him on a stretcher to remove him from the residence.

After Jason's body was removed, Daggenhart began looking around the room. Daggenhart testified,

> I noted that there was blood that appeared to be dried or drying on the wall. There were several pools of blood next to where the body had been. There was blood on the wall past where the body had been. I noted more blood that was going into what seemed to be and was the master bathroom.

He also observed a "brick stone or paving stone and a baseball bat . . . [r]ight next to a dresser that's just to the side of the master bedroom area that leads out to the foyer." There were areas near the base of the door that were saturated with blood.

When Daggenhart exited the bedroom, Defendants were standing just outside the door. Daggenhart did not notice anything remarkable about either one, except that Molly had blood on the top of her head. Daggenhart asked them to exit the house. Daggenhart and Corporal Rusty Ramsey were directed to go retrieve the children from their bedrooms. Daggenhart testified that Sarah was "asleep in bed undisturbed, wasn't affected in any way." Ramsey testified that when he knocked on Jack's bedroom door, Jack was asleep. The officers woke the children up, carried them down the stairs, and left them with Sharon, who had come up from the basement.

*Amanda Hackworth's testimony*

Amanda Hackworth, also a paramedic with Davidson County EMS, was working with another paramedic, Carley Lane, when they received a cardiac arrest call a little after 3:00 am on 2 August 2015. When they arrived at the scene to assist, Jason was already being brought out of the house on the stretcher. Hackworth got into the back of the ambulance to assist. She was putting a lead on Jason to get a better cardiac read when she reached across his body and felt his torso was cool. She turned to Alphin and asked, "How long did you say they waited before they called 911[?]" She said Alphin replied, "'They said they called as soon as he went down.'"

*David Dillard's testimony*

Patrol Deputy David Dillard was called to the scene a little after 3:00 am. After taping the perimeter of the scene, he escorted Molly to his patrol car. She remained there for about an hour while he remained beside the car. He testified, "She was making crying noises but I didn't see any visible tears. She was also rubbing her neck (demonstrating). I would say in a scrubbing motion-type thing. It wasn't a constant. She would do it and stop and do it and then stop while continuing to make the crying noises. That was about everything she had done."

### *Frank Young's testimony*

Lieutenant Frank Young, a Crime Scene Investigations Supervisor, arrived at the scene at about 4:00 am. He went to the patrol car in which Molly was sitting "to photograph her for any possible injuries she had received." Young testified, "as I was preparing [to take] the photographs, [Molly] continually tugged and pulled on her neck with her hand. I asked her to please stop doing that." After several requests, she stopped. Young did not note any injuries on Molly's person.

Young also took photographs inside the master bedroom. One photograph depicted a brick with hair on it. Young later photographed both Molly and Tom at the Sheriff's Department. He did not note any injuries on either individual.

### *Molly's written statement*

Molly gave a written statement to law enforcement officers on 2 August 2015 in which she stated the following:

> My husband, Jason Corbett, was upset that he awoke and an argument ensued with him telling me to "shut up," (etc.) and he applied pressure to my throat/neck and started choking me. At some point, I screamed as loud as possible. He covered my mouth and then started choking me again with his arm. My father, Tom Martens, came in the room and I cannot remember if he said something or just hit Jason to get him off me. Jason grabbed the bat from him and I tried to hit him with a brick (garden decor) I had on my nightstand. I do not remember clearly after that.

### Dr. Craig Nelson's testimony

Dr. Craig Nelson, Associate Chief Medical Examiner at the North Carolina Office of the Chief Medical Examiner, performed an autopsy on Jason's body on 3 August 2015. "The autopsy documented multiple blunt force injuries. These included ten different areas of impact on the head, at least two of which had features suggesting repeated blows indicating a minimum of 12 different blows to the head. Additionally, he had a few other injuries elsewhere on his body, the torso and extremities." The bones in Jason's nose were broken and there were "two large complex lacerations towards the back of the head" indicating repeated blows to those areas. Portions of Jason's skull on both the left and right sides had fractures all the way around them, such that when the scalp was pulled back in the autopsy, those portions fell out of place. One laceration on the back of Jason's head "ha[d] an appearance of a postmortem injury in that there[] [was] very little bleeding of that injury, suggesting it happened after the heart had stopped." Nelson testified, "The

degree of skull fractures in this case are the types of injuries that we may see in falls from great heights or in car crashes under other circumstances."

Nelson further testified that an abrasion on the right side of Jason's forehead had a sharp linear component, consistent with an object that had an edge, that he would not expect to see from a baseball bat. Jason had a contusion on the back of his left hand and some blunt force injuries on his right thigh. Jason's blood alcohol level was .02% and he tested positive for a low level of Trazadone, an antidepressant medication that can have some sedative effects. Nelson determined the cause of death to be "blunt force head trauma."

### *Melanie Carson's testimony*

Melanie Carson, a forensic scientist with the North Carolina State Crime Laboratory in the Trace Evidence Unit, testified that one of two hairs recovered from the end of the baseball bat, as well as twelve of twenty-five hairs recovered from the brick, were microscopically consistent with a hair sample taken from Jason.

### *Wendell Ivory's testimony*

Wendell Ivory, a forensic scientist with the North Carolina State Crime Lab, testified that the baseball bat, brick, Molly's pajama top and bottom, Tom's shirt, and Tom's boxer shorts tested positive for the presence of human blood. Furthermore, DNA profiles taken from the tissue recovered from the brick, as well as tissue

recovered from Molly's pajama top and bottom matched the DNA profile obtained

from Jason.

*Stuart James' testimony*

Stuart James was accepted by the trial court as an expert in the field of

bloodstain pattern analysis. James reviewed the photographs and videos taken at

the scene, as well as the physical evidence collected by law enforcement, and prepared

a written report on his findings and conclusions. Stuart testified regarding the blood

stains on Tom's boxer shorts as follows:

> And my conclusions are that the spatters on the front of
> these boxer shorts were confirmed as impact spatters. . . .
> And this had me -- my conclusions then are these impact
> spatters are consistent with the wearer of these boxer
> shorts in proximity to the victim Jason Corbett when blows
> were struck to his head. The head being the source of the
> blood in this particular case.
>
>  . . . .
>
> With respect to the small spatters on the front underside
> of the left leg of the shorts, these were consistent with the
> wearer of the shorts close to and above the source of the
> spattered blood. To what extent, I can't really say. In order
> for the stains to get to that location on the inside of the leg,
> they would have to be traveling, you know, at least
> somewhat upward in order to do that. My conclusion there
> was the source of the impact spatters is most likely the
> head of Jason Corbett while it was close to the floor in the
> bedroom.

In his report, he concluded, *inter alia*:

- . . . . Multiple impacts to the source of blood occurred as the
  source of blood was descending to the floor. This resulted

- 11 -

in the large accumulation of bloodshed in this area where the body of Jason Paul Corbett was discovered on the floor. . . .

. . . .

- The Louisville Slugger baseball bat with blood transfer and hair fragments is consistent with having impacting [sic] the head of Jason Paul Corbett.

- The paving brick with blood transfer and hair fragments is consistent with having impacting [sic] the head of Jason Paul Corbett. The presence of transfer stains on all surfaces of the brick is not consistent with a single impact to his head.

### *Joann Lowry's testimony*

Joann Lowry, one of Tom's co-workers, testified that during a conversation she had with Tom in 2015, Tom said, referring to Jason, "that son-in-law, I hate him."

## II. Issues

After considering the parties' arguments and my partial concurrence in the majority opinion, I consolidate and structure my discussion of the issues as follows: whether the trial court erred by (1) excluding from evidence certain interview statements made by Sarah and Jack; (2) instructing the jury on the aggressor doctrine as to Tom's claims of self-defense and defense-of-others; (3) allowing into evidence certain testimony by the State's blood spatter expert; (4) excluding from evidence Tom's testimony about a statement made by Michael Fitzpatrick; (5) striking Tom's testimony about a statement made by Molly during the altercation; (6)

instructing the jury on the criminal liability theory of concerted action as to Molly; and (7) denying Tom a fair trial based on cumulative error.

The majority opinion addresses issues 1, 2, 3, 5, and 7, but does not address issues 4 and 6.

## III.  Discussion

### 1.  *Exclusion of the Children's Statements*

Defendants contend that the trial court erred by excluding from evidence certain statements made by Sarah and Jack as inadmissible hearsay.

Before trial, Defendants moved to admit statements made by the children during 3 August 2015 interviews with a Union County Department of Social Services ("DSS") social worker[7] ("DSS Interviews") and 6 August 2015 interviews with a child forensic interviewer at the Dragonfly House ("Dragonfly House Interviews"), a child advocacy center, under several hearsay exceptions.  The statements concerned the events surrounding Jason's killing as well as prior instances of Jason's violent conduct.  Defendants also moved to determine the unavailability of Sarah and Jack.  The State moved to exclude the statements.

The trial court conducted an evidentiary hearing on the motion during a special session of superior court on 8 and 9 June 2017, and continued to consider the

---

[7] Defendants also moved to admit statements made by the children during 13 August 2015 interviews with a Davidson County DSS social worker.  Defendants have made no argument on appeal that those statements were erroneously excluded and thus the issue is deemed abandoned.  N.C. R. App. P. 28(a).

admissibility of the proffered statements during the presentation of the evidence at trial. The trial court excluded the children's statements from evidence and entered a written order memorializing its ruling. The trial court found Sarah and Jack unavailable in that they were "beyond the jurisdiction and process" of the court. The trial court concluded the children's statements were inadmissible under Rule 803(4)'s medical diagnosis or treatment exception because "they were not intended to obtain a medical diagnosis or treatment" and "they were not pertinent to any medical diagnosis or treatment." The trial court further concluded the children's statements were inadmissible under Rule 803(24)'s residual exception because they "do not have circumstantial guarantees of trustworthiness."

*A. Rule 803(4)'s Medical Treatment or Diagnosis Exception*

Defendants first contend that statements made by Sarah and Jack during their Dragonfly House Interviews were admissible under Rule 803(4)'s medical treatment or diagnosis hearsay exception.[8]

We review de novo a trial court's determination of the admissibility of an out-of-court statement pursuant to Rule 803(4). *State v. Norman*, 196 N.C. App. 779, 783, 675 S.E.2d 395, 399 (2009).

---

[8] Defendants make no argument on appeal that the trial court erred in excluding under this exception statements made by the children at the DSS interviews; such argument is thus deemed abandoned. N.C. R. App. P. 28(a).

Rule 803(4) excepts from the general rule against hearsay[9]

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

*Id.* § 8C-1, Rule 803(4) (2017). "This exception to the hearsay doctrine was created because of a 'patient's strong motivation to be truthful' when making statements for the purposes of medical diagnosis or treatment." *State v. Lewis*, 172 N.C. App. 97, 103, 616 S.E.2d 1, 4-5 (2005) (citing N.C. Gen. Stat. § 8C-1, Rule 803(4) official commentary (2003)).

In *State v. Hinnant*, 351 N.C. 277, 523 S.E.2d 663 (2000), our North Carolina Supreme Court created the following two-part inquiry to determine if statements are admissible under Rule 803(4): "(1) whether the declarant's statements were made for purposes of medical diagnosis or treatment; and (2) whether the declarant's statements were reasonably pertinent to diagnosis or treatment." *Id.* at 284, 523 S.E.2d at 667. "The first part of the inquiry seeks to determine the child's purpose in making the statement, not the interviewer's purpose in conducting the interview." *Lewis*, 172 N.C. App. at 103, 616 S.E.2d at 5 (*citing Hinnant*, 351 N.C. at 289, 523 S.E.2d at 671).

---

[9] "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2017). "Hearsay is not admissible except as provided by statute or by" the Rules of Evidence." *Id.* § 8C-1, Rule 802 (2017). There is no dispute that the statements at issue are hearsay.

"[T]he proponent of Rule 803(4) testimony must affirmatively establish that the declarant had the requisite intent by demonstrating that the declarant made the statements understanding that they would lead to medical diagnosis or treatment." *Hinnant*, 351 N.C. at 287, 523 S.E.2d at 669. In determining whether a child's statements are admissible under this exception, "the trial court should consider all objective circumstances of record surrounding declarant's statements in determining whether he or she possessed the requisite intent under Rule 803(4)." *Id.* at 288, 523 S.E.2d at 670.

In *Hinnant*, statements made by a five-year-old alleged victim of sexual abuse were not admissible under Rule 803(4) where "there [was] no affirmative record evidence indicating that [the child's] statements were medically motivated and, therefore, inherently reliable." *Id.* at 290, 523 S.E.2d at 671. The child was interviewed by a clinical psychologist two weeks after an initial medical examination, but just prior to a follow-up examination by a medical doctor. The record did not "disclose that [the psychologist] or anyone else explained to [the child] the medical purpose of the interview." *Id.* at 289-90, 523 S.E.2d at 671. "In addition, the interview was not conducted in a medical environment. Instead, it was held in what [the psychologist] described at trial as a 'child-friendly' room, one in which all of the furniture was child-sized." *Id.* at 290, 523 S.E.2d at 671. "In [the Court's] view, such a setting did not reinforce to [the child] her need to provide truthful information." *Id.*

*COLLINS, J., concurring in part and dissenting in part.*

Thus, the Supreme Court could not conclude that the child understood that the psychologist "was conducting the interview in order to provide medical diagnosis or treatment." *Id.* at 289, 523 S.E.2d at 671. Because the record failed to demonstrate that the child possessed the requisite intent when speaking with the psychologist, the child's statements "were not made for purposes of medical diagnosis or treatment." *Id.* at 290, 523 S.E.2d at 671. The trial court thus erred in admitting the statements under Rule 803(4). *Id.* at 290-91, 523 S.E.2d at 671.

In this case, Brandi Reagan, Executive Director of the Dragonfly House Children's Advocacy Center and certified child forensic interviewer, conducted interviews with Sarah and Jack. At trial, Reagan explained that when a child arrives at the Dragonfly House for an appointment, the child is met by a child advocate who "talks with th[e] nonoffending caregiver and the child about . . . people they are going to meet, every service they are going to receive[,] and what would happen at the end of the appointment." The child advocate tells the caregiver and the child "that they are there to receive a forensic interview and a medical exam. . . . [Y]ou are going to receive an interview and you will do these things in the interview; you will receive a medical exam and do these things in the medical exam."

Heydy Day, the child advocate in this case, testified, "I start off talking to the child and the caregiver saying, 'you will be talking with one of my friends today,' whether that's our interviewer Kim or interviewer Brandi, you will be talking to that

lady." Day testified that she would tell the children that cameras would "record what you and her talk about because this is really important. This way I don't have to talk to all of these different people that you don't know." She further testified that she would tell the children that while they were talking with her friend, their caregiver would be talking to the doctor. Finally, she testified that she would tell the children, "Once you finish talking with Miss Kim or Miss Brandi and the doctor finishes talking with the caregiver, then the doctor will call you back to do a head to toe check-up of you."

Reagan testified that the Dragonfly House is housed in an old home and the forensic interviews took place in one of the bedrooms that was designed and decorated to be a "child-friendly" interview room. The interview room was separate from the medical examination room, but in the same facility. Sarah and Jack were not introduced to the physician or taken to a medical examination room until after they had completed their forensic interviews with Reagan.

At the beginning of the interview, Reagan introduced herself to Sarah in the following manner, "My name is Brandi, and it is my job to talk to you today, okay?" In response to Reagan's specific inquiry, "Tell me why you're here today[,]" Sarah responded, "Because my dad died."

Similarly, Reagan introduced herself to Jack in the following manner, "And Jack, my name is Brandi. And it's my job to talk to you today." In response to

Reagan's specific inquiry, "Tell me why you're here[,]" Jack responded, "Um, my dad died, and people are trying – my aunt and uncle from my dad's side are trying to take away – take me away from my mom. And – that's why I'm here. My mom's trying to get custody over us." Toward the end of the interview, Reagan asked Jack, "And since you found out you were coming here, um, what has been in your mind?" Jack responded, "I was nervous at first, but then – and then my grandma and mom said everything's going to be fine. You're just going to ask me some questions, and they wanted me to tell the truth." Reagan then asked, "What do you want to happen now?" Jack responded, "Um, to be with my mom."

The objective circumstances of record surrounding each child's interview do not indicate that Sarah or Jack understood that the purpose of the interview was to gain information from them for their medical diagnosis or treatment. First, Sarah, almost 8, and Jack, almost 11, were both old enough to understand the purpose of the interview, and they specifically indicated that they understood the purpose of the interview was to talk about their dad dying and, in Jack's case, to help his Mom get custody of Sarah and him. *Cf. Lewis*, 172 N.C. App. at 104, 616 S.E.2d at 5 (children aged 8 and 9 "were old enough to understand the interviews had a medical purpose, and they indicated as such" by "sign[ing] forms stating they understood that the registered nurse would share their statements with a medical doctor"). Recognizing the difficulty of determining whether a declarant understood the purpose of his or her

statements, courts have attempted to infer a declarant's understanding from the surrounding circumstances. Here, however, no such inference is necessary as Sarah and Jack specifically articulated their understanding of the purpose of the interviews, which was something other than medical diagnosis and treatment. This record evidence alone leads to a conclusion that the children's statements were not medically motivated and, therefore, not inherently reliable.

The lack of inherent reliability in Sarah and Jack's statements is further demonstrated by additional surrounding circumstances. As in *Hinnant*, the interviews took place in a "child-friendly" room, not a medical examination room. Moreover, neither Reagan, a certified child forensic interviewer, nor Day, a child advocate, was a medical professional, and neither explained to Sarah or Jack a medical purpose for the interview or explained that their discussion would be shared with a doctor. To the contrary, Day explained that their *caregiver* would talk to the doctor while they were being interviewed and that *after* their interview they would receive a medical examination by a doctor; Reagan explained to each child that during their interview it was simply her job to talk to them. *Compare Hinnant*, 351 N.C. at 289-90, 523 S.E.2d at 671 (the Court could not conclude that the child understood the interviews were conducted in order to provide medical diagnosis or treatment where the record did not "disclose that [the psychologist] or anyone else explained to [the child] the medical purpose of the interview") *with Lewis*, 172 N.C. App. at 103-04, 616

S.E.2d at 5 (The record indicated that both children had the requisite intent to make their statements for a medical purpose where they "were both interviewed by a registered nurse, at least one of whom was wearing a nurse's uniform. . . . Both children signed forms stating they understood that the registered nurse would share their statements with a medical doctor. Both nurses testified that they also explained to the children their discussions would be shared with a doctor, who would then perform a medical examination.").

Accordingly, Defendants failed to affirmatively establish that Sarah or Jack had the requisite intent to make statements during the forensic interview for purposes of obtaining medical diagnoses or treatment. Thus, the trial court properly concluded Sarah and Jack's statements made during the Dragonfly House Interviews were inadmissible under Rule 803(4)'s medical treatment or diagnosis exception. In light of this conclusion, I need not analyze whether either of the children's statements "were reasonably pertinent to diagnosis or treatment." *Hinnant*, 351 N.C. at 284, 523 S.E.2d at 667.

*B. Rule 803(24)'s Residual Exception*

Defendants next contend that the trial court abused its discretion by excluding the children's statements made during their DSS Interviews and Dragonfly House Interviews because the trial court improperly concluded those statements lacked

sufficient guarantees of trustworthiness to be admissible under Rule 803(24)'s residual exception.

"[A]dmissibility of hearsay statements pursuant to the 803(24) residual exception is within the sound discretion of the trial court." *State v. Smith*, 315 N.C. 76, 97, 337 S.E.2d 833, 847 (1985). Thus, a trial court's decision to admit or deny the admission of evidence under Rule 803(24) may be disturbed on appeal only where an abuse of such discretion is shown. *See id.* An abuse of discretion warranting reversal results only where the trial court's ruling is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Rollins*, 224 N.C. App. 197, 199, 734 S.E.2d 634, 635 (2012) (quotation marks and citation omitted).

North Carolina Rule of Evidence 803(24) provides that the following is not excluded by the rule against hearsay:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

N.C. Gen. Stat. § 8C-1, Rule 803(24) (2017). "Because of the residual nature of the Rule 803(24) hearsay exception and the Commentary's warning that '[t]his exception does not contemplate an unfettered exercise of judicial discretion,' evidence proffered

for admission pursuant to . . . Rule 803(24) . . . must be carefully scrutinized by the trial judge within the framework of the rule's requirements." *Smith*, 315 N.C. at 91-92, 337 S.E.2d at 844. Thus, prior to admitting or denying hearsay evidence proffered under of the residual hearsay exception, the trial court must determine the following:

> (1) whether proper notice has been given, (2) whether the hearsay is not specifically covered elsewhere, (3) whether the statement is trustworthy, (4) whether the statement is material, (5) whether the statement is more probative on the issue than any other evidence which the proponent can procure through reasonable efforts, and (6) whether the interests of justice will be best served by admission.

*State v. Valentine*, 357 N.C. 512, 518, 591 S.E.2d 846, 852 (2003) (citing *Smith*, 315 N.C. at 91-98, 337 S.E.2d at 844-48).

Under the third part of this six-part test, the trial court must determine "whether the statement is trustworthy." *Id.*; *see* N.C. Gen. Stat. § 8C-1, Rule 803(24) (proffered hearsay statement must contain "circumstantial guarantees of trustworthiness" equivalent to those underpinning the remaining exceptions enumerated in Rule 803). "This threshold determination has been called 'the most significant requirement' of admissibility under Rule 803(24)." *Smith*, 315 N.C. at 93, 337 S.E.2d at 845.

In weighing the "circumstantial guarantees of trustworthiness" of a hearsay statement for purposes of Rule 803(24), the trial court must consider "(1) assurances of the declarant's personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever

recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination." *State v. Triplett*, 316 N.C. 1, 10-11, 340 S.E.2d 736, 742 (1986) (citing *Smith*, 315 N.C. 76, 337 S.E.2d 833). "Also pertinent to this inquiry are factors such as the nature and character of the statement and the relationship of the parties." *Triplett*, 316 N.C. at 11, 340 S.E.2d at 742 (citation omitted).

> None of these factors, alone or in combination, may conclusively establish or discount the statement's "circumstantial guarantees of trustworthiness." The trial judge should focus upon the factors that bear on the declarant at the time of making the out-of-court statement and should keep in mind that the peculiar factual context within which the statement was made will determine its trustworthiness.

*Smith*, 315 N.C. at 94, 337 S.E.2d at 845. "[I]f the trial judge examines the circumstances and determines that the proffered testimony does not meet the trustworthiness requirement, his inquiry must cease upon his entry into the record of his findings and conclusions, and the testimony may not be admitted pursuant to Rule 803(24)." *Id.*

"When ruling on an issue involving the trustworthiness of a hearsay statement, a trial court must make findings of fact and conclusions of law on the record." *State v. Sargeant*, 365 N.C. 58, 65, 707 S.E.2d 192, 196 (2011) (citation omitted). "We are bound by findings of fact supported by competent evidence." *State v. Brown*, 339 N.C. 426, 438, 451 S.E.2d 181, 189 (1994) (citations omitted). "This holds true even if evidence exists 'from which a different conclusion could have been

reached.'" *Brown*, 339 N.C. at 438, 451 S.E.2d at 189 (quoting *State v. Johnson*, 322 N.C. 288, 293, 367 S.E.2d 660, 663 (1988)).

On appeal, Defendants challenge the evidentiary sufficiency underlying the trial court's factual findings supporting its conclusion that "[t]he proffered statements do not have circumstantial guarantees of trustworthiness." I address each challenged finding in turn.

*a. Factual Findings nos. 15 & 20*

Factual findings 15 and 20, which address the trial court's consideration of "assurances of the [children's] personal knowledge of the underlying events," *Triplett*, 316 N.C. at 10, 340 S.E.2d at 742, state as follows:

> 15. The children's statements did not describe actual knowledge of the events surrounding the homicide of Jason Corbett. Jack identified the source of the information in his statements by saying "my mom told me" and "she (defendant Molly Corbett) told us." Sarah similarly described the source of her knowledge, saying the her grandmother "told [me] first and then her mother [told me]." When speaking of her "grandmother," Sarah was referring to the mother of defendant Molly Corbett and the wife of defendant Thomas Martens.
>
> . . . .
>
> 20. The statements of the children which the defense proffers were not made out of the personal knowledge of the declarant children but are instead double hearsay declarations of the defendant Molly Corbett and her mother.

These findings of fact are supported by the narrative of the DSS Interviews

and the transcript of the Dragonfly House Interviews.  The DSS Interview narrative notes, "Sarah states her father screams and yells and states when her mom and dad goes into the room her dad hurts her mom.  She stated her mom told her."  The narrative also notes, "Sarah stated her mom told her when she was about six or seven that her dad hurt her mom."

In Reagan's Dragonfly House Interview with Sarah, Reagan told Sarah, "I want you to think about that day and tell me as much as you can possibly remember about that day when your dad died."  Sarah responded,

> And then so in the nighttime at night, I was sleeping normally, and then this guy came upstairs I didn't know who it was.  It was actually an officer.  And me, my grandma and my brother were shut downstairs.

Later on, Sarah explained that on the night of the altercation, she fell asleep on the couch.  Then, "my mom brought me up [to bed] – either my mom or my dad, I don't know."  The following exchange then took place:

> [Reagan]:  All right.  So then the next thing you told me was that you were sleeping, and the next thing you know, a guy came into the room, and he was an officer, and it was about 4 a.m.
>
> [Sarah]: Um-hmm.  Yeah, and all I knew - at first I thought he was my grandpa, and then I thought it was my bald - but I didn't have a bald grandpa, but I thought my grandpa got bald for some reason.  And then I knew it was an officer.

Reagan questioned Sarah about any violence she had witnessed between Molly and Jason prior to the evening of Jason's death.  Sarah stated that Jason would hurt Molly.  When asked if Sarah saw Jason hurt Molly, Sarah said, "No, not really ever,

but one time I saw him step on her foot." Reagan followed up by asking, "So when you said that he would fight with her and he would hurt her, you said you didn't really see it, how would you know about it?" Sarah responded, "Because, um, my mom told me."

When Sarah was explaining how she knew what transpired during the fatal altercation, she said, "my grandma told me at first, because she said – she said, like – she said that, like, um, they were having a fight, and then grandpa went upstairs." Reagan then asked, "At any time during the night, did you wake up or hear anything that was going on that night?" Sarah responded, "No. I don't know what happened because I had – I was just being a hard sleeper that night."

Later in the interview, the following exchange took place:

> [Reagan]: Okay. What would happen when you do wake up during the night?
>
> [Sarah]: I would go downstairs because I usually had a nightmare. But I think what caused my dad being really mad that night was because, um, my mom kept on coming upstairs because I - like I have fairies on my bed, and I really get scared of those things, because they like look like spiders and lizards on my bed. So that's why my mom had to keep on coming up. I couldn't fall asleep until my mom put another sheet on my bed, and then my dad got mad.
>
> [Reagan]: Okay. So you told me that you had fallen asleep downstairs and someone carried you upstairs. Did you wake up at any point after that?
>
> [Sarah]: Nope.

> [Reagan]: Okay. So you said your mom had to put another sheet on. How did you know that?
>
> [Sarah]: Because before I went to sleep, she - because I woke up, like, in the middle – like not in the middle, but like – I'm sorry I said that I didn't wake up.

In Reagan's interview with Jack, Reagan asked him, "How did your dad die?"

Jack responded:

> Okay. Well, my sister had a nightmare about insect crawling – she had fairy blankets and insects all over her bed. That was a nightmare, though. And my dad got very mad, and he was screaming at our mom, and my mom screamed, and my grandpa came up and started to hit him with a bat. And then my dad grabbed hold of the bat – grabbed – held the bat and hit my grandpa with the bat, until my mom put a – put – we were going to paint a brick that was in there, like a cinder block, and it hit his temple, right here, and he died.

When Reagan followed up by asking, "Um, now you said your sister had a nightmare. How did you know that?" Jack responded, "My parents – my mom told me." When asked on several occasions to recount details about Jason's alleged prior behavior, Jack could not remember details, admitted he "[didn't] actually remember[,]" or stated that he knew about an event because his mom or grandma told him. At the end of the interview, Reagan asked, "And just to make sure I understand, how did you find out that your mom hit [your dad] with a brick and your grandpa hit him with a bat?" Jack responded, "She told me."

These exchanges provide competent evidence to support the factual findings that the children's "statements did not describe actual knowledge of the events

surrounding the homicide of Jason" and "were not made out of the personal knowledge of the declarant children but are instead double hearsay declarations of the defendant Molly Corbett and her mother."

b. *Factual Finding no. 21*

Factual finding 21, which addresses the trial court's consideration of "the [children's] motivation to speak the truth or otherwise," *Triplett*, 316 N.C. at 10-11, 340 S.E.2d at 742, states as follows:

> 21. These same statements were not made at a time when the children were motivated to speak the truth but were rather motivated to affect future custody arrangements - specifically the children feared that they were going to be "taken away from their mother" and removed to another country by their father's relatives.

The Dragonfly House Interviews were set up on 3 August—the same day the DSS Interviews took place—by the Davidson County DSS and Child Protective Services. Molly was not permitted to be present at the Dragonfly House Interviews, but she signed a consent form allowing the interviews to be conducted. Between 3 and 6 August, Sarah and Jack stayed in Molly's brother's home in Union County with their grandmother, Sharon—Molly's mother and Tom's wife. During that time, Molly spent time with the children while actively pursuing custody of them—filing petitions for guardianship and stepparent adoption on 4 August, and obtaining an ex parte temporary custody order on 5 August based on her allegation that Jason's sister was coming to the United States to take the children back to Ireland with her.

*COLLINS, J., concurring in part and dissenting in part.*

On the morning of 6 August, a funeral service was held for Jason. The children attended the service with Molly and Sharon. Immediately following the service, Sharon drove Sarah and Jack to the interview at the Dragonfly House. Reagan was apparently unaware that Jason's funeral service had been held that morning until Jack told her as much near the end of his interview.

Sarah indicated to Reagan that she had "heard people talk about my aunt trying to come get us, trying to come get me and my brother. . . . And that's why at the funeral, I had to (indiscernible) my mother – my mom's hand the whole time." Reagan clarified, "You had to hold your mom's hand the whole time?" Sarah responded, "Yes."

Reagan asked Jack, "And you said that your aunt and uncle want custody of you. How did you learn that?" Jack replied, "My mom and my grandma told me." Reagan asked, "What did they say?" Jack responded, "They said, Jack, at the service they're going to try to take you away. They're trying to get you and Sarah and trying to get all of your dad's stuff and bring him back to Ireland for a funeral."

The unique circumstances under which these interviews took place fully support the trial court's finding that Sarah and Jack's statements "were not made at a time when [they] were motivated to speak the truth but were rather motivated to affect future custody arrangements" in that "the children feared that they were going to be 'taken away from their mother' and removed to another country by their father's

relatives."

### c. Factual Finding no. 22

Factual finding 22, which addresses the trial court's consideration of whether the children ever recanted the statements, *Triplett*, 316 N.C. at 11, 340 S.E.2d at 742, states as follows:

> 22. The statements of the children that are offered by the defense as pertinent to the relationship between Molly Corbett and Jason Corbett have been specifically recanted. Sarah Corbett . . . recanted her statements in diary entries made after her return to Ireland. Jack Corbett recanted his statements in diary entries and during a recorded interview with members of the District Attorney's Office.

To undermine the trustworthiness of the statements made by Sarah and Jack, the State proffered a 27 May 2016 videotaped Skype interview of Jack that occurred in the home of Tracy and David Lynch[10] in Ireland and was conducted by a Davidson County District Attorney, as well as copies of journal entries allegedly written by Sarah and Jack dating from January to March 2017.

During Jack's videotaped Skype interview, he stated that Molly told Sarah and him what to say during their forensic interviews while Molly and their grandmother were driving the children to the Dragonfly House on 6 August 2015. Jack stated that Molly told them what happened during the fatal altercation, about Jason choking her and Tom coming upstairs to defend her with a bat, and "to tell the DA." Jack also

---

[10] Tracy Lynch, Jason's sister, and her husband David are Sarah and Jack's aunt and uncle, and were awarded custody of the children after Jason's death.

stated that Molly was "making up . . . stories about [Jason], saying that he was abusive, and she started saying if you don't lie [she would] never see [us] again." Jack further explained that Molly "was telling [Sarah and him] to say that [Jason] was abusive and saying that he was very mean to Molly." Jack stated, "I didn't tell the truth at Dragonfly. I didn't tell the truth [during the DSS Interview]."

Sarah's diary entries include statements indicating that Molly had told Jack and her to say that Jason hit and yelled at Molly; that Molly would punch herself; that Molly told her that Jason had killed Sarah's mom by putting a pillow over her mouth; and that Molly punched Jack. To the extent that Sarah had personal knowledge of violent episodes between Jason and Molly, the entry that Molly had told Jack and her to say that Jason hit and yelled at Molly tends to recant Sarah's prior assertion.

Thus, this evidence supports the trial court's finding of fact that the children's statements at the DSS and Dragonfly House Interviews "that are offered by the defense as pertinent to the relationship between Molly Corbett and Jason Corbett have been specifically recanted."

As the findings of fact are supported by competent evidence, they are thus conclusive and binding on appeal. *Brown*, 339 N.C. at 438, 451 S.E.2d at 189 (quotation marks and citation omitted). "This holds true even if evidence exists from which a different conclusion could have been reached." *Id.* (quotation marks and

citation omitted).

Based on these findings, the trial court made the following conclusions:

> 11. The court is not assured of the personal knowledge of the declarants as to the underlying events described in that both children identified the source of their knowledge being nothing more than statements of a defendant and that defendant's mother. The declarations contain no reference to seeing, hearing or perceiving anything about the events described except these statements of others.
>
> 12. The court is not assured of the children's motivation to speak the truth, but instead finds the children were motivated, in the near immediate aftermath of the death of their father, to preserve a custody environment with the only mother-figure they could remember having known during their lives. The children appear to have known that if they were not in the custody of defendant Molly Corbett they would be taken to live in the Republic of Ireland with relatives of their father.
>
> 13. The proffered statements were specifically recanted and disavowed.
>
> 14. The proffered statements do not have circumstantial guarantees of trustworthiness. Further, this court having concluded the statements are not trustworthy, the court need not continue to the additional prongs of the Smith analysis.

The findings support the trial court's conclusions of law, including the conclusion that "[t]he proffered statements do not have circumstantial guarantees of trustworthiness." Based on the record before this Court, the trial court's determination that the children's statements were not admissible under Rule 803(24) was not "manifestly unsupported by reason" or "so arbitrary that it could not have

been the result of a reasoned decision." *Rollins*, 224 N.C. App. at 199, 734 S.E.2d at 635 (quotation marks and citation omitted). Accordingly, the trial court did not abuse its discretion in determining that the children's statements were not admissible under Rule 803(24) and excluding the statements as inadmissible hearsay.

*C. Instances of Jason's Anger and Violent Character*

Although I conclude the trial court did not err in excluding the children's statements, I nonetheless address Tom's argument that "the trial court erred in excluding the statements . . . because they offered instances of Jason's anger and violent character."

Evidence of an individual's character is generally inadmissible to prove he "acted in conformity therewith on a particular occasion[.]" N.C. Gen. Stat. § 8C-1, Rule 404(a) (2017). A criminal defendant may, however, introduce evidence of a victim's pertinent character traits. N.C. Gen. Stat. § 8C-1, Rule 404(a)(2). Nonetheless, "[w]hether character evidence is admissible under Rule 404(a)(2) is merely a threshold inquiry, separate from the determination of the method by which character may be proved, which is governed by Rule 405." *State v. Bass*, 371 N.C. 535, 543, 819 S.E.2d 322, 327 (2018). "Under Rule 405, character may be demonstrated by evidence of specific instances of conduct only in cases 'in which character or a trait of character of a person is an essential element of a charge, claim, or defense.'" *Id.* (quoting N.C. Gen. Stat. § 8C-1, Rule 405(b)). "Otherwise, character

may be proved only 'by testimony as to reputation or by testimony in the form of an opinion.'" *Id.* (quoting N.C. Gen. Stat. § 8C-1, Rule 405(a)).

"Although under Rule 404(a)(2), evidence of a violent character is admissible to prove circumstantially that the victim was the aggressor, Rule 405(b) limits the method by which that fact may be proved." *Bass*, 371 N.C. at 544, 819 S.E.2d at 327. "[W]ith regard to a claim of self-defense, the victim's character may not be proved by evidence of specific acts." *Id.*[11]

At trial, Tom argued that the excluded statements "were primarily being offered on the issue of who was the aggressor . . . ." Tom further offered, "in particular, Jack's statements about what he saw and what he witnessed and what he heard, as well as Sarah's, . . . that that would be relevant to the issue of aggressor." However, with regard to Tom's claim of self-defense and defense of others, evidence of Jason's specific acts may not be used to prove circumstantially that Jason was the aggressor. *Id.* at 544, 819 S.E.2d at 327. Accordingly, the trial court's exclusion of the children's statements regarding Jason's prior violent behavior was not erroneous.

### 3. *Aggressor Doctrine*

---

[11] *Bass* was decided by our Supreme Court during the pendency of this appeal and overruled this Court's decision in *State v. Bass*, 253 N.C. App. 754, 802 S.E.2d 477 (2017), wherein we stated that "[e]vidence of specific instances of a victim's character, known or unknown to the defendant at the time of the crime, may be relevant in establishing that the victim was the aggressor when defendant claims self-defense[,]" *id.* at 768, 802 S.E.2d at 485-86 (emphasis, quotation marks, and citation omitted), and held that defendant was entitled to present evidence of specific instances of conduct which demonstrated the victim's violent behavior under Rule 405(b). *Id.* at 768, 802 S.E.2d at 486.

Tom next argues that the trial court erred by instructing the jury on the aggressor doctrine as to his claims of self-defense and defense of others because there was no evidence that Tom was the aggressor.

A properly preserved objection to the trial court's jury instructions is reviewed de novo on appeal. *State v. Hope*, 223 N.C. App. 468, 471, 737 S.E.2d 108, 111 (2012). Under de novo review, this Court considers the matter anew and is free to substitute its judgment for that of the trial court. *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008).

A trial court's jury instructions should be "a correct statement of the law and . . . supported by the evidence." *State v. Conner*, 345 N.C. 319, 328, 480 S.E.2d 626, 629 (1997). The aggressor doctrine provides that a defendant may not receive the benefit of self-defense if he was the aggressor. *State v. Juarez*, 369 N.C. 351, 358, 794 S.E.2d 293, 300 (2016). Likewise, a defendant may not receive the benefit of defense of others if he was the aggressor. *See State v. Phifer*, 165 N.C. App. 123, 129, 598 S.E.2d 172, 176 (2004) ("The elements of self-defense are applicable to the defense of others."). Furthermore, "[a] person is entitled under the law of self-defense to harm another only if he is without fault in provoking, engaging in, or continuing a difficulty with another." *State v. Effler*, 207 N.C. App. 91, 98, 698 S.E.2d 547, 552 (2010) (internal quotation marks and citations omitted). An individual is the aggressor if he or she "aggressively and willingly enters into a fight without legal excuse or

provocation." *State v. Wynn*, 278 N.C. 513, 519, 180 S.E.2d 135, 139 (1971). Moreover, "even if his opponent starts a fight, a defendant who provokes, engages in, or continues an argument which leads to serious injury or death may be found to be the aggressor." *State v. Lee*, 258 N.C. App. 122, 126, 811 S.E.2d 233, 237 (2018) (citations omitted).

"[W]hen reviewing a trial court's denial of a defendant's request to exclude the aggressor instruction from the jury instruction on self-defense, the appellate court does not consider the evidence in a light favorable to the defendant, as it is the province of the jury to resolve any conflict in the evidence in that regard." *Id.* at 127, 811 S.E.2d at 237 (citations omitted). Thus, where conflicting evidence was presented as to which party was the initial aggressor when a person claims self-defense, instructing the jury on the aggressor doctrine is proper. *See, e.g., State v. Cannon*, 341 N.C. 79, 83, 459 S.E.2d 238, 241 (1995) ("On the evidence before it, the trial court properly allowed the triers of fact to determine that defendant was the aggressor."); *State v. Terry*, 329 N.C. 191, 199, 404 S.E.2d 658, 662-63 (1991) ("Although defendant's evidence does not support the aggressor instruction, the State's evidence supports it. By instructing jurors on the aggressor qualification, the trial court allowed the triers of fact to determine which testimony to believe.").

Tom argues that "the only accounts given of the incident leading to [Jason's] death were [Tom's] testimony, and [Molly's] written statement. No contradictory evidence was introduced by the State." In his brief, Tom recites as follows:

> [Tom] describes being awakened in the middle of the night by a commotion upstairs. He proceeded upstairs in his underwear and shirt, carrying a bat for protection in anticipation of a potential confrontation. Once he ascertained that the commotion originated from his daughter's bedroom, he entered to find [Jason] strangling [Molly]. [Tom] testified about what he saw when he entered the bedroom, his initial fear that [Jason] would kill [Molly] and his stated intention to do just that. He testified about his fear that [Jason] would kill him after he wrestled the bat from [Jason's] grasp. Finally, he testified about his fear after regaining control of the bat that [Jason] would continue to try to kill both [Molly] and him if he did not take action.

The State argues, however, that the circumstantial and physical evidence contradicts Molly and Tom's testimonial evidence, thus allowing the jury to conclude that Molly and Tom's version of events was not true. The State specifically argues that "the comparison o[f] the injuries to Jason (extreme) and the injuries to the two Defendants (none apparent or shown)" was sufficient evidence to support the aggressor instruction.

Jason suffered multiple blunt force injuries, including "ten different areas of impact on the head, at least two of which had features suggesting repeated blows indicating a minimum of [twelve] different blows to the head. Additionally, he had a few other injuries elsewhere on his body, the torso and extremities." On the other

hand, while Alphin and Bent observed redness on the left side of Molly's neck, Dillard observed Molly "rubbing her neck . . . in a scrubbing motion-type thing" and Young testified that he saw Molly "continually tug[] and pull[] on her neck with her hand." This evidence could allow a jury to conclude that the redness on Molly's neck was self-inflicted and not a result of Jason's strangulation. Tom had no visible injuries.

While the disparity of the injuries in this case does not provide direct evidence that Tom was the initial aggressor, it provides evidence from which the jury could determine that Molly and Tom's version of events was not true. *See State v. Mumma*, 372 N.C. 226, 242, 827 S.E.2d 288, 298 (2019) (concluding that defendant could not show that, absent instructions on the aggressor doctrine, the jury would not have rejected his claim of self-defense where "the record contains no physical evidence tending to validate defendant's otherwise unsupported claim to have acted in self-defense and does contain substantial physical evidence tending to undercut his self-defense claim including, but not limited to, the evidence that [the victim] sustained defensive wounds to her hand, that she had sustained stab wounds that had been inflicted from the rear, and that the wounds that defendant sustained were much less severe than the wounds that had been inflicted upon [the victim]"); *State v. Presson*, 229 N.C. App. 325, 330, 747 S.E.2d 651, 656 (2013) ("Further, the lack of injuries to defendant, compared to the nature and severity of the wounds on [the victim] at his

death, is sufficient evidence from which a jury could find that defendant was the aggressor . . . .").

Moreover, the State presented the following evidence: (1) one of Jason's head wounds was inflicted after he was dead; (2) the blood spatter indicated that Jason's head was struck as it was descending and/or was near the ground; (3) the toxicology report from Jason's body showed the presence of the drug Trazodone, which induces sleep; (4) Jason was naked and unarmed when the altercation occurred in his bedroom at 3:00 am; (5) the children, who were sleeping in their bedrooms up the stairs from Jason and Molly's bedroom, were undisturbed; (6) EMS and law enforcement responders noticed upon their arrival that some of the blood on Jason's body had dried; (7) one paramedic testified that Jason's body felt cool, and asked another paramedic, "How long did you say they waited before they called 911[?]"; (8) Tom told a co-worker he hated Jason.

Although the evidence could allow a jury to determine that Tom armed himself with a baseball bat when he heard a commotion on the floor above, and came to Molly's defense when he saw Jason choking her,[12] the evidence could also allow a jury to determine that Tom armed himself with a baseball bat and aggressively and willingly entered into the fight with Jason without legal excuse or provocation. As

---

[12] Tom correctly notes, "In this case, all the evidence and testimony entitled [Tom] to a jury instruction on self-defense." Such instruction is not at issue here.

conflicting evidence was presented as to whether Tom was the initial aggressor, the trial court did not err in instructing the jury on the aggressor doctrine as to Tom.

## 4. *Blood Spatter Expert Testimony*

Defendants next argue that the trial court erred by admitting into evidence certain testimony by the State's blood spatter expert, Stuart James. Specifically, Defendants argue that the testimony regarding stains on the underside of the hem of Tom's boxer shorts should have been excluded as unreliable under North Carolina Evidence Rule 702(a) because it was not "the product of reliable principles and methods reliably applied to the facts of the case[.]"

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion . . . ." N.C. R. App. P. 10(a)(1). "To be timely, an objection to the admission of evidence must be made at the time it is actually introduced at trial." *State v. Ray*, 364 N.C. 272, 277, 697 S.E.2d 319, 322 (2010) (quotation marks and citations omitted). "An objection made only during a hearing out of the jury's presence prior to the actual introduction of the testimony is insufficient." *State v. Snead*, 368 N.C. 811, 816, 783 S.E.2d 733, 737-38 (2016) (internal quotation marks and citation omitted). Moreover, "[t]he admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character." *State v. Walters*, 357 N.C. 68, 104, 588 S.E.2d 344, 365 (2003) (internal quotation marks and citations omitted).

*COLLINS, J., concurring in part and dissenting in part.*

During James' voir dire examination, Defendants objected to James' conclusions that the stains on Tom's boxer shorts were impact blood spatter arising from blunt force strikes to Jason's head while he was on the ground as unreliable because (1) those particular stains never underwent blood testing, presumptive or confirmatory, so James could not state with scientific certainty that they were blood; (2) James never viewed a photograph of Tom wearing the boxer shorts, so he could not state with certainty the position of Tom's body when those stains occurred; and (3) James based his conclusions that the stains were "very characteristic of blood spatter" and "likely created during the same event" as the confirmed blood stains on the shorts based solely on his visual observation of "their location, size, shape[,] and distribution." The trial court overruled Defendants' objections, concluding that James' testimony was based on sufficient facts and data, was the product of reliable principles and methods with which he is familiar and with which others in his field are familiar, and that James had applied those principles to the facts.

At trial, James testified without objection as follows:

> With respect to the small spatters on the front underside of the left leg of the shorts, these were consistent with the wearer of the shorts close to and above the source of the spattered blood. To what extent, I can't really say. In order for the stains to get to that location on the inside of the leg, they would have to be traveling, you know, at least somewhat upward in order to do that. My conclusion there was the source of the impact spatters is most likely the head of Jason Corbett while it was close to the floor in the bedroom.

Although Defendants objected on reliability grounds during voir dire to the introduction of James' challenged testimony, Defendants failed to object to the testimony when it was elicited by the State at trial. As Defendants did not object when the State elicited the testimony before the jury, Defendants failed to preserve the alleged error for appellate review. *Snead*, 368 N.C. at 816, 783 S.E.2d at 738. Moreover, the unchallenged admission of James' testimony "waive[d] prior or subsequent objection to the admission of evidence of a similar character." *Walters*, 357 N.C. at 104, 588 S.E.2d at 365.

Furthermore, because Defendants failed to specifically and distinctly allege plain error in their briefs, they have waived their right to have this issue reviewed on appeal under the plain error standard. *See* N.C. R. App. P. 10(a)(4); *State v. Joyner*, 243 N.C. App. 644, 648, 777 S.E.2d 332, 335 (2015). Accordingly, Defendants' argument should be dismissed.

### 5. *Fitzpatrick Statement*

Defendants next argue that the trial court erred by excluding a statement allegedly made to Tom by the late Michael Fitzpatrick, the father of Jason's deceased first wife, Margaret. Specifically, Defendants argue that the trial court erroneously determined the statement was inadmissible hearsay and erroneously concluded the statement should be excluded under Rule 403.

Tom sought to introduce a statement allegedly made to him by Fitzpatrick to help illustrate Tom's state of mind during the altercation. Tom offered in voir dire that in an interview he gave his employer on 20 August 2015, he related that he had asked Fitzpatrick at some point in time what he thought of Jason. Tom stated that his "memory was [Fitzpatrick] said, 'I think he killed my daughter.'" Tom further explained in the interview, "I don't know if that was a bitter man, he needed someone to blame for his daughter's death or he had any basis for this."

In response in voir dire, the State proffered the coroner's report "finding that Mr. Fitzpatrick's daughter had died of an asthma attack"; testimony from Jason's family of the good relations with Fitzpatrick; and a statement Fitzpatrick gave, before he passed away, to the Solicitor's Office in Ireland, averring, "I can also state categorically that we never discussed my daughter Margaret or the circumstances of her death nor did I inform [Tom] that Jason had killed my daughter Margaret. Such statements by [Tom] are totally and utterly untrue and mischievous." The State further argued that, despite the fact that Tom, a lawyer with 30 years' FBI experience, was interviewed by law enforcement about the incident on 2 August 2015 – the day the incident occurred and 18 days prior to the interview he gave his employer – and offered, "'perhaps it would be helpful if I just kind of launched into a story . . . because it will contribute to my state of mind[,]'" Tom did not mention Fitzpatrick's statement at that interview.

Tom's attorney responded in voir dire, "Just so we think it is relevant for state of mind, we do think we are not saying indeed that's what was heard. We are saying it was his state of mind . . . ."

In ruling on the admissibility of Fitzpatrick's statement, the court announced:

> All right. I have carefully considered the alleged statement of Mr. Fitzpatrick with respect to the cause of Margaret Corbett's death. I have considered the totality of the circumstances relating to this hearsay statement. The self-serving nature of it, and in my discretion I have determined under Rule 403 that the probative value of this evidence substantially is outweighed by the danger of unfair prejudice, confusion of the issues[,] and misleading to the jury, so I will not permit the statement of Mr. Fitzpatrick through [Tom].

*A. Hearsay Determination*

Tom first argues that the trial court erred as a matter of law in concluding that Mr. Fitzpatrick's statement was hearsay as the statement was not being offered to prove the truth of the matter asserted but was instead being offered to show Tom's state of mind. Tom misinterprets the court's ruling.

Although in announcing its ruling the trial court referred to "this hearsay statement[,]" the plain language of the court's ruling indicates that the trial court did not exclude Fitzpatrick's statement under Rule 802 because it was hearsay,[13] but instead excluded the statement, in its discretion, after conducting a balancing test

---

[13] "Hearsay is not admissible except as provided by statute or by these rules." N.C. Gen. Stat. § 8C-1, Rule 802.

under Rule 403. Had the court concluded the statement was hearsay, and excluded it as such, it would not have engaged in a 403 balancing test. *See State v. Brown*, 335 N.C. 477, 486-87, 439 S.E.2d 589, 595 (1994) ("Assuming, *arguendo*, that the statements were not hearsay and that they had relevance when presented in this manner, we note that they are still subject to exclusion if their 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" (quoting N.C. Gen. Stat. § 8C-1, Rule 403 (1992)).

*B. 403 Balancing*

Tom further argues that the trial court erroneously excluded the statement under Rule 403 because the court "fundamentally misunderstood the highly probative purpose for which it was offered." (Original in all capital letters). "Despite [Tom's] several clarifications that the [] [s]tatement was offered for state of mind and not to prove its truth," the argument continues, "the trial court incorrectly concluded that the statement was hearsay." "The trial court then excluded the testimony under Rule 403, concluding that potential for prejudice, confusion of the issues, and misleading the jury outweighed the probative value of the testimony." Tom thus concludes, "Such a conclusion indicates that the trial court did not understand the testimony would be offered for non-hearsay purposes."

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2017). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." N.C. Gen. Stat. § 8C-1, Rule 403 (2017). The trial court's decision to exclude evidence under Rule 403 is reviewed on appeal for abuse of discretion. *State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008). An abuse of discretion results only when "the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* (quotation marks and citations omitted).

The substance of Tom's argument concerning the trial court's Rule 403 analysis repeats and amplifies his argument that the trial court erred in concluding the statement was hearsay. However, as indicated above, the trial court did not exclude Fitzpatrick's statement under Rule 802 because it was hearsay, but instead excluded the statement, in its discretion, after conducting a balancing test under Rule 403.

The trial court could reasonably have concluded that the statement was only weakly, or not at all, probative of Tom's fear and apprehension of Jason. According to Tom's own explanation, Fitzpatrick's statement had little, if any, effect on Tom's fear and apprehension of Jason where Tom himself questioned the veracity and basis of the statement. Additionally, in the 2 August 2015 interview, when Tom was forthcoming with a detailed explanation of the events leading up to and including the

altercation "'because it will contribute to my state of mind[,]'" Tom's omission of Fitzpatrick's statement further indicates the statement had little, if any, effect on Tom's state of mind as to his fear and apprehension of Jason. On the other hand, given the nature of the accusation that Jason killed his first wife, the trial court could have concluded there was a strong danger of unfair prejudice and confusion of the issues.

The record shows that the trial court conducted a lengthy voir dire hearing on the admissibility of the evidence, weighed the probative value of the evidence against the possibility of unfair prejudice, and specifically found that "the probative value of this evidence substantially is outweighed by the danger of unfair prejudice, confusion of the issues[,] and misleading to the jury[.]" The trial court's ruling was not "manifestly unsupported by reason" or "so arbitrary that it could not have been the result of a reasoned decision[,]" *id.*, and thus, the trial court properly exercised its discretion in excluding Fitzpatrick's statement. *See State v. McCray*, 342 N.C. 123, 131, 463 S.E.2d 176, 181 (1995).

### 6. *Molly's Statement*

Defendants next argue that the trial court erred by striking Tom's testimony that he heard Molly scream, "Don't hurt my dad[,]" during the altercation. Citing *State v. Everett*, 178 N.C. App. 44, 630 S.E.2d 703 (2006), Defendants argue that Molly's statement was offered to illustrate the reasonableness of Tom's fear and

apprehension of Jason—a necessary element of self-defense and defense of others—and was not inadmissible hearsay.

Even assuming, *arguendo*, that the trial court erred by sustaining the State's objection, Tom cannot show that he was prejudiced by the error.

> A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.

N.C. Gen. Stat. § 15A-1443(a) (2017).

Tom testified in detail about the altercation prior to when he heard Molly scream. During this testimony, he indicated three separate times that he was scared. Immediately prior to the stricken testimony, Tom testified that Jason had just shoved him across the bed. Tom then testified, "And that's -- you know, if I can get any more afraid, that was it."

Tom had already testified about circumstances illustrating the reasonableness of his fear and apprehension, and Molly's statement—made after the altercation had been well underway—was of mild, if any, additional value. Defendants' bare assertion on appeal that the "error significantly prejudiced" them does not meet their burden of showing "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." *Id.*

**7. *Acting in Concert***

*COLLINS, J., concurring in part and dissenting in part.*

Molly argues that the trial court erred by instructing the jury on the criminal liability theory of acting in concert. Molly further argues that the trial court's acting in concert instruction was incomplete and misleading, and thus prejudicially erroneous, because the trial court failed to provide the parenthetical explanation on the "mere presence" component of acting in concert.

*A. Acting in Concert Charge*

Molly argues the trial court erred by instructing the jury on acting in concert because there was no evidence that she shared a common plan or purpose with Tom to kill Jason.

As a threshold matter, I first address the State's argument that this issue has not been properly preserved for appellate review because, although Molly objected at the charge conference to the acting in concert instruction, Molly "failed to renew the objection" "after the jury charge was completed[.]"

However, "[o]ur Supreme Court has held, and we reiterate, that when a party has objected to proposed jury instructions during a charge conference, and the trial court has considered and denied the request, that the party need not repeat its objections after the jury charge is given." *Wilson v. Burch Farms, Inc.*, 176 N.C. App. 629, 633, 627 S.E.2d 249, 254 (2006) (citing *Wall v. Stout*, 310 N.C. 184, 188-89, 311 S.E.2d 571, 574 (1984)). Therefore, by objecting to the proposed acting in concert instruction at the charge conference and receiving a ruling on her objection, Molly

has properly preserved this issue for appeal. We review a properly preserved challenge to the trial court's decision regarding jury instruction de novo. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009).

"The trial court must instruct the jury on the law arising on the evidence." *State v. Simpson*, 230 N.C. App. 119, 123, 748 S.E.2d 756, 760 (2013) (quotation marks and citation omitted). In order to support a jury instruction on acting in concert, the State must present sufficient evidence that the defendant was "present at the scene of the crime" and acted "together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime." *State v. Joyner*, 297 N.C. 349, 357, 255 S.E.2d 390, 395 (1979). Thus, "[o]ne of the essential elements of acting in concert is that there is evidence of a common plan or purpose." *State v. Williams*, 299 N.C. 652, 657, 263 S.E.2d 774, 778 (1980).

While "[i]t is not . . . necessary for a defendant to do any particular act constituting at least part of a crime in order to be convicted of that crime under the concerted action principal[,]" *Joyner*, 297 N.C. at 357, 255 S.E.2d at 395, "[e]vidence that a defendant did some act forming a part of the crime charged, when considered together with evidence that others also did acts leading to the crime's commission, strongly indicates that the defendant was acting in concert with others to commit the crime charged." *State v. Diaz*, 317 N.C. 545, 547, 346 S.E.2d 488, 490 (1986).

Moreover, evidence that a defendant was engaged with another pursuant to a common plan or purpose may be found from the circumstances in which the incident occurred. *State v. Kaley*, 343 N.C. 107, 110, 468 S.E.2d 44, 46 (1996).

The altercation took place in Molly's bedroom at approximately 3:00 am when Jason was naked and unarmed. It is undisputed that Molly was present at the scene while Tom repeatedly hit Jason in the head with a baseball bat. During this time, by her own admission, Molly tried to hit Jason in the head with a brick, and the evidence supports a finding that Molly did in fact hit Jason in the head with a brick. This is evidence from which the jury could conclude that Molly and Tom were engaged in a common plan or purpose. Accordingly, the trial court did not err by instructing the jury on acting in concert.

*B. Delivery of Acting in Concert Charge*

Molly further contends that the trial court's acting in concert instruction was prejudicially erroneous because the trial court failed to instruct that "[a] defendant is not guilty of a crime merely because the defendant is present at the scene[.]"

The pattern jury instruction for acting in concert reads as follows:

> For a defendant to be guilty of a crime, it is not necessary that the defendant do all of the acts necessary to constitute the crime. If two or more persons join in a common purpose to commit (*name crime*), each of them, if actually or constructively present, is guilty of the crime (and also guilty of any other crime committed by the other in pursuance of the common purpose to commit (*name crime*), or as a natural or probable consequence thereof.)

> (A defendant is not guilty of a crime merely because the defendant is present at the scene, even though the defendant may silently approve of the crime or secretly intend to assist in its commission. To be guilty the defendant must aid or actively encourage the person committing the crime, or in some way communicate to another person the defendant's intention to assist in its commission.)

N.C.P.I.—Crim. 202.10 (2017) (footnotes omitted). "While not mandatory, these instructions serve as a guide for judges on how a jury should be instructed concerning a particular crime." *State v. Lineberger*, 115 N.C. App. 687, 691, 446 S.E.2d 375, 378 (1994). Moreover, "[o]ptional language is contained in parentheses. The optional parenthetical phrases should be given only when warranted by the evidence." N.C.P.I. Introduction, III. User's Guide, *Use of Brackets, Parentheses, and Type Styles* (June 2016).

Again, the evidence shows that Tom hit Jason in the head with a baseball bat. Molly admitted that she tried to hit Jason in the head with a brick, and the evidence supports a finding that Molly did in fact hit Jason in the head with a brick. Thus, the evidence did not show that Molly was "merely" present at the scene but instead showed that Molly actually aided Tom at the scene. As the optional parenthetical instruction on "mere presence" was not warranted by the evidence, it was not erroneously omitted. Moreover, given the evidence that Molly was not "merely" present at the scene, even if the trial court had erroneously omitted the "mere presence" instruction, Molly cannot show that "there is a reasonable possibility that,

had the error in question not been committed, a different result would have been reached at the trial . . . ." N.C. Gen. Stat. § 15A-1443(a); *see State v. Malachi*, 371 N.C. 719, 738, 821 S.E.2d 407, 421 (2018) (applying the harmless error standard to an alleged error in a jury instruction).

### 8. *Cumulative Error*

Tom next argues that, should this Court conclude that no single error was prejudicial, the cumulative effect of the errors nevertheless was sufficiently prejudicial to require a new trial. "Cumulative errors lead to reversal when 'taken as a whole' they 'deprived [the] defendant of his due process right to a fair trial free from prejudicial error.'" *State v. Wilkerson*, 363 N.C. 382, 426, 683 S.E.2d 174, 201 (2009) (quoting *State v. Canady*, 355 N.C. 242, 254, 559 S.E.2d 762, 768 (2002)). Although Tom has contended to this Court that numerous errors were made during trial, I have found only one instance of potential error, which was nonprejudicial. This nonprejudicial error did not deprive Tom of his due process right to a fair trial.

### IV. **Conclusion**

I conclude that Defendants received a fair trial, free from prejudicial error.